Exhibit 6

```
 1                                              1

 2    UNITED STATES DISTRICT COURT

 3    EASTERN DISTRICT OF NEW YORK

 4    ------------------------------------------x

 5    MICHAEL RAKEMAN, BRIAN SCHIELE, LUIS DELGADO,

 6    ROBERT TOLLIN, WILLIAM MCCUTCHAN, JOHN NELSON

 7    FENRICH and KEVIN BLANEY,

 8                      Plaintiffs,

 9                           Civil Index No:
                             16CV00453(JFB)(GRB)
10           - against -

11    MLD MORTGAGE INC. and LAWRENCE DEAR,

12                      Defendants.

13    ------------------------------------------x

14                      129 Third Street
                        Mineola, New York
15
                        April 18, 2019
16                      10:15 a.m.

17

18

19           Deposition of Plaintiff,

20       BRIAN SCHIELE, before Diana

21       Mitchell, a Notary Public of the

22       State of New York.

23

24       Rich Moffett Court Reporting, Inc.
         114 Old Country Road, Suite 630
25            Mineola, New York 11501
                   516-280-4664
```

```
 1                                                    2

 2     A P P E A R A N C E S:

 3     NEIL H. GREENBERG & ASSOCIATES, P.C.

 4     Attorney for Plaintiffs

 5          4242 Merrick Road

 6          Massapequa, New York 11758

 7     BY:   JUSTIN REILLY, ESQ.

 8

 9

10     THE LAW OFFICE OF RAYMOND NARDO

11     Attorney for Defendants

12          129 Third Street

13          Mineola, New York 11501

14     BY:   RAYMOND NARDO, ESQ.

15

16

17     ALSO PRESENT:

18          KEVIN BLANEY

19          JOHN FENRICH

20

21

22

23

24

25
```

3

1

2

3              IT IS HEREBY STIPULATED AND

4          AGREED by and between the attorneys

5          for the respective parties herein,

6          that the filing, sealing and

7          certification of the within

8          deposition be waived.

9              IT IS FURTHER STIPULATED AND

10         AGREED that all objections, except

11         as to the form of the question,

12         shall be reserved to the time of

13         the trial.

14             IT IS FURTHER STIPULATED AND

15         AGREED that the within deposition

16         may be sworn to and signed before

17         any officer authorized to

18         administer an oath with the same

19         force and effect as if signed and

20         sworn to before the Court.

21

22                  - oOo -

23

24

25

```
 1                                                    4
 2      B R I A N      S C H I E L E,
 3      called as a witness, having been duly
 4      sworn by a Notary Public, was examined
 5      and testified as follows:
 6                *              *              *
 7      EXAMINATION BY
 8      MR. NARDO:
 9           Q      Please state your full name
10      for the record.
11           A      My name is Brian Schiele.
12           Q      What is your address?
13           A      I live at 37 Dogwood Lane,
14      Rockville Centre, New York 11570.
15           Q      Good morning, Mr. Schiele.
16           A      Morning.
17           Q      All right, this is a
18      deposition.  As I understand, you were
19      present here for most of Michael
20      Rakeman's deposition, correct?
21           A      Correct.
22           Q      So you know some of the
23      rules, but I will explain them to you
24      anyway.  I'm going to ask you questions
25      which you must answer.  If you don't
```

1                                                    5

2          understand the question, please tell me

3          that you don't understand it, I'll do the

4          best I can to rephrase it.

5                        If you don't know an answer

6          you can simply say that you don't know.

7                        Try to have your responses be

8          verbal for the sake of the court reporter

9          who is taking down my questions and your

10         answers and who will generate a

11         transcript when this process is finished.

12                        Try not to speak when I'm

13         speaking, and I will try to do the same.

14         Have you understood that?

15             A      Yes.

16             Q      Have you ever sat through a

17         deposition like this before?

18             A      No.

19             Q      Have you ever brought any

20         litigation before where you have either

21         sued someone or been sued?

22             A      Yes.

23             Q      How many?

24             A      One.  One time.

25             Q      What was that?

```
1                                            6
2          A       That was with another company
3    we worked for, Contour Mortgage, for the
4    same situation that we're here for today.
5          Q       So let me go through some of
6    your background.
7                   What is your date of birth?
8          A       June 16, 1980.
9          Q       Tell me your educational
10   experience after high school.
11         A       Graduated from Hobart College
12   in 2002.
13         Q       What was your degree in?
14         A       Economics.
15         Q       Did you pursue any
16   postgraduate studies?
17         A       No.
18         Q       Have you had any formal
19   classroom education since graduating from
20   Hobart in 2002?
21         A       No, if you count, like,
22   mortgage licensing classes, that's all.
23         Q       Where did you go to high
24   school?
25         A       Saint Anthony's High School.
```

*Rich Moffett Court Reporting, Inc.*

```
1                                                    7
2          Q      Here on Long Island?
3          A      Yes.
4          Q      And you consider yourself to
5    be sophisticated in the mortgage
6    business?
7          A      Yes.
8          Q      Do you consider yourself to
9    be sophisticated in business in general?
10         A      Somewhat, I would say, yes.
11         Q      And you consider yourself to
12   be an honest person?
13         A      Yes.
14         Q      And a truthful person?
15         A      Yes.
16         Q      And that reputation for
17   honesty and truthfulness is important to
18   you, correct?
19         A      Absolutely.
20         Q      It's important to you in
21   business, correct?
22         A      Yes.
23         Q      And it's also important to
24   you personally?
25         A      Absolutely.
```

*Rich Moffett Court Reporting, Inc.*

8

1
2          Q      Did you market to any
3    religious segment when you were working
4    at MLD?
5          A      What do you mean "religious
6    segment"?
7                 MR. NARDO:  Actually, let me
8          withdraw that.
9          Q      Do you practice a religion?
10         A      Yes.
11         Q      What religion is that?
12         A      I'm Catholic.
13         Q      You consider yourself to be a
14   practicing Catholic?
15         A      Yes.
16         Q      Did you ever market any
17   products at MLD to a Christian audience?
18         A      We've done marketing that I
19   would say would be to a Christian
20   audience, you know, in terms of different
21   maybe radio stations, but not just a
22   Christian audience.
23         Q      Did you ever place ads on
24   Christian radio stations?
25         A      Yes.

*Rich Moffett Court Reporting, Inc.*

9

1

2          Q      Other than those ads, did you

3    ever do any marketing at MLD that was

4    directed to a specific audience?

5          A      People would say maybe a

6    Christian audience depending on the radio

7    station, but we wouldn't target, like,

8    certain groups of people necessarily, no.

9          Q      So other than the Christian

10   audience that you attempted to reach from

11   the radio stations, do you recall trying

12   to reach any other specific type of

13   audience through any marketing at MLD?

14         A      Just people that would want a

15   mortgage.

16         Q      We'll come back to this.

17                After Hobart what was your

18   first job in the financial industry?

19         A      I worked for Ameriquest

20   Mortgage Company.

21         Q      When did you work for them?

22         A      I started right out of

23   college, so I think that would be

24   September of 2002, and I believe they

25   closed up in 2006.

*Rich Moffett Court Reporting, Inc.*

```
 1                                              10
 2          Q      All right.
 3                 At that time did you work
 4     with Michael Rakeman?
 5          A      Yes, I did.
 6          Q      When did you first meet
 7     Michael Rakeman?
 8          A      In, I believe, it was early
 9     2003.
10          Q      So when you met Michael
11     Rakeman, were both of you working at
12     Ameriquest?
13          A      Yes.
14          Q      Did you become friends?
15          A      Yes.
16          Q      Did you become business
17     partners at some point?
18          A      At some point down the road.
19          Q      So did Mr. Rakeman work with
20     you at Ameriquest through 2006?
21          A      Not necessarily, like,
22     together.  Different offices, for the
23     most part.
24          Q      What did you do for
25     Ameriquest?
```

```
                                                11
 1
 2        A      So I was originally -- they
 3   called it an accounting executive, same
 4   thing as, like, a loan officer, and then
 5   I became branch manager and then
 6   eventually became an area manager.
 7        Q      What were your duties as, I'm
 8   going to call it loan officer.  What were
 9   your duties as loan officer?
10        A      To originate refinance
11   transactions for residential homes.
12        Q      Was it limited to refinances?
13        A      Our sector, yes.  There was a
14   different purchase sector.
15        Q      And is loan officer the same
16   as mortgage loan officer, same as
17   mortgage loan originator?
18        A      Yes.  It wasn't called loan
19   originator then.
20        Q      But if I use those terms
21   throughout the course of this deposition,
22   you'll understand me to be referring to
23   the same position, correct?
24        A      Yes.
25        Q      So tell me what your duties
```

*Rich Moffett Court Reporting, Inc.*

12

1

2      were to originate refinance transactions

3      when you were at Ameriquest.

4          A      Okay, so you would you do

5      outbound calls to homeowners in your

6      region and ask them about refinancing.

7      Some of those calls would be cold calls,

8      some would be leads that would come

9      through the Internet, or at that time

10     they were faxed over as well, and you

11     would see how you can qualify them based

12     on their income, equity and benefits

13     along with credit.

14              Then you would, you know,

15     present the loan to them, gather up the

16     necessary documentation once they wanted

17     to move forward, submit the loan to

18     processing, underwriting and then the --

19     complete the transaction with a formal

20     closing.

21         Q      Did you attend the closings

22     normally?

23         A      At that time 50/50.

24         Q      Again, I'm specifically

25     asking about Ameriquest right now.

*Rich Moffett Court Reporting, Inc.*

13

A        Yup.

Q        You said there were some
leads that were generated through the, I
think you said, Internet?

A        Yes.

Q        Can you tell me about that?

A        So Ameriquest was a very,
very large company with a very strong
brand name, and people would go online
and they would fill out, you know, a
basic reach-out form if where they wanted
to be contacted and if that person was in
your designated area, that lead would
either get uploaded to your lead system
at that time, or prior to that it would
actually get faxed over from corporate.

Q        Where did you work physically
for Ameriquest?

A        I started in Islandia.  I
then got promoted to run a branch in
Syosset.  I then got -- I then got moved
to Babylon, then got promoted to run an
area in New England and then got moved
back to run Long Island.

*Rich Moffett Court Reporting, Inc.*

14

2      Q      When you were in Islandia,

3   approximately how many mortgage loan

4   officers were in that office?

5      A      Ten to twelve.

6      Q      I'm going to ask for each

7   office.

8              How many loan officers were

9   in Syosset?

10     A      Ten to twelve.

11     Q      And in Babylon?

12     A      Maybe 12 to 15.

13     Q      What was your compensation

14  when you worked at Ameriquest?

15     A      It was as a loan officer?

16     Q      Yes, start with that.

17     A      It was a tiered system based

18  on revenue that would be generated for

19  the company.  The higher the revenue you

20  produced for the company the higher

21  percentage of that revenue you would

22  receive as compensation.

23     Q      Was there any component of

24  your pay that was not commission based

25  when you were a loan officer for

*Rich Moffett Court Reporting, Inc.*

```
 1                                        15
 2     Ameriquest?
 3          A      Yes, there was a salary of, I
 4     want to say, it was $24,000 a year.
 5          Q      And that was payable
 6     regardless of the commissions, correct?
 7          A      Correct.
 8          Q      So that was not a draw?
 9          A      Correct.
10          Q      When you were promoted, did
11     you have that same structure for
12     commissions on any loans that you
13     originated?
14          A      When you got promoted at
15     Ameriquest, you were not originating
16     loans anymore.
17          Q      Okay.
18          A      You were at that time
19     overseeing the ten to twelve people in
20     your office as they originated loans and
21     you would be compensated a -- same way.
22     You just, you know, a smaller piece of
23     that revenue but on a larger scale.
24          Q      Is that called an override?
25          A      It wasn't called an override,
```

*Rich Moffett Court Reporting, Inc.*

16

1
2    but you could maybe call it that.

3        Q    Basically, when you were

4    branch manager, you got a commission

5    based on each salesperson's sales?

6        A    No.

7        Q    No?

8        A    Collectively as a group.

9        Q    Okay.

10        Did that work out better for

11    you at the time?

12        A    For me at the time?

13        Q    Yes.

14        A    Yes.  But I wouldn't say that

15    this works better for everyone --

16        Q    Right.

17        A    -- because if your branch

18    isn't good you're not making money.

19        Q    Were you also getting a

20    salary when you were branch manager?

21        A    Yes, I believe that went up

22    to 60 or $70,000.

23        Q    Was the Syosset branch a good

24    performing branch?

25        A    They were good.

17

1

2      Q      How about Babylon?

3      A      They were very good.

4      Q      And then I think you said you

5  became regional director of New England?

6      A      It was called an area

7  manager.

8      Q      Did that have a greater

9  compensation or just the base, the

10 salary?

11     A      Yes.  Not a lot more.  I

12 don't recall what it was.  Maybe it went

13 up to a hundred thousand.

14     Q      And did you also get, what we

15 referred to as, an override?

16     A      Yes.

17     Q      Did Ameriquest close down?

18     A      Yes.

19     Q      So what period of time did

20 you work with Mr. Rakeman at Ameriquest?

21     A      For a short period of time.

22 When you say worked -- excuse me.  When

23 you say worked together, you mean in the

24 same location?

25     Q      Yes, for what period of time

18

1

2       did you work in the same location as

3       Mr. Rakeman at Ameriquest?

4           A       Four months maybe.

5           Q       What year was that?

6           A       2003.

7           Q       After you ceased working with

8       Mr. Rakeman did you keep in touch with

9       him?

10          A       We still worked at the same

11      company.  He got promoted as well so we

12      were just running two separate offices.

13      So the answer would be yes.

14          Q       Did you live in Rockville

15      Centre at the time?

16          A       No, I did not.

17          Q       Did he?

18          A       Yes.

19                  You know what, I'm not sure.

20      I think there was a short period of time

21      where he maybe had an apartment in Long

22      Beach, but we did not live in the same

23      town.

24          Q       Did you and he come to live

25      in Rockville Centre by coincidence?

*Rich Moffett Court Reporting, Inc.*

```
1                                              19
2          A      He grew up in Rockville
3   Centre, we became close friends.  I spent
4   more and more time in Rockville Centre,
5   and after I got married I figured it was
6   a good town to raise a family in.
7          Q      Where did you go to work
8   after Ameriquest?
9          A      Concord Mortgage.
10         Q      Let me step back to
11  Ameriquest here.
12                You know who the plaintiffs
13  are in this lawsuit, correct?
14         A      Yes.
15         Q      Other than Mr. Rakeman, did
16  any of the other plaintiffs work at
17  Ameriquest?
18         A      Yes.
19         Q      Who?
20         A      Kevin Blaney, John Fenrich,
21  Luis Delgado and Robert Tollin.
22         Q      Is that everyone, other than
23  Rakeman?
24         A      Are you --
25         Q      Yes, that is correct.
```

*Rich Moffett Court Reporting, Inc.*

20

```
 1
 2          A      Everyone in the lawsuit?
 3          Q      Yes, in this current
 4  lawsuit --
 5          A      Yeah.
 6          Q      -- remaining.
 7          A      The only one I think that
 8  didn't was William McCutchan.
 9          Q      Where did you go after
10  Ameriquest?
11          A      Concord Mortgage.
12          Q      Where was that located?
13          A      Melville.
14          Q      Was that in 2006?
15          A      I believe so.  Yeah, it was
16  right after Ameriquest so I believe that
17  was 2006.
18          Q      What was your position at
19  Concord?
20          A      Loan officer.
21          Q      Did Mr. Rakeman go there?
22          A      Yes.
23          Q      Did you and Mr. Rakeman
24  discuss going to Concord Mortgage before
25  the decision was made to go to Concord
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                          21
 2    Mortgage?
 3            A      So I'm sorry.
 4            Q      Before you went to work at
 5    Concord Mortgage did you ever discuss
 6    with Mr. Rakeman that you were going to
 7    work at Concord Mortgage?
 8            A      Yes.
 9            Q      Did he start working at
10    Concord Mortgage at the same time as you
11    did?
12            A      Yes.
13            Q      So did the two of you jointly
14    agree to go to Concord Mortgage?
15            A      I wouldn't say -- well, we
16    both agreed that's where we think is best
17    to go.
18            Q      At the time you started
19    working at Concord Mortgage did anyone
20    else in this lawsuit, other than
21    Mr. Rakeman, work at Concord Mortgage?
22            A      Kevin Blaney came to Concord
23    Mortgage at the same time that we did.
24    That was because Ameriquest had shutdown
25    so there were a lot of people that had to
```

*Rich Moffett Court Reporting, Inc.*

```
1                                           22

2    make decisions on where to go.

3          Q      To your knowledge, did

4    Mr. John Fenrich ever work at Concord?

5          A      No, I don't believe so.

6          Q      To your knowledge, did Luis

7    Delgado work at Contour?

8          A      No.

9          Q      Did Robert Tollin work at

10   Contour?

11         A      No.

12         Q      Did William McCutchan work at

13   Concord?

14         A      No.

15         Q      Did you and Mr. Rakeman ever

16   form some sort of partnership when you

17   were working at Concord Mortgage?

18         A      No.

19         Q      For how many years did you

20   work there?

21         A      I'd say it was a year and a

22   half maybe.

23         Q      What were your duties at

24   Concord Mortgage?

25         A      Loan officer.
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                           23
 2         Q        Were they pretty much the
 3    same as the duties you previously
 4    described for Ameriquest?
 5         A        Yes.
 6         Q        Was there anything different
 7    at Concord?
 8         A        Yes.
 9         Q        What was different?
10         A        Ameriquest was simply a bank
11    where you underwrote to their guidelines.
12    They had their specific guidelines that
13    you had to qualify your customer within
14    that matrix.
15                  Concord was a brokerage, so
16    there were more options.  You had 20
17    different banks that maybe you can --
18    that had a niche in something that maybe
19    you can place that loan in.
20         Q        So is it fair to say then
21    that the universe of products available
22    to a customer was greater at Concord?
23         A        Yes.  That's also a product
24    of the, you know, where housing was at
25    that time.
```

*Rich Moffett Court Reporting, Inc.*

24

You know, there's so many different products.  It was a guide -- guidelines were much looser so you could get a lot more people to qualify because banks had all these different niches.

Q       After getting information from the customer, how would you, while you were working at Concord, determine what products might be beneficial to that customer?

A       That comes down to really getting to know the client, what their needs are, what their overall goals are, what their credit looks like, what their income looks like and which bank we can place that customer with that would be most beneficial for them just to fit all their needs.

Q       So the interest rates varied from bank to bank?

A       Very little.  It's more of what -- what's better.  You know, if a borrower has more assets that drives a lower interest rate with bank A.  Well,

*Rich Moffett Court Reporting, Inc.*

25

1  let's place them with bank A because

2  that's better for them as opposed to bank

3  B that has no impact on assets, they can

4  just get the loan done.  So I'm going to

5  place them with bank A because it's

6  better.

7         Q      It would be advantageous to

8  you when you worked at Concord to know

9  the idiosyncrasies of each bank and what

10  their niche is, correct?

11         A      Yes, and that's why you had a

12  lot of reps from these banks that would

13  come in like a revolving door talking

14  about all their new products and what

15  they can do.  So they were -- they were

16  well versed and they would educate us as

17  well.

18         Q      Was MLD a bank or a

19  brokerage?

20         A      They were a bank similar to

21  Ameriquest in that sense.  They had their

22  guidelines, their overlays, their systems

23  that me as the employee had to abide by

24  and try and fit those guidelines, fit the

```
1                                                    26
2    clients into their parameters.
3           Q       Why did you stop working at
4    Concord?
5           A       I got a better opportunity.
6           Q       Where did you go?
7           A       Precision Financial.
8           Q       When was that?
9           A       Oh --
10          Q       Approximately.
11          A       -- maybe 2008 sometime.
12          Q       At the time you started at
13   Precision Financial did anyone else from
14   Concord start working as a loan officer
15   at Precision Financial?
16          A       Just Michael Rakeman.
17          Q       Did you and Mr. Rakeman form
18   any kind of alliance or business
19   partnership at Precision Financial?
20          A       We would work together on --
21   I wouldn't say we worked together.  We
22   would work on our own files at that time
23   but we would split commissions and work
24   together.  If one person was out, maybe
25   pick up the slack, vice versa.
```

*Rich Moffett Court Reporting, Inc.*

27

```
 1
 2        Q      Was your entire book split
 3   between you and Mr. Rakeman when you
 4   worked at Precision?
 5        A      What do you mean "book"?  We
 6   don't have, like, a client book like a
 7   Rolodex.
 8        Q      Were the entirety of your
 9   commissions split between yourself and
10   Mr. Rakeman when you worked at Precision?
11        A      I believe so.  If not, the --
12   you know, everything, most of it.
13        Q      Did you need permission from
14   Precision to engage in that arrangement?
15        A      Yes.
16        Q      Did you have to execute any
17   paperwork to do that?
18        A      I don't believe so, because
19   that was prior to Dodd-Frank all that
20   stuff.
21        Q      How long did you work at
22   Precision Financial?
23        A      Maybe -- probably less than a
24   year.
25        Q      To your knowledge, did any
```

*Rich Moffett Court Reporting, Inc.*

28

```
1
2       other loan officer involved in this
3       lawsuit work at Precision Financial?
4              A       No.
5              Q       Was Precision Financial a
6       bank or a brokerage?
7              A       They were both a bank and a
8       brokerage.
9              Q       So Precision Financial
10      offered a lot of products then?
11             A       Correct.
12             Q       Were your job duties at
13      Precision Financial any different than
14      those at Concord?
15             A       No.
16             Q       Why did you leave Precision
17      Financial?  I think I asked, you said
18      better opportunity?
19             A       Better opportunity.  That's
20      also the time, though - I just want to
21      point out - that's where, like, the whole
22      housing market just crashed.  So all
23      those banks that would come in with these
24      niche products closed, then everything
25      became just strictly pretty much a
```

*Rich Moffett Court Reporting, Inc.*

29

2    correspondent lender.

3        Q       A what?

4        A       Correspondent lender.

5        Q       What does that mean?

6        A       That means that you were a

7    bank, you were a direct lender and you

8    would use your warehouse lines and you

9    would lend the money based on whether it

10   was FHA or Fannie Mae, Freddie Mac, then

11   you would sell it on -- off on the

12   secondary market to the big banks like a

13   Chase, Wells Fargo.  The whole mortgage

14   industry changed around that time.

15       Q       What you just described, only

16   banks lending money according to their

17   warehouse lines and selling those

18   products off to big banks is the business

19   model for MLD when you worked there,

20   correct?

21       A       Yes.

22       Q       Just tell me what you mean

23   when you say "warehouse lines."

24       A       Am I allowed to give you an

25   analogy?

*Rich Moffett Court Reporting, Inc.*

```
                                                    30
1

2          Q     Sure.

3          A     So you have a credit card

4    with a $500,000 limit.  You borrow

5    $250,000 to lend to Jane Smith.  You use

6    that credit card to lend that money, and

7    then you look to take that mortgage and

8    place it with one of the other banks like

9    a Chase and a Wells Fargo at a premium.

10   They give you your $250,000 back in this

11   analogy, plus a premium.  That's how MLD

12   and a lot of other banks make money.

13   They're selling the rights to service

14   that line.

15         Q     So using MLD in this example,

16   the guidelines that MLD has are

17   guidelines that will ensure that they are

18   able to sell these loans, correct, if you

19   know?

20              MR. REILLY:  Objection to

21        form.

22         A     To the best of my knowledge,

23   they -- they have the regular guidelines

24   that their investors will give and then

25   they give overlays on top of that to make
```

31

the loan as safe and sellable as possible

for MLD.

     Q     What do you mean by

"overlays"?

     A     So Chase would, let's say, go

to a 90 percent loan to value, okay?

They allow that, but MLD may say, "We're

not going to do that.  We're going to

lower this to 85 percent loan to value

because that's the matrix that we want

'cause it's safer for us and less risky."

     Q     Did you know what banks MLD

would sell its loans to?

     A     Specifically, I can't say

definitively, but I think it would be,

you know, Chase, The Money Source was a

big one, maybe Citibank, Wells Fargo.

     Q     And am I correct in saying

you were not part of those transactions?

     A     Oh, no, that's way, way over

my head, that stuff.

     Q     Where was the next place you

worked after Precision Financial?

     A     Contour Mortgage.

1                                                    32

2          Q       Was Contour Mortgage a bank?

3          A       Yes.

4          Q       Do the brokerages still exist

5    in the industry?

6          A       Very little at that time.

7          Q       When did you go to Contour

8    Mortgage?

9          A       2009, I think.

10         Q       At the time you went to

11   Contour Mortgage did Mr. Rakeman go with

12   you?

13         A       Yes, he did.

14         Q       When you worked at Contour

15   Mortgage did any other mortgage loan

16   officer, who was a plaintiff in this

17   case, work at Contour Mortgage?

18         A       No.

19         Q       Were you and Mr. Rakeman

20   functioning as a team together at Contour

21   Mortgage?

22         A       Yes.

23         Q       Was your arrangement with

24   Mr. Rakeman at Contour the same as what

25   your arrangement was at Precision --

33

2          A       Yes.

3          Q       -- with Mr. Rakeman?  Okay.

4                  Were you both loan officers

5    at Contour?

6          A       Yes.

7          Q       Were your duties at Contour

8    Mortgage the same as your duties at

9    Precision?

10         A       Yes.

11         Q       For how long were you at

12   Contour Mortgage?

13         A       Until December 2013.

14         Q       What happened then?

15         A       So the gentleman that ran --

16   the owner of Contour Mortgage, I believe

17   on paper, was Richard Pregiato, but there

18   were three other gentlemen as well that

19   were considered partners.  I don't know

20   if they owned any portion of Contour or

21   not.

22                 They, Richard Pregiato, these

23   three gentlemen, they had a parting of

24   ways, and that's when John Veracka,

25   Michael Brooks and Scott Schraeger joined

*Rich Moffett Court Reporting, Inc.*

                                                              34

2    forces with MLD and we went that route.

3          Q       And Contour Mortgage still

4    exists, correct?

5          A       Yes, sir.

6          Q       When did you start at MLD?

7          A       December of 2013, I believe.

8          Q       When you started, were

9    Mr. Veracka, Mr. Brooks and Mr. Schraeger

10   there?

11         A       Yes.

12         Q       How long had they been there

13   before you?

14         A       I don't know officially when

15   they signed their paperwork, but I would

16   say maybe a couple of weeks.

17         Q       When you started at MLD, did

18   Mr. Rakeman go with you?

19         A       Yes.

20         Q       Were you two a team at MLD?

21         A       Yes.

22         Q       Who did you interview with at

23   MLD, if anyone?

24                 MR. REILLY:  Objection to

25         form.  Last question.

*Rich Moffett Court Reporting, Inc.*

35

A       I don't think I interviewed with anyone, because Veracka, Brooks and Schraeger were taking on this new branch in East Meadow, so we already knew them. They were our bosses then, they were our bosses now, so nothing really changed, just banks that we were working for.

Q       Where was the branch located in East Meadow?

A       1900 Hempstead Turnpike, Suite 206, I believe.

Q       And that's where you reported to work for MLD?

A       Oh, yeah.

Q       And how long did you work at MLD, until when?

A       I was fired September 21st, I believe, 2015.

Q       Did you share an office with Mr. Rakeman while you were at MLD?

A       Yes.

Q       Did anyone else occupy that office, other than you and Mr. Rakeman?

A       No.

*Rich Moffett Court Reporting, Inc.*

1                                                      36

2          Q       What were your duties at MLD?

3          A       Same duties pretty much as

4    Contour.

5          Q       Were the products at MLD more

6    restrictive, less restrictive or the same

7    as at Contour?

8          A       In some ways they were more

9    flexible depending on the type of loan.

10   Other ways they had significant overlay;

11   that is, they would put on certain files

12   as well, so it depends on the loan is

13   really the correct answer.

14         Q       What types of loans did you

15   sell when you were at MLD?

16         A       FHA loans, conventional loans

17   and maybe a couple of reverse mortgages.

18   99 percent were conventional loans, FHA

19   loans, though.

20         Q       In the FHA loans, are there

21   different types?

22         A       Yes, you have your adjustable

23   rates.  You have your different terms, 15

24   year, 20 year, 30 year, cash out

25   refinance.  You have a rate-and-term

*Rich Moffett Court Reporting, Inc.*

37

refinance.  You have purchase loans, so

there are a variety of different FHA

products.

     Q        For conventional loans were

there different types?

     A        Yes.

     Q        What types were there?

     A        Thirty year, twenty-five

year, twenty year, fifteen year.

     Q        So that's terms?

     A        Terms.

          Ten year.

     Q        Were there any other

differences in conventional?

     A        You had adjustable rates that

will be fixed for five years or

seven years or ten years.  They would be

fixed for and then adjusted.  After that

you could do a rate-and-term refinance on

a conventional loan.  You could do a cash

out.  You could do a purchase loan.

     Q        What's a "purchase loan"?

     A        If someone's purchasing a

home.

*Rich Moffett Court Reporting, Inc.*

```
 1                                              38
 2         Q      What percentage of your loans
 3    at MLD were refi's as opposed to
 4    purchases?
 5         A      If I had to give a
 6    percentage, I would -- I would say
 7    95 percent refinance.
 8         Q      The refi's have a
 9    three-day-recision period, correct?
10         A      Correct.
11         Q      And that means that the
12    borrower can decide to cancel the
13    transaction within three days, correct?
14         A      Yes.
15         Q      What percentage of your loans
16    cancelled within the three days?
17         A      Maybe one percent, if that.
18                My time at MLD was an
19    unbelievable market, lowest rates ever,
20    so the benefits were just so abundant and
21    clear on how these people could save
22    money on a monthly basis or do what they
23    needed to get done.  It was the best
24    market in my, you know, 17 years in the
25    business.
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                        39
 2          Q      And there was a lot of
 3   refinancing going on across the board at
 4   that time, correct?
 5          A      Oh, yes.
 6          Q      How would you determine what
 7   product and sub-product to sell to a
 8   client?
 9                 MR. REILLY:  Objection to
10          form.
11          A      What do you mean by
12   "sub-product"?
13          Q      Can you refinance with an FHA
14   loan?
15          A      Yes, you can.
16          Q      So for a refinance you can
17   have an FHA loan or a conventional loan,
18   correct?
19          A      Correct.
20          Q      All right, let's consider
21   those to be the products, and then within
22   those categories you can have different
23   terms as far as the amount of time, the
24   rate, cash out and those types of things,
25   correct?
```

*Rich Moffett Court Reporting, Inc.*

```
                                                    40

 1

 2        A      Yes.

 3        Q      So that's what I was

 4   referring to as sub-products, but how

 5   would you discern what type of loan and

 6   what terms of that type of loan would

 7   best suit a customer?

 8        A      That first comes down to

 9   being a good listener.  When you speak to

10   your clients for two hours on an initial

11   phone call and hear exactly about all

12   their wants and needs, figuring out what

13   they want to do, just cash out, finding

14   out what that's for, maybe it's college

15   tuition, maybe it's A, B or C, hearing

16   them out, then with the knowledge that I

17   have, whether it be a lot or a little, I

18   would see what could be best for them.

19              That also goes to bringing it

20   to one of our underwriters at MLD and

21   going over what fits in MLD's matrix,

22   their guidelines, piecing it together,

23   seeing -- working up two options or three

24   options and what's going to give them the

25   best monthly payment, best program for
```

*Rich Moffett Court Reporting, Inc.*

41

1

2    them.

3                   Again, reverting back to that

4    first phone call, listening to what they

5    want to do, that's how you figure out

6    what's -- what loan you would put them

7    into along with, obviously, qualifying,

8    which is what, you know, the matrix and

9    underwriting that MLD had.

10       Q     So as a mortgage loan officer

11   you have to know the different products

12   and terms and parameters of those

13   products that your bank offers, correct?

14       A     Yes.  You also need to have a

15   strong support staff, which MLD

16   definitely did.

17       Q     Am I correct in saying that

18   some customers are calling and talking to

19   you about vague objectives?

20             MR. REILLY:  Objection as to

21       form.

22       A     Can you clarify that?

23       Q     Sure.

24             Some customers might call you

25   looking for a very specific product,

```
                                                    42
 1

 2    correct?

 3         A      Some.

 4         Q      And they might say, "I need a

 5    15-year conventional loan for a certain

 6    amount of money."  Does that occur?

 7         A      Not normally.

 8         Q      No?

 9         A      People would normally call

10    and say, "I want to lower my rate.  I

11    want to lower my payment," or, "I want to

12    cut my term.  I have 22 years left, I

13    want to go to 15," as an example.

14               So again, it goes back to

15    listening and then asking the right

16    follow-up questions to figure out what's

17    best for the client.

18         Q      So you have to discern the

19    client's objectives, correct?

20         A      Correct.

21         Q      And then you have to discern

22    what products might fit those objectives?

23         A      Yes.

24         Q      There are occasions where a

25    client will have a choice among products,
```

*Rich Moffett Court Reporting, Inc.*

```
1                                                43

2    correct?

3         A        Absolutely.

4         Q        How do you and the client

5    sort out which specific product they are

6    going to try to obtain?

7         A        I would ask them which sounds

8    better, which do you like, which are you

9    more comfortable with.

10        Q        And do you ever recommend any

11   products?

12        A        Clients will ask me, "What

13   would you do?"  And I'll give them my

14   answer, but like I always say, "Given

15   what you told me and looking at things on

16   paper, this is the one I would probably

17   do."

18        Q        When you say "which sounds

19   better," what are the factors you're

20   comparing between the various types of

21   loans?

22        A        Someone wanted -- they want

23   to cut their term and I gave them maybe a

24   20-year-term option or a 15-year-term

25   option, the 15-year term is going to have
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                             44
 2    a higher monthly payment, but you will
 3    save more money in the long run on a
 4    15-year term.  So it's -- it's -- is it
 5    the immediate better or is it the long
 6    term better.
 7          Q      And ultimately the client has
 8    to make a decision, correct?
 9          A      Yeah, it's up to the clients
10    as long as they qualify for both loans,
11    yeah.
12          Q      After the clients make a
13    decision it will go to underwriting?
14          A      The -- the process would
15    start.
16          Q      So in the very beginning when
17    you do that, what could be a two-hour
18    conversation with the client, that's
19    typically on the phone?
20          A      Yes.
21          Q      Are you filling anything out?
22          A      You're filling out a formal
23    loan application called a 1003 and also
24    making your own notes.
25          Q      Does the client see the 1003?
```

45

2    A       On the initial phone call?

3    Q       After the initial phone call.

4    A       After the initial phone call

5  when the loan is disclosed, yes.

6    Q       What kind of information is

7  on the 1003?

8    A       Your basics, name, address,

9  how many years you went to school, where

10  you live, dependents, when the house was

11  built, income, assets, goals.

12          When I say "goals," it's --

13  it's a template, so it's rate and term or

14  cashout.

15    Q       Is this form standard

16  throughout the industry?

17    A       Yes, it is.

18    Q       After the 1003 is completed

19  what is your next step?

20    A       So the loan gets disclosed,

21  which would go through the disclosure

22  desk in this case at MLD.  They would

23  overnight disclosures to the client and

24  we would also start gathering up

25  documentation needed from the client,

46

1

2      like income, IDs, things like that.

3          Q      Is that something you would

4      personally do?

5          A      Yes.

6          Q      Were there loan processors at

7      MLD?

8          A      Yes.

9          Q      Did the loan processors do

10     any of that work for any of your loans?

11         A      Gathering up of documents?

12         Q      Right.

13         A      No.

14         Q      What did the loan processors

15     do for you at MLD?

16         A      When the income documentation

17     or documents you needed from the client

18     would come in along with the disclosures,

19     they would go through the accuracy of the

20     application based on the income

21     documentation that we have, etcetera, and

22     we'd get the file ready to be submitted

23     to underwriting for a loan approval.

24         Q      Did the loan processors work

25     on your loans the same as they would work

47

on the loans of any other mortgage loan

originator at MLD?

    A     Yes.

    Q     What is the range of time

that you might have to communicate with

the client on the phone between the first

call and the time that the loan is fully

processed?

    A     The first time to closing?

    Q     Yes.

    A     Okay, on a refinance?

    Q     Yes.

    A     It could be three weeks.

    Q     But what is the actual

telephone time that you might have with

the client?  You can give me a range from

the shortest to the longest.

    A     For that process, I mean, if

you add up all of the time on the phone

with the Smith loan --

    Q     Right.

    A     -- it could be four hours.

If you add up all the time on the Jones

loan it could be 20.

*Rich Moffett Court Reporting, Inc.*

```
 1                                            48
 2         Q      Let's go back to the
 3    advertisements.
 4                When is the first time that
 5    you placed any radio advertisement that
 6    was directed at a Christian market?
 7         A      Maybe 2008.
 8         Q      So that was prior to when you
 9    worked at MLD?
10         A      Yes.
11         Q      And did you do that with
12    Mr. Rakeman?
13         A      Yes.
14         Q      Were those advertisements
15    ever in the New York metropolitan area?
16         A      Yes.
17         Q      On what stations?
18         A      WMCA.
19         Q      570 AM?
20         A      That's it.
21         Q      Any other stations?
22         A      I think that was it then.
23         Q      From 2008 to your last day of
24    employment at MLD did you continue the
25    radio advertisements that were
```

```
 1                                        49
 2     broadcasted through a Christian market?
 3          A      Yes.
 4          Q      Do you continue them to date?
 5          A      Yes.
 6          Q      Do you still work with
 7     Mr. Rakeman?
 8          A      Yes.
 9          Q      When you were at MLD, how
10     were those ads paid for?
11          A      MLD would pay the advertising
12     out of their revenues on filings, the
13     revenues on our closed loans.
14          Q      And then would you have to
15     reimburse MLD for that payment?
16          A      No, it would come out of the
17     total revenue of the loan.
18          Q      Oh, I see.
19                 Other than the ads directed
20     to a Christian market, did you place any
21     other radio ads while you worked at MLD?
22          A      Yes.
23          Q      On what stations?
24          A      I think there's one on Long
25     Island called like The Shark or something
```

*Rich Moffett Court Reporting, Inc.*

```
                                          50
 1
 2    like that.  It's out in Suffolk County.
 3    I think we might have done, like, a small
 4    KJOY one.  We've done a couple of country
 5    stations as well.
 6         Q      Did you ever place any ads on
 7    television?
 8         A      No.
 9         Q      How would MLD know that the
10    person calling in to MLD had heard the
11    advertisement?
12         A      Could you repeat that?
13         Q      Yes.
14                How would MLD route the
15    person who listened to the ads so that it
16    went to you or Mr. Rakeman?
17         A      'Cause it would be a phone
18    line that is ours, or it would be a
19    website that they let us use, a domain
20    that they had.
21         Q      During the time you were at
22    MLD was anyone else on your team, other
23    than Mr. Rakeman?
24         A      I wouldn't say a team, but we
25    worked with -- I mean, there were a bunch
```

*Rich Moffett Court Reporting, Inc.*

1                                                    51

2       of people that worked in the office.

3       Mike and I had our own office, so...

4            Q       Let me rephrase that.

5                    During the time you were at

6       MLD did you share commissions with anyone

7       else, other than Mr. Rakeman?

8            A       No.

9            Q       Did you ever receive leads

10      that were generated by MLD when you

11      worked there?

12           A       Other than the advertising

13      that we did?

14           Q       Right.

15           A       No.

16           Q       What were your hours when you

17      worked at Contour?

18           A       Contour, pretty similar to

19      MLD.

20           Q       Is that also true with

21      Precision?

22           A       No.  No, because the market

23      was not so hot at that time.

24           Q       What days did you report to

25      work at MLD?

*Rich Moffett Court Reporting, Inc.*

52

2       A       Six days a week.

3               "Report to work," you mean

4       report to the physical location?

5       Q       Right.  Right, in East

6       Meadow.

7       A       Right, six days a week.

8       Q       Did you have keys to get in?

9       A       Yes.

10      Q       Who gave you keys?

11      A       Mike Brooks.

12      Q       So were you able to get into

13      MLD's East Meadow office when no one else

14      was there?

15      A       Yes.

16      Q       If you wanted to go at 2 in

17      the morning to pick something up you were

18      able to do that?

19      A       Yup, the building itself had

20      a punch code.  It probably changed every

21      other week, but the popular one was the

22      East Meadow zip code.  Then we had -- had

23      separate keys that would allow us into

24      our office.

25      Q       Is that 11550?

*Rich Moffett Court Reporting, Inc.*

53

A       4.

Q       11554?

A       For the record.

Q       What day of the week did you not go into the office?

A       Sundays usually.

Q       What time did you get to the office during the week?  And if it's different on different days, let me know.

A       So it would pretty much be some days I would get there before 7:00 a.m., all right, but if I got there before 7, let's say I got there, like, 6:15, 6:30, I would get there at 6:15, 6:30, then I would work straight through for a few hours and then go to the gym in the mark -- the plaza there and then come back and then work until, I don't know, I could be there until 8:00 and then go home and work from there.

         Other days if I just went for a run or something around the neighborhood I would go to work around 7, 7:15 and work straight through until --

```
 1                                          54
 2           Q      Work straight?
 3           A      Work straight through, like,
 4      not go to the gym or go anywhere until I
 5      went home, and work from there and see my
 6      wife and, well, one child at that time.
 7           Q      How old was your child at
 8      that time?
 9           A      When I started working at
10      MLD, she was three months old.
11           Q      That schedule you just gave
12      me, was that a Monday to Friday?
13           A      Monday to Friday.
14           Q      Did you leave earlier on
15      Friday?
16           A      Maybe, like, 7 or 8:00.
17           Q      I thought that was when you
18      normally left Monday to Thursday.
19           A      Sometimes I would go Monday
20      to Thursday, but I would -- I would still
21      work at home Monday to Thursday.  I would
22      really try and shut down completely 7,
23      8:00 on a Friday so my wife wouldn't kill
24      me.
25           Q      But let me ask you this.
```

*Rich Moffett Court Reporting, Inc.*

                                                          55

Right now I am just asking for the hours

that you are at the East Meadow location.

We can get to working at home after that.

        A        Okay.

        Q        So normally you would get

there around 6:15 to 6:30, and on Monday

to Thursday when would you normally

leave?

        A        8:00.

        Q        How much time would you spend

at the gym when you went there during a

weekday?

        A        Thirty-five, forty minutes.

        Q        When you got in at 6:15 to

6:30, what kind of work did you do?

        A        That's more a follow up,

trying to get paperwork together, trying

to map out your day, trying to go through

files on your desk, prioritizing, working

up calculations to see if debt ratios

work, what documentation you could be

missing on a file.

        Q        Am I correct in saying that

you weren't normally on the phone at that

56

1

2    hour?

3         A      No.

4         Q      At what hour would phone

5    calls begin?

6         A      I would start at 8:00, unless

7    a client called me earlier, but you could

8    always send e-mails to clients earlier,

9    react.  People will send e-mails on the

10   West Coast, you know, 9:00 their time and

11   I am asleep at midnight, so you still

12   have to react.

13        Q      Would the time that you

14   arrived on Friday be the same?

15        A      Yes.

16        Q      Did you ever keep track of

17   the hours you worked there?

18        A      No.

19        Q      So you are testifying then

20   from your memory?

21        A      Oh, yeah, and my wife would

22   remind me that I'm never home.

23        Q      What about on Saturdays, what

24   were your hours then, again, at the East

25   Meadow office?

57

    A       8:00 a.m. 'till, I mean,
ballpark it, I could leave at 2:00, I
could leave at 6:00.  It depends.

    Q       Are you able to estimate how
often you left at 2 and how often you
left at 6 when you worked Saturdays at
MLD?

    A       The physical location?

    Q       Yes.  Yes, just from the
physical location.

    A       It would kind of -- I --
physical location, I'd have to say 50/50.
You know, somewhere in that range.  Maybe
a little more.  Actually, probably maybe
75 percent was at 4:00.

    Q       Did you typically not go into
the office at all on Sunday?

    A       Unless there was an emergency
and I had to be there and I couldn't do
it from my phone or I couldn't do it from
my computer at home, I would try not to.

    Q       So let's go back to the
Monday to Thursdays when you would work
until 7 or 8:00 at MLD's office in East

```
 1                                          58
 2     Meadow.  How far was your commute from
 3     East Meadow to where you were living at
 4     the time?
 5           A       Fifteen minutes, maybe less.
 6           Q       Would you normally eat dinner
 7     at MLD or at home at that time?
 8           A       At MLD.
 9           Q       Where would you eat breakfast
10     during that time?
11           A       I'll grab something, like,
12     walking.  I'm not a big breakfast person
13     so I would just grab something as I went
14     out of the house.  I -- I still do that.
15           Q       Grab something from the
16     house?
17           A       From -- from my house, yeah.
18           Q       But when you worked for MLD
19     Monday through Thursday, you were having
20     lunch and dinner at MLD?
21           A       Correct.
22           Q       How about Friday?
23           A       Lunch, yes, dinner, depends
24     if I was like, really hungry or if I can
25     hold off until I got home.
```

*Rich Moffett Court Reporting, Inc.*

59

1

2      Q      And on Saturdays you would

3  have lunch at MLD?

4      A      Saturdays, yes, or, you know,

5  I'd eat there.  I'd maybe bring it from

6  home but I would eat there.

7              The market was, again, the

8  best mark for mortgages probably ever --

9      Q      Okay.

10     A      -- and those hours, I can't

11  do that now because my kids would never

12  see me, but at that time, you know, it's

13  worth it.

14     Q      So if you got home around 7

15  or 8:00 on a Monday to Thursday, what

16  work, if any, did you do from home?

17     A      You're doing -- you're

18  nonstop.  I feel the same way, Ray.

19  You're nonstop reacting in this job.

20  You're being proactive following up on

21  people on the West Coast, but you're also

22  -- your phone is ringing nonstop because

23  of files that are in process or marketing

24  that's currently running, because, you

25  know, marketing isn't just from 9:00 a.m.

*Rich Moffett Court Reporting, Inc.*

60

to 5:00 p.m.  People will call whenever.

It's a very -- it's consumer direct so you have to be on, you know, as close to 24/7 as you can.

So there would be -- you'd be working pretty much straight through. Like, while you're having a conversation with your wife and taking a bite to eat you're working through 'till about 10:00.

Q     Are people calling you at that hour?

A     People are calling us and we're calling -- we're following up on current clients, and new clients are calling us as well.

Q     Are you also checking e-mails?

A     Absolutely.

Q     At the time were you able to do that on your cell phone?

A     Yes, I had a Blackberry.

Q     And you would be logging into MLD's e-mail?

A     Correct.

```
 1                                        61

 2          Q      You can send an e-mail out,

 3     also?

 4          A      Yes.

 5          Q      How many hours of sleep did

 6     you normally get around that time that

 7     you were working there?

 8          A      Well, I had a newborn, so I

 9     would say five to six.

10          Q      How many hours were you in

11     the bedroom, regardless of whether or not

12     you were sleeping?

13                 MR. REILLY:   Objection to

14          form.

15          A      Seven.

16          Q      Did you set an alarm to wake

17     yourself up?

18          A      I didn't have to.  I had a

19     newborn.

20                 Could we take a quick break?

21     I just want to stretch my legs.

22          Q      Absolutely.

23                 (Recess taken.)

24          Q      Mr. Schiele, if you came home

25     at 8:00 p.m. on a Monday to Thursday
```

```
1                                          62

2      while you worked at MLD, what period of

3      time do you think you were working at

4      home after that?

5            A       On an average, I would say

6      two hours to two and a half hours.  If it

7      was the end of the month probably longer.

8            Q       When you were working at

9      home, did you have a home office?

10           A       I did at that time.

11           Q       Would you normally be working

12     in that home office when you worked at

13     MLD for those two to two and a half hours

14     at the end of the day?

15           A       Sometimes.  Again, with

16     having a newborn if I was, you know,

17     like, trying to rock her to sleep, I

18     would take the Rock 'n Play into that

19     office and work, but otherwise, I would

20     have a laptop that I would be working on

21     or my phone, of course, could send

22     e-mails and, you know, if it's 2 in the

23     morning and I am up, I'm not calling

24     anyone but calls coming in and going.

25           Q       Was the laptop something that
```

```
 1                                          63
 2     you purchased or was it issued by MLD?
 3          A     I purchased.
 4          Q     Would I be correct in saying
 5     that the work at home on a weekday while
 6     you worked at MLD was not constant?
 7               MR. REILLY:  Objection to
 8          form.
 9          A     No, you wouldn't be correct.
10     It was -- it was constant and also not
11     constant depending on the day.  It could
12     be nonstop or you could have a little bit
13     of a lull and you're just, you know,
14     you're tying to follow up on was this and
15     that done or something like that, you
16     know.  If it's nonstop it's completely
17     reactive.
18          Q     Was there any way for you to
19     download MLD documents onto your laptop
20     when you were working from home?
21          A     I don't know.  I don't think
22     I ever did.  If there were documents they
23     would be in an e-mail and I would be able
24     to just kind of go to that e-mail and
25     look at them.  I wouldn't do anything
```

*Rich Moffett Court Reporting, Inc.*

64

1

2    else except look at them.

3         Q       Did you bring that laptop

4    into the East Meadow office?

5         A       No.

6         Q       Did you engage in any

7    networking with other professionals?

8         A       No.

9         Q       Did you ever do any seminars

10   when you worked at MLD?

11        A       No.

12        Q       Did you ever do any church

13   seminars when you worked at MLD?

14        A       Believe it or not, you would

15   think we would have, but no.

16        Q       How do you know that?

17        A       Because I've only done two

18   church seminars and they were when we

19   were with Contour Mortgage.

20        Q       Did you ever do any types of

21   other seminars when you worked at MLD?

22        A       No.

23        Q       Did you ever have any

24   meetings with any groups for the purposes

25   of marketing when you worked at MLD?

```
 1                                          65

 2         A      We would have marketing reps

 3    come to our office.  We actually had,

 4    even to the point of the radio stuff, we

 5    had -- it's called a COMREX system that

 6    was in our office, so we didn't have to

 7    go anywhere to even record.

 8         Q      What did the COMREX system

 9    do?

10         A      So, example, it -- like, Mike

11    Francesa is on the FAN right now.  He

12    doesn't go to the city.  He does it from

13    his house.

14              So I can log in.  I can log

15    into this computer right here, the

16    station gives me their IP address.  I

17    have a microphone.  I have a headset.  As

18    soon as they give me the access, I hit

19    Connect and it sounds like I'm in studio.

20         Q      And for what purpose would

21    you do that when you were at MLD?

22         A      For any type of radio spots

23    that we -- that we would run.

24         Q      Was your voice on the radio

25    spot?
```

66

2        A     Most of them.

3        Q     Did the radio spots mention

4  your name?

5        A     Yes.

6        Q     Did they also mention

7  Mr. Rakeman's name?

8        A     They mentioned our first

9  name, but first and foremost, it would

10  start out with the company name and end

11  with the company name, and that's for

12  compliance.

13        Q     Did the radio spots identify

14  you as a practicing Christian?

15        A     No.

16        Q     Did it identify Mr. Rakeman

17  as a practicing Christian?

18        A     No.

19        Q     Was there anything in the

20  radio spot itself pertaining to

21  Christianity?

22        A     I don't think so.

23        Q     Do you ever listen to WMCA?

24        A     Yes.

25        Q     Do you ever hear

67

1
2      advertisements where Gary Glenn or
3      somebody identifying himself as a
4      Christian attorney --
5              A       I have, yeah.
6              Q       -- or business person?
7              A       Yeah.
8              Q       And your radio spots did not
9      identify you or Mr. Rakeman as
10     Christians?
11             A       No.
12                     In a 60 second spot I think
13     it's foolish to just talk -- it just --
14     it sounds petty to -- to speak about
15     that.  It sounds fake.
16             Q       So am I correct in saying
17     that that radio spot could have run on
18     any station?
19             A       Similar spots could run on
20     different stations.
21             Q       But did you tailor those
22     radio spots on the Christian stations
23     towards the Christian beliefs of the
24     audience in any way?
25             A       No.  What we would do is

*Rich Moffett Court Reporting, Inc.*

68

1
2    maybe if it's a commercial for WMCA, we
3    would talk about WMCA listeners, and if
4    it was on a different station, if it was
5    on Star 99 we would talk about Star 99
6    listeners, so it's not just a general
7    advertisement.
8         Q     When you say you would talk
9    about WMCA listeners, you would mention
10   that, WMCA listeners, right?
11        A     Yeah, either we would or if
12   it was a host endorsement.
13        Q     But was there anything more
14   specific about, let's say, WMCA
15   listeners?
16        A     I don't think so.
17        Q     So how many hours a week do
18   you estimate that you worked from home
19   when you worked at MLD?  And you can give
20   me a range if that helps you.
21        A     Twenty-five, maybe a little
22   less, maybe twenty.
23        Q     Other than your home and your
24   office, was there any other fixed spot
25   that you would perform work for MLD?

69

1

2      A      No.

3      Q      And am I correct in saying

4  that you might be looking at your phone

5  for e-mails or on a phone call while you

6  were commuting or while you were at the

7  gym or while you were at a restaurant or

8  any other public place?

9      A      Absolutely.

10     Q      Was there anything seasonal

11  about the work when you were at MLD?

12     A      No.  People ask a lot of if

13  there's, like, a hot time, and no.

14  Again, it was all market driven.

15     Q      You used the term "marketing

16  reps" would come to the office.  Who were

17  the marketing reps?

18          MR. REILLY:  Objection to

19      form.

20     A      So you gave an example, WMCA.

21  If the WMCA marketing representative

22  wanted to come and speak about a new

23  proposal, he or she would come to the

24  office and talk about endorsing this or

25  doing the past year's Appreciation

*Rich Moffett Court Reporting, Inc.*

1                                        70

2    Breakfast or doing The Bowery Mission,

3    different opportunities, different ways

4    to gain our business more.

5         Q      Other than your marketing and

6    your past clients, did you have any other

7    referral sources at MLD?

8              MR. REILLY:  Objection to

9         form.

10        A      No, I don't think so.  The

11   only other business would really be,

12   like, friends or family that would come

13   to us.

14        Q      Did you ever meet with real

15   estate brokers?

16        A      No.

17        Q      Did you ever meet with

18   accountants for the purposes of

19   marketing?

20        A      No.

21        Q      Did you ever meet with banks

22   that don't do mortgages for purposes of

23   marketing?

24        A      No.

25        Q      Did you have any fliers,

71

2    promotional fliers, that you would hang

3    anywhere?

4         A      No.

5         Q      During the time you worked at

6    MLD did you ever take time off due to

7    illness or injury?

8         A      I sprained my ankle once and

9    I had to go to the doctor that next

10   morning and I was late.

11        Q      Other than that?

12        A      No.

13        Q      Did you ever take any

14   vacations when you worked at MLD?

15        A      I took one vacation to my

16   parents' condominium in Florida.

17        Q      How long was that?

18        A      Four or five days.

19        Q      Was your family with you?

20        A      My immediate family was with

21   me.  My parents were not there.

22        Q      Did you engage in any work on

23   that vacation?

24        A      Unfortunately, yes.  A

25   hundred percent reactive, but the phone

72

1
2   still rings, the e-mails still come, yes.
3          Q      During those four to
4   five days how many hours would you
5   estimate that you worked?
6          A      Three hours a day.
7          Q      Did you go to work on
8   holidays at MLD?
9          A      Not Christmas, not the 4th of
10  July, not Easter, not Thanksgiving.
11  Labor Day, yes, Memorial Day, probably,
12  Martin Luther King day, yes, Columbus
13  day, yes.  You know, so you could kind of
14  see the trend.
15         Q      Now, when you went to work
16  on, let's say, Labor Day or Memorial Day,
17  was the back office staff not at work?
18         A      No, those days are strictly
19  originating days.  You know, picking up
20  new business because the rest of the
21  world is off and available usually.
22         Q      When you say "picking up new
23  business," is that what you said?
24         A      Yes.  I'm sorry, originating.
25         Q      What would you do on a

```
1                                          73
2    holiday to try to originate business that
3    you might not do on a regular workday?
4         A      If -- if -- maybe you have a
5    log of people that have reached out at
6    some point in the past or recently that
7    you haven't gotten a hold of or maybe
8    people that you've asked about a loan and
9    maybe they just kind of run off the grid
10   a little bit, it's a good day to regroup
11   and try to capture that business.
12        Q      To your knowledge, did anyone
13   at MLD keep track of your hours?
14        A      No.
15        Q      So you never signed in with
16   time sheets at MLD --
17        A      No.
18        Q      -- right?
19               And you didn't have any swipe
20   card or anything like that?
21        A      No.
22        Q      Were you aware that some
23   employees did have time sheets?
24        A      I found out about that after
25   I was fired.
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                              74
 2          Q      At the time you worked at MLD
 3   did you ever see an employee executing a
 4   time sheet?
 5          A      No.
 6          Q      Did you have any role in the
 7   approval of time sheets?
 8          A      No.
 9          Q      Did MLD ever pay you in cash?
10          A      No.
11          Q      All your payments were by
12   check; is that right?
13          A      Yes.
14          Q      Did you ever receive an
15   override on any other employee sales when
16   you worked at MLD?
17          A      Yes.
18          Q      When was that?
19          A      So if we would have -- we
20   would do some marketing and if we were
21   overloaded, we would maybe have someone
22   else take over that loan or do that loan,
23   and we would get a small portion of that.
24   It happened pretty rarely.
25          Q      So am I correct in saying
```

*Rich Moffett Court Reporting, Inc.*

75

1

2      that that was on an episodic basis?

3          A      Yes.

4          Q      Was any portion of your

5      compensation at MLD not commission based?

6          A      No.  There was a, what we

7      call, a draw, but that was still against

8      our commissions.

9          Q      Did you ever receive a salary

10     in addition to commissions at MLD?

11         A      No.  I mean, you would get --

12     it may show as a salary but it was always

13     against commissions, and we received that

14     once MLD was, you know, seven figures in

15     the hole over a million dollars owed to

16     us from MLD, and they would put in a --

17     they would call it a salary to chip away

18     at what we were owed and maybe a sign of

19     good faith.

20         Q      At what point in time was MLD

21     seven figures in the hole to you and

22     Mr. Rakeman?

23         A      I would think going into --

24     going into 2015, I believe.

25         Q      How did that occur?

76

1

2          A       When a loan officer comes, at

3    any mortgage bank, they sign their loan

4    officer compensation agreement and you're

5    supposed to get paid on deals that would

6    fund between, an example, the 1st and the

7    15th of the month for one pay period and

8    then the following pay period would pay

9    you for deals that funded from the 16th

10   to the end of the month, and any deals

11   that funded between that period you're

12   supposed to get a certain amount of basis

13   points.

14              If we were owed $70,000 --

15   let's not even say that.  Let's say we

16   were owed $72,321, because it was always

17   an odd number because it's a certain

18   period, we would get a check for $20,000

19   even.  A round number that makes no

20   sense, and they would just continue to

21   short this pay.  That number adds up.

22          Q       When is the first time you

23   realized that MLD was not paying you the

24   precise amount you earned in commission?

25          A       Probably maybe towards the --

*Rich Moffett Court Reporting, Inc.*

77

towards the end of 2014.

Q    How is it that you were able to determine the precise amount MLD owed to you?

A    Because you get a list of every loan that would fund over that time period with a -- the loan amount.  So you take that loan amount and you multiply it by what your compensation should be for on your, they call it, Dodd-Frank payout, whether it's four percent or two and a half percent, whatever it is, and you add up what that -- you multiply it, what that number should be, and then subtract it by what was paid.

Q    And have you engaged in that mathematical computation?

A    Yes, I have.

Q    When is the first time you did that?

A    I did probably a rough estimate when I was working there, and then when we got fired, you do a total and you do your, you know, your

*Rich Moffett Court Reporting, Inc.*

1                                                    78

2        Dodd-Frank times all the loans that you

3        closed subtracted by what my W-2s and

4        last pay stub was, and that's where I

5        came to that final number.

6              Q       What was the final number?

7              A       I believe it was just shy of

8        $1.5 million.

9              Q       And that would include you

10       and Mr. Rakeman?

11             A       Correct.  Yes.

12                     I want to make that clear.

13       That's between Michael and myself.

14             Q       Did you ever have any

15       conversations with anyone at MLD about

16       paying that money after your termination?

17             A       Yes.

18             Q       Who did you speak with?

19             A       David Zilberman.

20             Q       What did he say to you and

21       what did you say to him in those

22       conversations?

23             A       I said, "David," I'm kind of

24       paraphrasing here, "David, can we go

25       through all the final loans that are

*Rich Moffett Court Reporting, Inc.*

79

1

2   closed and figure out what's owed,

3   because I have a number that's a million

4   dollars plus?"  I didn't have that

5   complete number at that point.

6            David said he would go

7   through and try and work on those

8   numbers.  It would take some time, and as

9   I followed up, David then offered us a

10  million or $1.5 million to come back and

11  work for MLD, because he wanted us to

12  come back.

13       Q    I just want to make sure I

14  understand that.

15            So David was saying he would

16  pay you that 1.5 million if you would

17  return to work?

18       A    Correct.

19       Q    Okay.  Got it.

20            Was there anything else in

21  that conversation?

22       A    We met with David and he

23  tried to convince us to come back and

24  work for MLD, and we said -- I really did

25  enjoy our time at MLD, but I said, "I

80

1

2     can't even think about that until I get a

3     portion, some, half, I don't know,

4     something of the money that we're owed."

5               I've even -- and then after

6     that we even went to Mr. Dear's golf

7     club, and he tried to convince us to go

8     back and work for MLD.  I said the same

9     thing to Mr. Dear, "Get me, get us, a

10    large portion of the money that we're

11    owed before we even consider it."

12          Q     And what did he say?

13          A     He kind of -- well, he --

14    they also did say at that time, "No,

15    we'll give you the $1.5 million, whatever

16    it is, to come back."  He had the same

17    pitch and then kind -- of kind of went

18    dark after I asked to get some of that

19    money as a sign of good faith before we

20    have any further discussions.

21          Q     Other than what you have

22    testified about, did you speak to anyone

23    at MLD about getting paid these unpaid

24    commissions?

25          A     No.

```
1                                           81

2          Q      Let's go back.

3                 When you met with David

4   Zilberman, I assume that was yourself,

5   Mr. Rakeman and Mr. Zilberman?

6          A      Correct.

7          Q      Was anyone else present?

8          A      No.

9          Q      Where did you meet with him?

10         A      It was at a steakhouse in

11  Manhattan.  I forget the name of it.

12         Q      Do you know what month?

13         A      We got fired, they fired us

14  in September, I would want to say that

15  probably October.

16         Q      At the time you met with

17  David was the East Meadow office still

18  open?

19         A      Yes.

20         Q      So was he talking about you

21  coming back to work in the East Meadow

22  office?

23         A      He -- he -- he didn't, no.

24  Actually, because he wanted us to -- he

25  wanted to give us, like, a bigger role
```

82

because we were just loan officers in
East Meadow, you know.  We reported to
John, Mike and Scott, so he wanted us
to -- he wanted, like, a different role.
A different kind -- kind of -- he wanted
us to kind of start a branch.

Q      So did he mention that the
place that you would work would be
somewhere other than East Meadow?

A      I don't recall.

Q      When did you meet with
Mr. Dear at his golf club?

A      I would probably say a couple
of weeks after meeting with David.

Q      Was anyone there, other than
yourself, Mr. Rakeman and Mr. Dear?

A      Morty and Larry were both
there.

Q      Do you know their last names?

A      Dear.

Q      Morty also worked for MLD,
correct?

A      Morty is the -- the -- the
father of Larry, I believe.  I think

83

2    that's correct.  So Morty is the original

3    owner of The Money Store.  Larry, I

4    believe, is his son.  I may have those

5    two confused, but I'm pretty sure that's

6    accurate.

7         Q     Did they both have positions

8    with MLD at the time you met with them?

9         A     I believe so.  I know

10   definitely that the son did.  I don't

11   know if I'm using the names properly.  I

12   don't know if Morty was still, like, on

13   the books or not.

14        Q     At the time you met with

15   Mr. Zilberman, going back now, were you

16   already working for another company?

17        A     Yes, I was.

18        Q     Who was that?

19        A     Intercontinental Capital

20   Group.

21        Q     Is that where you are

22   currently?

23        A     Yes.

24        Q     Is that also a bank?

25        A     Yes.

```
 1                                                84

 2          Q      And you have the same

 3   arrangement with Mr. Rakeman there?

 4          A      Yes.

 5          Q      Was the conversation with

 6   Mr. Dear cordial?

 7          A      Absolutely.  He's a very

 8   likeable guy.

 9          Q      After that conversation with

10   Mr. Dear you never heard anything else

11   from anyone at MLD about you continuing

12   to work there, correct?

13          A      I don't -- I don't recall.  I

14   don't think so.  I am -- I remember those

15   specifically because those were meetings,

16   so that's why they stick out more.

17          Q      Of the loan officers who are

18   in this case, how many work at

19   Intercontinental Capital Group, other

20   than yourself and Mr. Rakeman?

21          A      All of them except Robert

22   Tollin.

23          Q      Where is he?

24          A      I don't know, but he's

25   not with our company.
```

```
1                                          85
2          Q      To your knowledge, is he
3    still in the business?
4          A      I believe so.
5          Q      And is he working on Long
6    Island?
7          A      I think so.  I believe so.
8          Q      Where do you physically
9    report to work for Intercontinental?
10         A      100 Merrick Road in Rockville
11   Centre.
12         Q      Did you ever complain to
13   anyone at MLD that you were not getting
14   overtime?
15         A      No, I never complained about
16   it because I was more focused on getting
17   paid on the commissions that were owed.
18         Q      Did you ever complain to any
19   Department of Labor that you were not
20   getting overtime?
21         A      While working at MLD?
22         Q      Right.
23         A      During that tenure I never
24   complained to anyone.
25         Q      What is the basis of your
```

*Rich Moffett Court Reporting, Inc.*

86

1

2    claim that you should have received

3    overtime while working at MLD?

4         A     Because of the -- of the

5    hours that were put in and not being paid

6    for it.

7         Q     Do you know if outside

8    salespersons are exempt from overtime?

9              MR. REILLY:  Objection to

10        form.

11        A     I'm not an outside

12   salesperson.

13        Q     What is the basis for that

14   statement?

15        A     Because I had a location to

16   report to every day, a place I went to

17   every day.  My computer was there, my

18   desktop's there, my phone line's there.

19   That's the address on my business card.

20   I have an office.  I go to work every day

21   at a location.

22        Q     Were you ever able to forward

23   calls from MLD?

24        A     Tell you what, I'm sure you

25   could.  I never did because I would -- on

87

1

2    my voicemail I would leave my cell phone

3    number with maybe kind of the hope that

4    clients would use that discretion.

5         Q       What percentage of your calls

6    from customers at MLD came on the work

7    phone versus your cell phone?

8         A       50/50.

9         Q       Were you technically on the

10   cell phone while in the office?

11        A       Yeah, a lot of times I'm in

12   the office and I get a call on my cell, I

13   say, "Let me call you back from the

14   office," or I would keep it on the cell

15   phone.

16               Once clients get a phone

17   number they usually just keep that

18   number, and that's the one they're going

19   to call you at all the time.

20        Q       Did you supervise any

21   employees when you were at MLD?

22        A       No.

23        Q       Did any of the mortgage loan

24   originators report to you?

25        A       No.

88

    Q    Did you ever fill out performance evaluations for anyone?

    A    No.

    Q    Did you ever receive performance evaluations from anyone?

    A    My bosses, Mike, John, Scott, would just kind of say, "You're doing a great job."  That's it.

    Q    Did you ever receive written performance evaluations?

    A    An e-mail saying, "You're doing a great job."

    Q    Have you ever been convicted of a crime?

    A    No.

    Q    What was the date that MLD terminated you?

    A    I was fired on September 21st, 2015.  I believe that's -- 21st, maybe 22nd.  I think it's the 21st, though.

    Q    Where were you physically at the time of your termination?

    A    In my office.

89

Q      Were you there with
Mr. Rakeman?

A      Yup.  Yes.

Q      Am I correct in saying that
you were not expecting to get terminated
that day?

A      Absolutely not.  For the
record, I didn't expect them to show up
with a cop either.

Q      So tell me who showed up on
September 21st, 2015 at your office at
MLD.

A      John Veracka, Michael Brooks,
Scott Schraeger and a policeman from the
Nassau County Police Department.

Q      And your office has a door on
it?

A      Yeah.  Yes.  Sorry.

Q      And did your office also have
windows?

A      Yeah.  Yes.

Q      Did you see these folks
approaching?

A      No.

```
 1                                               90
 2        Q      So did someone knock on the
 3   door?
 4        A      My door was open, so I think
 5   either me or Mike were on a call and they
 6   kind of popped in and just kind of
 7   hovered for a second, and I was like,
 8   Whoa, that's kind of weird.
 9        Q      When you say they "popped
10   in," it was Veracka --
11        A      Yes.
12        Q      -- Mike, Scott and the police
13   officer?
14        A      The police officer was
15   outside in the hallway.  Outside of the
16   actual office, like, building hallway.  I
17   think they expected -- I don't know.  I
18   don't know.  Maybe they expected the
19   unexpected.  I have no idea.  I'm not a
20   violent person.
21        Q      So when the three of them
22   popped in and you and Mr. Rakeman were
23   not on the phone, what was said?
24        A      "Hey, guys, you got to go.
25   You're terminated."
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                               91

 2        Q       Who said that?

 3        A       Scott Schraeger.

 4        Q       And what did you and/or

 5   Mr. Rakeman say?

 6        A       We kind of laughed, like,

 7   "What?"  And they said, "Yes, we got a

 8   call from corporate.  You're terminated.

 9   Got to pack up your stuff and go."

10        Q       Any other discussion you

11   recall at that time?

12        A       I walked out into the

13   hallway, I saw the cop there, and I said,

14   "You got to be kidding me."

15        Q       All right.

16                Any other discussion that you

17   recall?

18        A       No.

19        Q       Did you and Mr. Rakeman pack

20   up and leave?

21        A       Yes.  Absolutely.

22        Q       How long did that take?

23        A       Ten minutes.

24        Q       And what stuff did you take

25   with you?
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                          92
 2          A        Pictures, all personal stuff.
 3    Like, I kept, like, my tax returns there,
 4    things like that.   Anything that I owned
 5    I took with me.
 6          Q        Did you take any client
 7    names?
 8          A        No.
 9          Q        Any client lists?
10          A        No.
11          Q        Any HUDs?
12          A        No.
13          Q        Did Mr. Dear or Mr. Zilberman
14    or anyone at MLD ever explain why they
15    made that decision?
16          A        David did.
17          Q        Was that at the meeting you
18    testified about earlier?
19          A        The dinner meeting.
20          Q        Right.
21                   What did Mr. Zilberman say?
22          A        He said that they heard we
23    were leaving from John, Mike and Scott,
24    and I don't know who said to terminate
25    us, but that's where they came to the
```

93

1

2        conclusion to terminate us.

3                Q        Were you and Mr. Rakeman

4        planning to leave MLD at the time?

5                A        We were not planning to

6        leave, but we were exploring options

7        because we were owed so much money in

8        unpaid commissions and we were not

9        getting a straight answer, and we would

10       call Mr. Zilberman ourselves, and he

11       wouldn't take our calls.

12                        Can we take a break?

13                        MR. REILLY:  Yes.

14                        Let's go off the record.

15                        (Recess taken.)

16               Q        Mr. Schiele, when did you

17       have to become licensed in this industry?

18               A        I want to say that's 2009, I

19       think.

20               Q        That was a time when everyone

21       had to be licensed, correct?

22               A        Maybe 2010, somewhere around

23       there.  Actually, could be even later.  I

24       honestly don't know.

25               Q        By the time you went to MLD

94

1

2      the licensing requirement existed,

3      correct?

4          A      Absolutely.

5          Q      And that was industrywide?

6          A      Yes.

7          Q      So you stated earlier that

8      you had sued Contour Mortgage before,

9      correct?

10         A      Yes.

11         Q      Do you know when you filed

12     that lawsuit, what year?

13         A      2015.

14         Q      Was that lawsuit filed before

15     or after you were terminated from MLD?

16         A      After.

17         Q      And that case ultimately

18     resolved, correct?

19         A      Yes.

20         Q      And you were represented by

21     the same counsel who represents you in

22     this case, correct?

23         A      Yes.

24         Q      Have you ever discussed this

25     lawsuit with anyone, other than your

95

1
2    counsel and your co-plaintiffs?
3        A       No.
4        Q       Has any employer ever asked
5    you about this lawsuit?
6        A       No.
7        Q       How many people were
8    terminated from MLD on or about
9    September 21st of 2015?
10       A       I don't know the full number,
11   but maybe 12, 12 to 14.
12       Q       Were they all mortgage loan
13   originators?
14       A       No.
15       Q       How many mortgage loan
16   originators were terminated from MLD on
17   or about September 21, 2015?
18       A       How many people are in this
19   lawsuit?  I'm sorry.  That's my answer,
20   yeah.  Yeah.  Sorry.
21       Q       That's all right.
22               Did you ever assist in hiring
23   any employees for MLD?
24       A       No.
25       Q       Did you ever recommend the

96

names of any employees for MLD?

        A       John, Mike or Scott would
maybe come up to us and say, "Hey, do you
know this person?"  And I would say,
"Yeah, good guy," or, "good worker," or,
"No, I don't know them."

        Q       Were you ever involved in
disciplining any employees for MLD?

        A       No.

        Q       Were you ever involved in
recommending discipline for anyone at
MLD?

        A       No.

        Q       Were you ever involved in
terminating anyone from MLD?

        A       No.

        Q       Did John, Mike or Scott have
licenses?

        A       John, no, Mike, no, Scott, I
believe he did.  I don't know where, but
I know he didn't pass his licensing test.

        Q       And was that the same license
you have?

        A       Yes.

97

Q      Is the person who supervises you required to have any type of license?

A      I'm sorry, can you rephrase that?

Q      Yes.

Who supervised you at MLD?

A      Okay, John, Mike and Scott.

Q      Do you know if there is a rule requiring the person who supervises you to have a license?

A      I don't think so.

Q      Was there a time in which you worked for MLD where the total hours you worked a week were more or less than at other times you worked for MLD?

A      End of the month would always be more.

Q      Between the years 2014 and 2015, was there any differentiation there in hours?

A      No.  It was, again, the best market and, you know, relatively young. It was, you know, strike while the iron's hot.  That was the mentality.

98

1

2      Q      Are you able to estimate the

3   percentage of time you worked from MLD in

4   the East Meadow office versus out of the

5   office?

6              MR. REILLY:  Objection to

7         form.

8      A      When you say "out of the

9   office," I mean, it's really MLD office

10  or my home office, and I would say

11  difference of, like, maybe less than ten

12  percent was outside of MLD office.  I'm

13  trying to do the math on this, but it was

14  very much predominantly in the East

15  Meadow office.

16             I don't know if that answered

17  your question.

18     Q      Yes, that's fine.

19             I would like to show you a

20  couple of exhibits.

21             MR. NARDO:  What I will do is

22        I will mark them and we'll continue

23        from Monday's exhibits.

24             So the last one I had was G,

25        so we will mark this as H.

*Rich Moffett Court Reporting, Inc.*

```
 1                                          99
 2                  (Defendants' Exhibit H,
 3          Employment Agreement, marked for
 4          identification.)
 5                  (Defendants' Exhibit I,
 6          Employment Agreement, marked for
 7          identification.)
 8                  (Defendants' Exhibit J,
 9          Notice and Acknowledgement of Pay
10          Right and Payday, marked for
11          identification.)
12                  (Defendants' Exhibit K,
13          2014 W-2, marked for
14          identification.)
15                  (Defendants' Exhibit L,
16          Earnings Statements, marked for
17          identification.)
18          Q     Mr. Schiele, I am going to
19   show you what has been marked as
20   Defendants' Exhibit H (handing).
21                  I ask you to review that, and
22   let me know when you are done reviewing
23   it.
24          A     (Perusing.)
25                  Okay.
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                        100
 2         Q       Do you see on the first page
 3    it has your name on it?
 4         A       Yes.
 5         Q       Just so you know, these are
 6    Bates stamped so I may refer to the Bates
 7    stamped page.
 8                 On that page 11, which is the
 9    first page --
10         A       Okay.
11         Q       -- it refers to you being
12    employed in the capacity as an outside
13    sales employee.  Do you see that?
14         A       Yes.
15         Q       And did you agree to that
16    when you signed this?
17         A       My signature is on the last
18    page, so yeah.  I mean, this is a -- this
19    is the same template that pretty much
20    every mortgage company has.
21         Q       Did you ever make any effort
22    to determine what that meant, that
23    phrase, "outside sales employee"?
24         A       No.  The thing about this
25    hiring process was that it happened so
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                          101

 2      quickly, this move, this transition, and

 3      these were thrown out there by, I

 4      remember, Ken Peskin to, like, 25 of us

 5      at a clip, and there was, you know, the

 6      only thing that really matters on a loan

 7      officer perspective is that, that last

 8      page (indicating).  That's the only thing

 9      that's different.

10            Q      And that page is Bates

11      stamped 18, correct?

12            A      18, yes.  Yes, sir.

13            Q      That indicates the basis

14      points you would get for each sale; is

15      that correct?

16            A      Yes, sir.

17            Q      That ultimately is how your

18      compensation is determined, correct?

19            A      Yes.

20            Q      Now, it does say in paragraph

21      1 that you, at the end of paragraph 1,

22      "Employee understands that employee has

23      the right to consult with a lawyer before

24      entering this agreement."

25                   Do you see that?
```

*Rich Moffett Court Reporting, Inc.*

102

1

2          A       Yes.

3          Q       After you signed this

4     agreement and while you worked at MLD,

5     did you ever ask anyone what the term

6     "outside sales employee" means?

7          A       No, I did not, because I was

8     more focused on getting paid the

9     commissions that I was owed.

10          Q       If you take a look at the

11    second page of this document, which is

12    number 12, take a look at that paragraph

13    C.  Does that describe the duties you

14    performed?

15          A       Yes, that's pretty accurate.

16          Q       Where was Intercontinental

17    located when you started working there?

18          A       In Jericho.

19          Q       Did Mr. Zilberman or anyone

20    at MLD ever indicate why other loan

21    originators were terminated on

22    September 21st of 2015?

23          A       I don't recall.  I don't

24    know.

25          Q       Referring to the Exhibit A,

*Rich Moffett Court Reporting, Inc.*

103

the last page of this Exhibit A, did that

comport with what you were told about

what your payment would be at MLD?

     A    Can you rephrase that

question?

     Q    Yes.

         Before you signed this

employment agreement did anyone have a

discussion with you about what your

payment would be?

     A    Yes.

     Q    Who had that discussion with

you?

     A    John Veracka, Michael Brooks,

Scott Schraeger.

     Q    Did they discuss the basis

points?

     A    I don't know if it was

discussed.  I mean, it's pretty easy to

figure out.

     Q    Well, did this Exhibit A on

the back of Exhibit H comport with what

your understanding of what the basis

points would be?

*Rich Moffett Court Reporting, Inc.*

104

A       Yes, at that time, yes.

Q       I would like to show you what has been marked as Defendants' Exhibit A. This one actually is from the other day (handing).

A       Oh, sure.

Q       See if you can identify what that document is.

A       Exhibit A?

Q       Yes, so that's what you're looking at.  Don't look at the first page, but look at the other pages.

A       This is Exhibit A?

Q       Right.

A       But don't look at this page?

Q       Right, forget the first page. Forget the first page.

A       Okay.

Q       See if you can make sense out of the remaining pages.

A       It looks like a profit and loss statement.

Q       Does it look like a profit and loss statement pertaining to you and

```
1                                        105
2    Mr. Rakeman?
3         A      No.
4         Q      Do you know whose profit and
5    loss statement this is?
6         A      No.
7         Q      If you take a look at the
8    last page numbered 143, does that assist
9    you in discerning what this document is?
10        A      This is a profit and loss
11   statement, but this is a hundred percent
12   not mine or Michael's.
13        Q      Okay.
14               Do you know whose it is?
15        A      I have no idea.
16        Q      All right.  Thank you.
17               I will show you what has been
18   marked as Defendants' Exhibit I
19   (handing).
20               If you take a look at this
21   Defendants' Exhibit I, you will see the
22   Bates stamp or that stamp at the bottom
23   says P146, which means this is a document
24   that you produced.
25        A      Okay.
```

```
106
```

1                                              106

2        Q       Do you recall having a copy

3    of your employment agreement?

4        A       Yes.

5        Q       Do you know if you have the

6    full employment agreement?

7        A       Probably, I would think.  My

8    attorney would know because I would turn

9    everything over to him.

10       Q       And you have already done

11   that --

12       A       Yeah.

13       Q       -- related to this case?

14               MR. REILLY:  It might have

15           been just this page that you gave

16           us.  If it was a full one I would

17           have turned it over, so just go

18           back and check your records.

19               THE WITNESS:  I could check.

20       Q       Let me show you what has been

21   marked as Defendants' Exhibit J

22   (handing).

23               Does this have your name on

24   it?

25       A       Yes, it does.

*Rich Moffett Court Reporting, Inc.*

```
 1                                    107
 2          Q       Does it have your signature
 3     on it?
 4          A       Yes, it does.
 5          Q       Do you recall receiving this
 6     from Denise Veracka?
 7          A       Yes.  Well, I don't recall.
 8     I'm assuming.  Yeah, it looks like it.
 9          Q       Well, do you recall any
10     discussions --
11          A       Absolutely.
12          Q       You do?
13          A       Yeah.
14          Q       So approximately when did you
15     receive this from Ms. Veracka?
16          A       This was in January,
17     beginning of 2015 when John, Mike and
18     Scott all agreed that we were owed way,
19     way, way too much money, seven figures.
20     And this is where they changed our
21     commission structure to this $4,000
22     salary it says here, but that's really
23     just chipping away at the over million
24     dollars that's owed, and that's when they
25     increased our Dodd-Frank payout
```

108

1  drastically to chip away at the balance

2  that's owed.  The $4,000 and the increase

3  in Dodd-Frank was a sign of good faith.

4      Q      Did that ultimately decrease

5  the balance that MLD owed to you and

6  Mr. Rakeman?

7      A      Yes, but the issue is that we

8  were continuously, again, with the market

9  the way it was, we continuously produced

10  more.

11      Q      How long did this change in

12  compensation structure last?

13      A      A few months.  To be honest

14  with you, I'm sure you have the next one,

15  I would go off that because it went back

16  after this.  This was increased to four

17  percent and you'll have the third

18  employment agreement I think will give

19  you the date that was changed back.

20      Q      Let me ask you, looking at

21  Defendants' Exhibit J, it says, "$4,000

22  salary plus commission."

23              Do you see that?

24      A      Yes.

*Rich Moffett Court Reporting, Inc.*

109

1

2          Q       Is that the way you were

3     paid?

4          A       I was paid $4,000 as a sign

5     of good faith to chip away at the money

6     that was owed, so it's essentially a draw

7     because it's coming -- coming against my

8     commissions that was already owed, and

9     then I was getting paid commissions at a

10    higher rate again to chip away at the

11    significant amount that was owed to us at

12    that time.

13              I know it says $4,000 salary,

14    but that's a draw against commissions,

15    and you could probably see that it was.

16    If you have other profit and losses from

17    MLD, you would see that it was taken out

18    against our commission.

19         Q       If the $4,000 given to you

20    after February 1st, 2015 was a draw

21    versus commissions, how would that reduce

22    the arrears of what was owed to you?

23         A       I mean, it would take

24    forever.  It's like running a marathon

25    but, like, walking it, but it was their

110

1
2  way at $4,000 that would knock out, you
3  know, knock down that million dollar plus
4  number.  Very small.
5        Q      But in order for that to work
6  wouldn't the $4,000 have to be something
7  paid in addition to the commissions?
8        A      Yes, but let me explain,
9  that's why they increased.  So our -- our
10  Dodd-Frank payout was 2.75 percent,
11  whatever it says there.  They got so far
12  behind in paying us, and you will see in
13  the pay stubs that you have that our pay
14  was round numbers, 20,000, 30,000, which
15  makes no mortgage banking payroll sense
16  whatsoever.
17              They got so far behind so
18  they increased our Dodd-Frank to four
19  percent, meanwhile, it was still
20  technically supposed to be 2.75, so they
21  would overpay the 1.25 percent on top of
22  the $4,000 salary to try to pay that debt
23  down more aggressively.
24        Q      Am I correct in saying that
25  the additional 1.25 percent that you

111

1

2    would have received under this Dodd-Frank

3    payout would be applied to the arrears

4    that they owed you?

5         A      Yes, sir.

6         Q      Do you know how much money

7    you received in that additional

8    1.25 percent for the few months that this

9    was in effect?

10        A      I honestly don't know.  My

11   paychecks were still round numbers,

12   though.  That made no sense.

13        Q      Who had that discussion with

14   you about the 4,000 plus commission and

15   the 4.0 percent?

16        A      It was either-or any

17   combination of John, Mike or Scott.

18        Q      Was Denise part of that

19   discussion?

20        A      Well, yes, because she's the

21   one that handed me, I believe, me that --

22   that other -- that one page.  It says,

23   like, Exhibit A on it, the breakdown of

24   it.  She generates that so she was part

25   of it.

1                                                    112

2          Q      Is it this exhibit

3    (indicating)?

4          A      No, it would be the --

5          Q      The employment agreement?

6          A      She's the one that hands me

7    that.

8          Q      So she handed you the last

9    page of the employment agreement, which

10   has the basis points?

11         A      Correct, she generates that

12   after discussions with John, Mike and

13   Scott.

14         Q      Let me ask you a question:

15   What is Brian G. Schiele, Inc.?

16         A      It's a corporation.

17         Q      When did you open that?

18         A      Probably, wait, 2007 maybe.

19         Q      That was before you worked at

20   MLD, correct?

21         A      Oh, yeah.

22         Q      What was the purpose of that?

23         A      So we opened -- I.  We I'm

24   saying.  I opened that up back then as

25   just, initially, just as based on advice

*Rich Moffett Court Reporting, Inc.*

```
 1                                            113
 2      from our -- from my accountant.  It
 3      really didn't have much activity at all
 4      back then, but as we got into more
 5      marketing it was more -- it was utilized
 6      more.  So for years it was nothing.
 7           Q      How did you utilize Brian G.
 8      Schiele, Inc. when you worked at MLD?
 9           A      Just in terms of media buying
10      or advertising.  Sometimes act as your
11      own agent.
12           Q      Did you ever pay Joanna
13      Longobardi through Brian G. Schiele,
14      Inc.?
15           A      Probably.  If there's a 1099
16      I would say yes.
17           Q      What did you pay her for?
18           A      She and other people would
19      help with controlling spot times on
20      different stations, making sure that
21      banner ads were up on various websites.
22                  There's a lot of checks and
23      balances when you're doing any type of
24      advertising, so there were people that
25      would kind of be in charge of maybe
```

*Rich Moffett Court Reporting, Inc.*

1                                          114

2      that -- that segment of it.  While Mike

3      and I are originating loans, they would

4      help us in terms of just making sure that

5      this ran at this time correctly.

6           Q     So take a look at what is

7      marked as Defendants' Exhibit K.  Is the

8      first page of Defendants' Exhibit K your

9      W-2 for 2014?

10          A     Yes, sir.

11          Q     It shows income in excess of

12     $1 million for that year?

13          A     Yes.

14          Q     Is the third page your W-2

15     for 2015?

16          A     Yes.

17          Q     And that shows income in

18     excess of $1.3 million for that year,

19     correct?

20          A     Yes.

21          Q     And you were always paid on

22     W-2 by MLD?

23          A     Absolutely.

24          Q     Are you the sole shareholder

25     for Brian G. Schiele, Inc.?

115

A     Yes, sir.

Q     This second page on Defendants' Exhibit K is a 1099 of Brian G. Schiele, Inc. issued to Joanna Longobardi, correct?

A     Yes.

Q     That was for services she performed for Brian G. Schiele, Inc., right?

A     Yes.

Q     Those services were in furtherance of your advertising that was occurring at MLD?

A     Correct.

Q     Other than Brian G. Schiele, Inc., do you own any other corporations?

A     Currently?

Q     While you worked at MLD.

A     I think there was another corporation in mid-2015 opened up.  I believe that's the date.  And that's Cross Island Media.

Q     Was that something that you opened?

1                                                      116

2          A        Yes.

3          Q        What was the purpose of that?

4          A        Same type, advertising, media

5     buying.

6          Q        Who is the shareholder of

7     that?

8          A        Me.

9          Q        Is this something you

10    coordinated with Mr. Rakeman?

11         A        No.

12         Q        But is this something used at

13    MLD?

14         A        I don't even -- I don't even

15    think so.  I don't know.  I can't tell

16    you a hundred percent, but I don't think

17    so.

18         Q        Did you ever use it at all?

19         A        During MLD?

20         Q        Yes.

21         A        I don't know.  After, yes.

22         Q        I will show you what is

23    marked as Defendants' Exhibit L

24    (handing).

25         A        Do you want these back?

*Rich Moffett Court Reporting, Inc.*

117

1

2      Q      No, you can just leave them

3  here for now.  Eventually I want them

4  back.

5                  (Witness perusing.)

6      Q      Have you reviewed this

7  exhibit?

8      A      A lot of pages.  I get the

9  gist of it.

10      Q      These appear to be your pay

11  stubs or earnings statements from MLD --

12      A      Sure.

13      Q      -- correct?

14      A      Yes.

15      Q      Do you know why the first pay

16  stub here says, "$36,000 advance"?

17      A      Yes.

18      Q      Why is that?

19      A      Ray, you're making me yawn.

20  Making me tired.

21      Q      We're almost done.

22      A      When we came on board, there

23  was a lot of -- I think there was waiting

24  for the branch to get licensed and we

25  were starting to close loans, and I

118

believe these closed while licenses were

being transitioned, so we were owed, in

this case, I was owed, commissions.  But

I don't know why they do it this way.

But there were no taxes taken out, and it

says Advance but it was actually for

commissions that were -- that were paid

prior or commissions that were owed prior

to the fully licensing being transferred,

I believe.

      Q     Did you ever have a

discussion with anyone about that?

      A     Yeah, I didn't say, "Why does

it say advanced?" because I knew it was

-- it wasn't an advance, but I asked

about the taxes.

      Q     Whom did you ask?

      A     Either John, Mike or Scott,

and I forget what their answer was.  I

really don't know.

      Q     Just if you look, they're not

Bates stamped in order.  This is how they

were produced.  But the fifth page in

seems to show a number that might be

*Rich Moffett Court Reporting, Inc.*

119

1
2    consistent with commissions earned during
3    that period because it's not a round
4    number.
5         A    Uh-huh.
6         Q    Is that a yes?
7         A    Yeah, I would -- I would say
8    so.
9         Q    If you look at the next page,
10   the next page is Bates stamped 956 and
11   that shows $15,000.
12        A    Yeah.
13        Q    And basically, if you leaf
14   through these you will see some of these
15   are round numbers, as you have testified,
16   and some are not?
17        A    Correct.  Chances of
18   commissions being a round number is kind
19   of like hitting the lottery twice in a
20   year.  It doesn't happen.
21        Q    Now, there are a few things,
22   I can direct you to them if necessary,
23   that show a payment of $16,666.66.
24        A    Oh, yeah, I see that.
25        Q    Do you know why that number

```
 1                                          120

 2   comes up repetitively?

 3        A       You know what, I see what

 4   you're saying.  I don't.  I don't know.

 5   I think maybe they would -- I honestly

 6   don't know.  They probably had a plan of

 7   how to get X amount.

 8               Let's do this.  If you

 9   actually add up that number three times

10   you're going to get a round number.

11        Q       Okay.  It comes out to

12   $100,000 basically.

13        A       There you go, so they slotted

14   X amount of dollars for me, and that's

15   how they were doing it.

16        Q       What explanation did anyone

17   at MLD give for them being behind on your

18   commission statements?

19        A       David never gave me an

20   explanation because he wouldn't take my

21   calls.  John, Mike and Scott said that

22   this is what David has allowed to be

23   paid.  I wouldn't go over my bosses' head

24   just to go right to David except when

25   they say, "This is what David said," so
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                         121
 2    that's when I would try to call David.
 3         Q      Did you ever discuss it with
 4    Larry Dear, other than the
 5    posttermination dinner?
 6         A      No.
 7         Q      Did you ever discuss it with
 8    anyone, other than John, Mike, Scott or
 9    David?
10         A      During my employment?
11         Q      During your employment, yes.
12         A      No, because once you start --
13    once you start making those rumblings in
14    an office, in a mortgage company,
15    everything goes downhill, and I didn't
16    want to do that to other people.
17         Q      Is it fair to say that you
18    and Mr. Rakeman were frustrated by this?
19         A      Absolutely.
20         Q      To your knowledge, was this
21    happening with any other loan originators
22    at MLD?
23         A      I don't know.
24         Q      Did any loan originator ever
25    discuss with you at MLD the fact that MLD
```

*Rich Moffett Court Reporting, Inc.*

1                                            122

2     was in arrears on commission payments?

3          A      They could have.  I don't

4     recall totally.

5          Q      All right.

6                 I am going to go to Exhibit G

7     marked at the previous deposition

8     (handing).

9          A      Could I use the bathroom?

10         Q      Absolutely.

11                (Recess taken.)

12         Q      Mr. Schiele, have you taken a

13    look at what has been previously marked

14    as Defendants' Exhibit G?

15         A      Yes.

16         Q      This was produced by your

17    side, so if you look at the first pages

18    P363 to 372, do you know what that is?

19         A      Yes, it's a funding report.

20         Q      And who generates that?

21         A      This would be generated by

22    Michael Brooks.

23         Q      How often were these

24    generated?

25         A      Monthly.

123

1

2      Q      Do you know what month this

3   funding report was for?

4      A      Well, it looks like it's --

5   it's starting from beginning of time,

6   beginning of my employment up until,

7   unless we're missing any pages, it

8   probably should go to the end of July,

9   yeah.

10      Q      That's correct.

11      A      Yup, July of 2015.

12      Q      Do you know why it goes to

13   that point?

14      A      Because -- well,

15   coincidentally, we never got the

16   August 1st, and then we were -- we never

17   got the August 1st because we were

18   terminated in September, and I think that

19   was premeditated not to give it to us.

20      Q      All right.

21             Now take a look at 418

22   through 436, which at the back of this

23   document --

24      A      Got it.  That would be what

25   the revenue, the payout should be on --

*Rich Moffett Court Reporting, Inc.*

1                                    124

2      so the first couple of pages that we

3      looked at are funding reports, the

4      client's name, loan amount.  The back

5      would be what commissions on that would

6      be.  The payout is 7,658.  Half would go

7      to Michael Rakeman, half would go to me.

8            Q      And there are a couple

9      starting at page 418 that say, "Payout."

10           A      Correct.

11           Q      That would be the amount

12     earned for each transaction by the loan

13     originator, correct?

14           A      Correct.

15           Q      Now, if you go to page 436,

16     can you tell me what that is?

17           A      This would be each owed --

18     I'm sorry.  This is a total revenue

19     report that either is, I believe, this

20     would be prior -- money that's owed

21     through July 31st.  Then you have all of

22     August and half of September on top of

23     that.

24           Q      By the way, who generated

25     this document, referring to pages 418 to

*Rich Moffett Court Reporting, Inc.*

125

2      436?

3          A      Michael Brooks.

4          Q      Is this something that you or

5      Mr. Schiele received from Mr. Brooks?

6          A      Yeah, me and Michael Rakeman

7      would receive it, yes.

8          Q      I am sorry.  Did you each

9      receive one?

10         A      Yes.

11         Q      Do you know, looking at page

12     436 what the term "gross income" refers

13     to or means?

14         A      No.

15         Q      Do you know what the term

16     "gross expenses" refers to?

17         A      No.  I'm assuming it's

18     expenses.  That doesn't -- the math of

19     the whole thing doesn't add up, but I

20     don't know exactly what that refers to.

21         Q      Do you know what "gross

22     balance due" refers to?

23         A      Money that's owed to Michael

24     and myself.

25         Q      And then each owed is half of

```
1                                      126
2     the gross balance due?
3          A     Correct.
4          Q     And then there is something
5     below that box, it says, "Presumably
6     Michael, Brian year to date income."
7                See that?
8          A     Yes.
9          Q     Is that the amount that they
10    paid you for up to that point?
11         A     I don't know if that is what
12    is paid -- was paid or if that is what
13    would be projected to be paid.  I'm not
14    sure.  But I would think that would be --
15    that's what was paid up to date.
16         Q     And do you know what
17    "carryover" is?
18         A     That is one of two things.
19    It's either the carryover from the
20    beginning of 2015 or possibly the
21    addition of any type of August or --
22    August loans that were added in there.  I
23    don't know definitively.
24         Q     So does this document
25    indicate what you and Mr. Rakeman are
```

*Rich Moffett Court Reporting, Inc.*

127

2  owed through July 31st of 2015 in any

3  way?

4       A      Yeah, I think the 497 each is

5  what could be owed through July, but that

6  doesn't include anything for August and

7  September.

8              And keep in mind also, for

9  the record, that when we were fired on

10  September 21st, there was still other

11  deals that were going to close in my or

12  Mike's name.

13       Q      Well, let me ask you this:

14  If you can look at page 435, what does

15  "TMS revenue adjustment" mean in about

16  the middle of the page?

17       A      That's a good question.  I

18  don't remember what it was.  I don't

19  know.  It's definitely not something I

20  would argue saying it shouldn't be there,

21  but I don't remember what it was.

22       Q      Do you recall having any

23  discussions with anyone about this

24  particular Defendants' Exhibit G?

25       A      Dave Zilberman.

*Rich Moffett Court Reporting, Inc.*

128

1

2      Q      What did you have a

3   discussion with Mr. Zilberman about it?

4      A      On the phone and in person.

5      Q      When was the phone

6   discussion?

7      A      When we were setting up

8   dinner.

9      Q      So that was posttermination?

10     A      Oh, yes.  Yes.  I'm sorry.

11  Yes, the only conversation with David

12  Zilberman was posttermination.

13     Q      To your knowledge, did

14  Mr. Zilberman or Mr. Dear ever dispute

15  the amount that you and Mr. Rakeman claim

16  to be owed by MLD?

17     A      Absolutely not.

18     Q      What was that amount again?

19     A      Prior to August fundings,

20  August loans, 994, total about

21  1.5 million.

22     Q      So when you were discussing

23  with Mr. Zilberman and Mr. Dear the

24  amounts owed, you and Mr. Rakeman were

25  claiming to be owed 1.5 million at that

129

1

2    point?

3         A       At that point we didn't know

4    a full number.  We knew it was over seven

5    figures at that point.

6         Q       What information did you

7    obtain that leads you to believe it's

8    1.5 million in commissions?

9         A       Two things.  Two things will

10   show that.  You add up, if you take our

11   Dodd-Frank compensation, you take the

12   funded loans times our compensation, you

13   get a gross number.  Subtract our W-2s

14   and pay stubs from that number, that's

15   where you're going to get 1.5 million.

16        Q       And have you personally done

17   that?

18        A       Yes.

19               Now, the other way to do it,

20   get a list of all the loans that closed

21   in the month of August 2015 and September

22   of 2015, add it to the 994 that you see

23   on the back of this page and you're going

24   to get that same number.  Two ways to

25   back into it.

130

Q      How did you get the information for the August loans?

A      Because I -- at that time I was able to write down loans that I closed, and David Zilberman, I e-mailed them to Dave Zilberman.

Q      Do you have a copy of that?

A      I can get it.

Q      What could you get?

A      I can get the e-mail that I wrote to David Zilberman showing the loans.  I'm 90 percent sure I can get this e-mail showing the loans that closed in August and September that are not on this list, and they're probably loans that closed after that e-mail too that wasn't on there that probably closed in October, late October.

Q      But how did you get that information about the August loans?

A      Because it was fresh in my head on deals that we closed.  At that time I had that information.

Q      So you wrote that information

```
 1                                        131
 2    down or had that information at the time?
 3         A      Absolutely.
 4         Q      And whether or not you have
 5    it now you're not sure?
 6         A      I can go back and try and
 7    find the e-mails.  It's pretty easy to
 8    search.
 9         Q      But wouldn't that e-mail be
10    from an MLD e-mail?
11         A      No.  No.  No.  It would be
12    after termination, so, say, September
13    25th I e-mailed Dave Zilberman from my
14    personal account, "Hey, Dave, you have
15    this list of all these deals.  Here's a
16    list of the ones that are not on this
17    list."
18         Q      Would you agree with me that
19    the amount of any recovery, if you are
20    correct on the overtime claim, would be
21    in proportion to the number of hours you
22    worked?
23         A      Can you rephrase that?
24         Q      Yes.
25                Would you agree with me that
```

*Rich Moffett Court Reporting, Inc.*

132

1

2  the more hours you worked per week, the

3  greater your recovery would be for the

4  overtime claim if MLD is liable?

5       A      Yeah.  I think -- yeah, if

6  there's an overtime claim and more hours

7  is greater than lesser hours, yes.

8       Q      Did you and Mr. Rakeman

9  jointly agree to file this lawsuit?

10      A      Yes.

11      Q      Did you ever contact other

12  employees to file this lawsuit?

13      A      No.

14      Q      Do you know if Mr. Rakeman

15  did?

16      A      I cannot speak for him, but I

17  would think no.

18      Q      Do you know how it came about

19  that the other employees joined the

20  lawsuit?  And I don't want you to discuss

21  any discussions you had with your

22  attorney.

23      A      So what's the question?

24      Q      Do you know how it came about

25  that this lawsuit had more plaintiffs

133

other than you and Mr. Rakeman?

     A     No, I do not.

     Q     Were you ever a mentor to other loan officers?

     A     At MLD?

     Q     Yes.

     A     No.

     Q     Did any other loan officers have offices with doors on it at MLD?

     A     I believe so.  I should say absolutely, yes, they did.

     Q     Do you know how many were in that office?

     A     Some were individual, some were two to an office.

     Q     Were there ever more than two to an office at MLD?

     A     No, not enough room for that.

     Q     How many receptionists worked at one time for MLD?

     A     Receptionists?

     Q     Yes.

     A     During business hours there would be one.

```
 1                                         134
 2          Q       Were all calls to MLD routed
 3     through the reception area?
 4          A       No.
 5          Q       So people could call your
 6     line directly?
 7          A       Yes.
 8          Q       If they called the line that
 9     was in the advertisements, would that go
10     through reception or would that ring
11     directly to your phone?
12          A       It would ring directly to our
13     phone.
14          Q       Are mortgage loan originators
15     required to sign contracts?
16          A       What do you mean "contracts"?
17     Like a loan officer agreement?
18          Q       Yes.
19          A       Yes.
20          Q       And the contract you signed,
21     or the agreement you signed, with MLD,
22     you read it before you signed it?
23          A       It's a template so it's kind
24     of the same all around.  I read the last
25     page, which is the most important, I
```

1                                              135

2      would think, in how we would get paid.

3              Q       Did you read the prior pages?

4              A       I may have skimmed over it.

5              Q       Did you understand the terms?

6              A       To the best of my ability.

7              RQ         MR. NARDO:  Okay, I

8              have nothing further, but I would

9              request a few things on the record.

10             One is if Mr. Schiele has his

11             full employment agreement in his

12             possession.

13             Another is any Schedule Cs he

14             submitted for Brian G. Schiele,

15             Inc. or any other corporation or

16             business for the years 2013 through

17             2015, and any e-mails to David

18             Zilberman or Mr. Dear after his

19             termination from MLD.

20             MR. REILLY:  Are you done?

21             MR. NARDO:  That's it.

22             MR. REILLY:  The first and

23             third request we will provide to

24             the extent that he can locate it,

25             and the second request, please put

*Rich Moffett Court Reporting, Inc.*

```
 1                                          136

 2        that in written form under the

 3        federal rules so that I could

 4        respond to them under the federal

 5        rules.

 6              MR. NARDO:  The requests for

 7        Rakeman went out yesterday.  This

 8        will go out shortly.  I'll put all

 9        three of them in.

10              MR. REILLY:  Sure.  Perfect.

11              MR. NARDO:  Any questions?

12              MR. REILLY:  No.

13              MR. NARDO:  Then we're done.

14              (Time noted:  1:33 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                              137
 2              A C K N O W L E D G M E N T
 3
 4      STATE OF NEW YORK  )
                                     :ss
 5      COUNTY OF [!COUNTY]    )
 6
 7              I, BRIAN SCHIELE, hereby
 8      certify that I have read the transcript
 9      of my testimony taken under oath in my
10      deposition of April 18, 2019; that the
11      transcript is a true, complete and
12      correct record of my testimony, and that
13      the answers on the record as given by me
14      are true and correct.
15
16
17              _____
18                     BRIAN SCHIELE
19
20      Signed and subscribed to before
        me, this            day
21      of                   , 2019.
22
23      _____
        Notary Public, State of New York
24
25
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                        138
 2  -------------------I N D E X-------------------
 3  WITNESS              EXAMINATION BY      PAGE
 4  BRIAN SCHIELE        MR. NARDO              4
 5
 6  ----------------DOCUMENT REQUEST----------------
 7  Mr. Schiele's full employment agreement
 8
 9  Schedule Cs submitted for Brian G. Schiele, Inc.
10  or any other corporation or business for
11  2013 through 2015.
12
13  Any e-mails to David Zilberman or Mr. Dear after
14  termination from MLD.
15
16  -------------------EXHIBITS-------------------
17  DEFENDANTS' FOR I.D.                     PAGE
18  H      Employment Agreement             99
19  I      Employment Agreement             99
20  J      Notice and Acknowledgement of Pay  99
21          Right and Payday
22  K      2014 W-2                         99
23  L      Earnings Statements              99
24
25  (Counsel retained exhibits.)
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                        139
 2                C E R T I F I C A T E

 3
     STATE OF NEW YORK   )
 4                       )  ss.:
     COUNTY OF NASSAU    )
 5
 6              I, DIANA MITCHELL, a Notary
 7         Public within and for the State of
 8         New York, do hereby certify:
 9              That BRIAN SCHIELE, the
10         witness whose deposition is
11         hereinbefore set forth, was duly
12         sworn by me and that such
13         deposition is a true record of the
14         testimony given by such witness.
15              I further certify that I am not
16         related to any of the parties to this
17         action by blood or marriage; and that I
18         am in no way interested in the outcome
19         of this matter.
20              IN WITNESS WHEREOF, I have
21         hereunto set my hand this 25th day
22         of April, 2019.

23
24         -------------------------
                DIANA MITCHELL
25
```

*Rich Moffett Court Reporting, Inc.*

140

**$**

$100,000 [1] - 120:12
$15,000 [1] - 119:11
$16,666.66 [1] - 119:23
$20,000 [1] - 76:18
$24,000 [1] - 15:4
$250,000 [2] - 30:5, 30:10
$36,000 [1] - 117:16
$4,000 [9] - 107:21, 108:3, 108:22, 109:4, 109:13, 109:19, 110:2, 110:6, 110:22
$500,000 [1] - 30:4
$70,000 [2] - 16:22, 76:14
$72,321 [1] - 76:16

**'**

'till [2] - 57:2, 60:10

**1**

1 [3] - 101:21, 114:12
1.25 [3] - 110:21, 110:25, 111:8
1.3 [1] - 114:18
1.5 [8] - 78:8, 79:10, 79:16, 80:15, 128:21, 128:25, 129:8, 129:15
100 [1] - 85:10
1003 [4] - 44:23, 44:25, 45:7, 45:18
1099 [2] - 113:15, 115:4
10:00 [1] - 60:10
10:15 [1] - 1:16
11 [1] - 100:8
114 [1] - 1:24
11501 [2] - 1:25, 2:13
11550 [1] - 52:25
11554 [1] - 53:3
11570 [1] - 4:14
11758 [1] - 2:6
12 [4] - 14:12, 95:11, 102:12
129 [2] - 1:14, 2:12
14 [1] - 95:11
143 [1] - 105:8
15 [3] - 14:12, 36:23, 42:13
15-year [3] - 42:5, 43:25, 44:4
15-year-term [1] - 43:24

15th [1] - 76:7
16 [1] - 6:8
16CV00453(JFB)(GRB [1] - 1:9
16th [1] - 76:9
17 [1] - 38:24
18 [4] - 1:15, 101:11, 101:12, 137:10
1900 [1] - 35:11
1980 [1] - 6:8
1:33 [1] - 136:14
1st [4] - 76:6, 109:20, 123:16, 123:17

**2**

2 [3] - 52:16, 57:6, 62:22
2.75 [2] - 110:10, 110:20
20 [3] - 23:16, 36:24, 47:25
20,000 [1] - 110:14
20-year-term [1] - 43:24
2002 [3] - 6:12, 6:20, 9:24
2003 [2] - 10:9, 18:6
2006 [4] - 9:25, 10:20, 20:14, 20:17
2007 [1] - 114:18
2008 [3] - 26:11, 48:7, 48:23
2009 [2] - 32:9, 93:18
2010 [1] - 93:22
2013 [4] - 33:13, 34:7, 135:16, 138:11
2014 [5] - 77:2, 97:19, 99:13, 114:9, 138:22
2015 [19] - 35:19, 75:24, 88:20, 89:12, 94:13, 95:9, 95:17, 97:20, 102:22, 107:17, 109:20, 114:15, 123:11, 126:20, 127:2, 129:21, 129:22, 135:17, 138:11
2019 [4] - 1:15, 137:10, 137:21, 139:22
206 [1] - 35:12
21 [1] - 95:17
21st [8] - 35:18, 88:20, 88:21, 88:22, 89:12, 95:9, 102:22, 127:10
22 [1] - 42:12
22nd [1] - 88:21
24/7 [1] - 60:5
25 [1] - 101:4

25th [2] - 131:13, 139:21
2:00 [1] - 57:3

**3**

30 [1] - 36:24
30,000 [1] - 110:14
31st [2] - 124:21, 127:2
37 [1] - 4:13
372 [1] - 122:18

**4**

4 [2] - 53:2, 138:4
4,000 [1] - 111:14
4.0 [1] - 111:15
418 [3] - 123:21, 124:9, 124:25
4242 [1] - 2:5
435 [1] - 127:14
436 [4] - 123:22, 124:15, 125:2, 125:12
497 [1] - 127:4
4:00 [1] - 57:16
4th [1] - 72:9

**5**

50/50 [3] - 12:23, 57:13, 87:8
516-280-4664 [1] - 1:25
570 [1] - 48:19
5:00 [1] - 60:2

**6**

6 [1] - 57:7
60 [2] - 16:22, 67:12
630 [1] - 1:24
6:00 [1] - 57:4
6:15 [4] - 53:15, 55:7, 55:15
6:30 [4] - 53:15, 53:16, 55:7, 55:16

**7**

7 [6] - 53:14, 53:24, 54:16, 54:22, 57:25, 59:14
7,658 [1] - 124:6
75 [1] - 57:16
7:00 [1] - 53:13
7:15 [1] - 53:25

**8**

85 [1] - 31:10
8:00 [9] - 53:20, 54:16, 54:23, 55:10, 56:6, 57:2, 57:25, 59:15, 61:25

**9**

90 [2] - 31:7, 130:13
95 [1] - 38:7
956 [1] - 119:10
99 [8] - 36:18, 68:5, 138:18, 138:19, 138:20, 138:22, 138:23
994 [2] - 128:20, 129:22
9:00 [2] - 56:10, 59:25

**A**

a.m [4] - 1:16, 53:13, 57:2, 59:25
abide [1] - 25:24
ability [1] - 135:6
able [10] - 30:18, 52:12, 52:18, 57:5, 60:20, 63:23, 77:3, 86:22, 98:2, 130:5
absolutely [17] - 7:19, 7:25, 43:3, 60:19, 61:22, 69:9, 84:7, 89:8, 91:21, 94:4, 107:11, 114:23, 121:19, 122:10, 128:17, 131:3, 133:12
abundant [1] - 38:20
access [1] - 65:18
according [1] - 29:16
account [1] - 131:14
accountant [1] - 113:2
accountants [1] - 70:18
accounting [1] - 11:3
accuracy [1] - 46:19
accurate [2] - 83:6, 102:15
Acknowledgement [2] - 99:9, 138:20
act [1] - 113:10
action [1] - 139:17
activity [1] - 113:3
actual [2] - 47:15, 90:16
add [4] - 47:20, 47:24, 77:13, 120:9, 125:19, 129:10,

129:22
added [1] - 126:22
addition [3] - 75:10, 110:7, 126:21
additional [2] - 110:25, 111:7
address [4] - 4:12, 45:8, 65:16, 86:19
adds [1] - 76:21
adjustable [2] - 36:22, 37:16
adjusted [1] - 37:19
adjustment [1] - 127:15
administer [1] - 3:18
ads [8] - 8:23, 9:2, 49:10, 49:19, 49:21, 50:6, 50:15, 113:21
advance [2] - 117:16, 118:16
Advance [1] - 118:7
advanced [1] - 118:15
advantageous [1] - 25:8
advertisement [3] - 48:5, 50:11, 68:7
advertisements [5] - 48:3, 48:14, 48:25, 67:2, 134:9
advertising [6] - 49:11, 51:12, 113:10, 113:24, 115:13, 116:4
advice [1] - 112:25
agent [1] - 113:11
aggressively [1] - 110:23
agree [5] - 21:14, 100:15, 131:18, 131:25, 132:9
AGREED [3] - 3:4, 3:10, 3:15
agreed [2] - 21:16, 107:18
agreement [13] - 76:4, 101:24, 102:4, 103:9, 106:3, 106:6, 108:19, 112:5, 112:9, 134:17, 134:21, 135:11, 138:7
Agreement [4] - 99:3, 99:6, 138:18, 138:19
alarm [1] - 61:16
alliance [1] - 26:18
allow [2] - 31:8, 52:23
allowed [2] - 29:24, 120:22
almost [1] - 117:21
ALSO [1] - 2:17

**AM** [1] - 48:19
**Ameriquest** [23] - 9:19, 10:12, 10:20, 10:25, 12:3, 12:25, 13:8, 13:19, 14:14, 15:2, 15:15, 17:17, 17:20, 18:3, 19:8, 19:11, 19:17, 20:10, 20:16, 21:24, 23:4, 23:10, 25:22
**amount** [16] - 39:23, 42:6, 76:12, 76:24, 77:4, 77:8, 77:9, 109:11, 120:7, 120:14, 124:4, 124:11, 126:9, 128:15, 128:18, 131:19
**amounts** [1] - 128:24
**analogy** [2] - 29:25, 30:11
**AND** [3] - 3:3, 3:9, 3:14
**ankle** [1] - 71:8
**answer** [6] - 4:25, 5:5, 18:13, 36:13, 43:14, 93:9, 95:19, 118:20
**answered** [1] - 98:16
**answers** [2] - 5:10, 137:13
**Anthony's** [1] - 6:25
**anyway** [1] - 4:24
**apartment** [1] - 18:21
**appear** [1] - 117:10
**application** [2] - 44:23, 46:20
**applied** [1] - 111:3
**Appreciation** [1] - 69:25
**approaching** [1] - 89:24
**approval** [2] - 46:23, 74:7
**April** [3] - 1:15, 137:10, 139:22
**area** [6] - 11:6, 13:14, 13:24, 17:6, 48:15, 134:3
**argue** [1] - 127:20
**arrangement** [4] - 27:14, 32:23, 32:25, 84:3
**arrears** [3] - 109:22, 111:3, 122:2
**arrived** [1] - 56:14
**asleep** [1] - 56:11
**assets** [3] - 24:24, 25:4, 45:11
**assist** [2] - 95:22, 105:8

**ASSOCIATES** [1] - 2:3
**assume** [1] - 81:4
**assuming** [2] - 107:8, 125:17
**attempted** [1] - 9:10
**attend** [1] - 12:21
**Attorney** [2] - 2:4, 2:11
**attorney** [3] - 67:4, 106:8, 132:22
**attorneys** [1] - 3:4
**audience** [8] - 8:17, 8:20, 8:22, 9:4, 9:6, 9:10, 9:13, 67:24
**August** [12] - 123:16, 123:17, 124:22, 126:21, 126:22, 127:6, 128:19, 128:20, 129:21, 130:3, 130:15, 130:21
**authorized** [1] - 3:17
**available** [2] - 23:21, 72:21
**average** [1] - 62:5
**aware** [1] - 73:22

**B**

**Babylon** [3] - 13:23, 14:11, 17:2
**background** [1] - 6:6
**balance** [4] - 108:2, 108:6, 125:22, 126:2
**balances** [1] - 113:23
**ballpark** [1] - 57:3
**bank** [18] - 23:10, 24:16, 24:21, 24:25, 25:2, 25:3, 25:6, 25:10, 25:19, 25:21, 28:6, 28:7, 29:7, 32:2, 41:13, 76:3, 83:24
**banking** [1] - 110:15
**banks** [12] - 23:17, 24:6, 25:13, 28:23, 29:12, 29:16, 29:18, 30:8, 30:12, 31:13, 35:8, 70:21
**banner** [1] - 113:21
**base** [1] - 17:9
**based** [9] - 12:11, 14:17, 14:24, 16:5, 29:9, 46:20, 75:5, 112:25
**basic** [1] - 13:12
**basics** [1] - 45:8
**basis** [9] - 38:22, 75:2, 76:12, 85:25, 86:13, 101:13, 103:17,

103:24, 112:10
**Bates** [6] - 100:6, 101:10, 105:22, 118:23, 119:10
**bathroom** [1] - 122:9
**Beach** [1] - 18:22
**became** [5] - 11:5, 11:6, 17:5, 19:3, 28:25
**become** [3] - 10:14, 10:16, 93:17
**bedroom** [1] - 61:11
**begin** [1] - 56:5
**beginning** [5] - 44:16, 107:17, 123:5, 123:6, 126:20
**behind** [3] - 110:12, 110:17, 120:17
**beliefs** [1] - 67:23
**below** [1] - 126:5
**beneficial** [2] - 24:10, 24:18
**benefits** [2] - 12:12, 38:20
**best** [12] - 5:4, 21:16, 30:22, 38:23, 40:7, 40:18, 40:25, 42:17, 59:8, 97:22, 135:6
**better** [12] - 16:10, 16:15, 24:23, 25:3, 25:7, 26:5, 28:18, 28:19, 43:8, 43:19, 44:5, 44:6
**between** [9] - 3:4, 27:3, 27:9, 43:20, 47:7, 76:6, 76:11, 78:13, 97:19
**big** [4] - 29:12, 29:18, 31:18, 58:12
**bigger** [1] - 81:25
**birth** [1] - 6:7
**bit** [2] - 63:12, 73:10
**bite** [1] - 60:9
**Blackberry** [1] - 60:22
**Blaney** [2] - 19:20, 21:22
**BLANEY** [1] - 1:7, 2:18
**blood** [1] - 139:17
**board** [2] - 39:3, 117:22
**book** [3] - 27:2, 27:5, 27:6
**books** [1] - 83:13
**borrow** [1] - 30:4
**borrower** [2] - 24:24, 38:12
**bosses** [3] - 35:6, 35:7, 88:7
**bosses'** [1] - 120:23

**bottom** [1] - 105:22
**Bowery** [1] - 70:2
**box** [1] - 126:5
**branch** [11] - 11:5, 13:21, 16:4, 16:17, 16:20, 16:23, 16:24, 35:4, 35:9, 82:7, 117:24
**brand** [1] - 13:10
**break** [2] - 61:20, 93:12
**breakdown** [1] - 111:23
**breakfast** [2] - 58:9, 58:12
**Breakfast** [1] - 70:2
**Brian** [11] - 4:11, 112:15, 113:7, 113:13, 114:25, 115:4, 115:9, 115:16, 126:6, 135:14, 138:9
**BRIAN** [6] - 1:5, 1:20, 137:7, 137:18, 138:4, 139:9
**bring** [2] - 59:5, 64:3
**bringing** [1] - 40:19
**broadcasted** [1] - 49:2
**brokerage** [4] - 23:15, 25:20, 28:6, 28:8
**brokerages** [1] - 32:4
**brokers** [1] - 70:15
**Brooks** [9] - 33:25, 34:9, 35:3, 52:11, 89:14, 103:15, 122:22, 125:3, 125:5
**brought** [1] - 5:19
**building** [2] - 52:19, 90:16
**built** [1] - 45:11
**bunch** [1] - 50:25
**business** [19] - 7:6, 7:9, 7:21, 10:16, 26:18, 29:18, 38:25, 67:6, 70:4, 70:11, 72:20, 72:23, 73:2, 73:11, 85:3, 86:19, 133:24, 135:16, 138:10
**buying** [2] - 113:9, 116:5
**BY** [4] - 2:7, 2:14, 4:7, 138:3

**C**

**calculations** [1] - 55:21
**cancel** [1] - 38:12
**cancelled** [1] - 38:16

**cannot** [1] - 132:16
**capacity** [1] - 100:12
**Capital** [2] - 83:19, 84:19
**capture** [1] - 73:11
**card** [4] - 30:3, 30:6, 73:20, 86:19
**carryover** [2] - 126:17, 126:19
**case** [7] - 32:17, 45:22, 84:18, 94:17, 94:22, 106:13, 118:4
**cash** [5] - 36:24, 37:21, 39:24, 40:13, 74:9
**cashout** [1] - 45:14
**categories** [1] - 39:22
**Catholic** [2] - 8:12, 8:14
**ceased** [1] - 18:7
**cell** [6] - 60:21, 87:2, 87:7, 87:10, 87:12, 87:14
**Centre** [6] - 4:14, 18:15, 18:25, 19:3, 19:4, 85:11
**certain** [5] - 9:8, 36:11, 42:5, 76:12, 76:17
**certification** [1] - 3:7
**certify** [3] - 137:8, 139:8, 139:15
**chances** [1] - 119:17
**change** [1] - 108:12
**changed** [5] - 29:14, 35:7, 52:20, 107:20, 108:20
**charge** [1] - 113:25
**Chase** [4] - 29:13, 30:9, 31:6, 31:17
**check** [4] - 74:12, 76:18, 106:18, 106:19
**checking** [1] - 60:17
**checks** [1] - 113:22
**child** [2] - 54:6, 54:7
**chip** [4] - 75:17, 108:2, 109:5, 109:10
**chipping** [1] - 107:23
**choice** [1] - 42:25
**Christian** [14] - 8:17, 8:19, 8:22, 8:24, 9:6, 9:9, 48:6, 49:2, 49:20, 66:14, 66:17, 67:4, 67:22, 67:23
**Christianity** [1] - 66:21
**Christians** [1] - 67:10
**Christmas** [1] - 72:9
**church** [2] - 64:12,

142

**Citibank** [1] - 31:18
**city** [1] - 65:12
**Civil** [1] - 1:9
**claim** [5] - 86:2, 128:15, 131:20, 132:4, 132:6
**claiming** [1] - 128:25
**clarify** [1] - 41:22
**classes** [1] - 6:22
**classroom** [1] - 6:19
**clear** [2] - 38:21, 78:12
**client** [17] - 24:13, 27:6, 39:8, 42:17, 42:25, 43:4, 44:7, 44:18, 44:25, 45:23, 45:25, 46:17, 47:7, 47:17, 56:7, 92:6, 92:9
**client's** [2] - 42:19, 124:4
**clients** [11] - 26:2, 40:10, 43:12, 44:9, 44:12, 56:8, 60:15, 70:6, 87:4, 87:16
**clip** [1] - 101:5
**close** [5] - 17:17, 19:3, 60:5, 117:25, 127:11
**closed** [12] - 9:25, 28:24, 49:13, 78:3, 79:2, 118:2, 129:20, 130:6, 130:14, 130:17, 130:18, 130:23
**closing** [2] - 12:20, 47:10
**closings** [1] - 12:21
**club** [2] - 80:7, 82:13
**co** [1] - 95:2
**co-plaintiffs** [1] - 95:2
**Coast** [2] - 56:10, 59:21
**code** [2] - 52:20, 52:22
**coincidence** [1] - 18:25
**coincidentally** [1] - 123:15
**cold** [1] - 12:7
**collectively** [1] - 16:8
**college** [2] - 9:23, 40:14
**College** [1] - 6:11
**Columbus** [1] - 72:12
**combination** [1] - 111:17
**comfortable** [1] - 43:9
**coming** [4] - 62:24, 81:21, 109:7
**commercial** [1] - 68:2
**commission** [10] -

**14:24, 16:4, 75:5, 76:24, 107:21, 108:23, 109:18, 111:14, 120:18, 122:2
**commissions** [24] - 15:6, 15:12, 26:23, 27:9, 51:6, 75:8, 75:10, 75:13, 80:24, 85:17, 93:8, 102:9, 109:8, 109:9, 109:14, 109:21, 110:7, 118:4, 118:8, 118:9, 119:2, 119:18, 124:5, 129:8
**communicate** [1] - 47:6
**commute** [1] - 58:2
**commuting** [1] - 69:6
**company** [11] - 6:2, 13:9, 14:19, 14:20, 18:11, 66:10, 66:11, 83:16, 84:25, 100:20, 121:14
**Company** [1] - 9:20
**comparing** [1] - 43:20
**compensated** [1] - 15:21
**compensation** [10] - 14:13, 14:22, 17:9, 75:5, 76:4, 77:10, 101:18, 108:13, 129:11, 129:12
**complain** [2] - 85:12, 85:18
**complained** [2] - 85:15, 85:24
**complete** [3] - 12:19, 79:5, 137:11
**completed** [1] - 45:18
**completely** [2] - 54:22, 63:16
**compliance** [1] - 66:12
**component** [1] - 14:23
**comport** [2] - 103:3, 103:23
**computation** [1] - 77:18
**computer** [3] - 57:22, 65:15, 86:17
**COMREX** [2] - 65:5, 65:8
**conclusion** [1] - 93:2
**Concord** [24] - 19:9, 20:11, 20:19, 20:24, 20:25, 21:5, 21:7, 21:10, 21:14, 21:19, 21:21, 21:22, 22:4, 22:13, 22:17, 22:24,

**23:7, 23:15, 23:22, 24:9, 25:9, 26:4, 26:14, 28:14
**condominium** [1] - 71:16
**confused** [1] - 83:5
**Connect** [1] - 65:19
**consider** [6] - 7:4, 7:8, 7:11, 8:13, 39:20, 80:11
**considered** [1] - 33:19
**consistent** [1] - 119:2
**constant** [3] - 63:6, 63:10, 63:11
**consult** [1] - 101:23
**consumer** [1] - 60:3
**contact** [1] - 132:11
**contacted** [1] - 13:13
**continue** [4] - 48:24, 49:4, 76:20, 98:22
**continuing** [1] - 84:11
**continuously** [2] - 108:9, 108:10
**Contour** [23] - 6:3, 22:7, 22:10, 31:25, 32:2, 32:7, 32:11, 32:14, 32:17, 32:20, 32:24, 33:5, 33:7, 33:12, 33:16, 33:20, 34:3, 34:6, 34:7, 51:17, 51:18, 64:19, 94:8
**contract** [1] - 134:20
**contracts** [2] - 134:15, 134:16
**controlling** [1] - 113:19
**conventional** [7] - 36:16, 36:18, 37:5, 37:15, 37:21, 39:17, 42:5
**conversation** [6] - 44:18, 60:8, 79:21, 84:5, 84:9, 128:11
**conversations** [2] - 78:15, 78:22
**convicted** [1] - 88:14
**convince** [2] - 79:23, 80:7
**coordinated** [1] - 116:10
**cop** [2] - 89:10, 91:13
**copy** [2] - 106:2, 130:8
**cordial** [1] - 84:6
**corporate** [2] - 13:17, 91:8
**corporation** [4] - 112:16, 115:21, 135:15, 138:10
**corporations** [1] -

**115:17
**correct** [70] - 4:20, 4:21, 7:18, 7:21, 11:23, 15:6, 15:7, 15:9, 19:13, 19:25, 25:11, 28:11, 29:20, 30:18, 31:19, 34:4, 36:13, 38:9, 38:10, 38:13, 39:4, 39:18, 39:19, 39:25, 41:13, 41:17, 42:2, 42:19, 42:20, 43:2, 44:8, 55:24, 58:21, 60:25, 63:4, 63:9, 67:16, 69:3, 74:25, 78:11, 79:18, 81:6, 82:23, 83:2, 84:12, 89:5, 93:21, 94:3, 94:9, 94:18, 94:22, 101:11, 101:15, 101:18, 110:24, 112:11, 112:20, 114:19, 115:6, 115:15, 117:13, 119:17, 123:10, 124:10, 124:13, 124:14, 126:3, 131:20, 137:12, 137:14
**correctly** [1] - 114:5
**correspondent** [2] - 29:2, 29:4
**counsel** [2] - 94:21, 95:2
**Counsel** [1] - 138:25
**count** [1] - 6:21
**Country** [1] - 1:24
**country** [1] - 50:4
**COUNTY** [2] - 137:5, 139:4
**County** [2] - 50:2, 89:16
**couple** [7] - 34:16, 36:17, 50:4, 82:14, 98:20, 124:2, 124:8
**course** [2] - 11:21, 62:21
**COURT** [1] - 1:2
**court** [1] - 5:8
**Court** [2] - 1:24, 3:20
**crashed** [1] - 28:22
**credit** [4] - 12:13, 24:15, 30:3, 30:6
**crime** [1] - 88:15
**Cross** [1] - 115:23
**Cs** [2] - 135:13, 138:9
**current** [2] - 20:3, 60:15
**customer** [6] - 23:13, 23:22, 24:8, 24:11,

**24:17, 40:7
**customers** [3] - 41:18, 41:24, 87:6
**cut** [2] - 42:12, 43:23

**D**

**dark** [1] - 80:18
**date** [7] - 6:7, 49:4, 88:17, 108:20, 115:22, 126:6, 126:15
**Dave** [4] - 127:25, 130:7, 131:13, 131:14
**David** [22] - 78:19, 78:23, 78:24, 79:6, 79:9, 79:15, 79:22, 81:3, 81:17, 82:15, 92:16, 120:19, 120:22, 120:24, 120:25, 121:2, 121:9, 128:11, 130:6, 130:12, 135:17, 138:13
**days** [12] - 38:13, 38:16, 51:24, 52:2, 52:7, 53:10, 53:12, 53:22, 71:18, 72:4, 72:18, 72:19
**deals** [6] - 76:5, 76:9, 76:10, 127:11, 130:23, 131:15
**DEAR** [1] - 1:11
**dear** [11] - 80:9, 82:13, 82:17, 82:21, 84:6, 84:10, 92:13, 128:14, 128:23, 135:18, 138:13
**Dear** [1] - 121:4
**dear's** [1] - 80:6
**debt** [2] - 55:21, 110:22
**December** [2] - 33:13, 34:7
**decide** [1] - 38:12
**decision** [4] - 20:25, 44:8, 44:13, 92:15
**decisions** [1] - 22:2
**decrease** [1] - 108:5
**Defendants** [2] - 1:12, 2:11
**DEFENDANTS'** [1] - 138:17
**Defendants'** [17] - 99:2, 99:5, 99:8, 99:12, 99:15, 99:20, 104:4, 105:18, 105:21, 106:21, 108:22, 114:7,

114:8, 115:4, 116:23, 122:14, 127:24
**definitely** [3] - 41:16, 83:10, 127:19
**definitively** [2] - 31:16, 126:23
**degree** [1] - 6:13
**DELGADO** [1] - 1:5
**Delgado** [2] - 19:21, 22:7
**Denise** [2] - 107:6, 111:18
**Department** [2] - 85:19, 89:16
**dependents** [1] - 45:10
**deposition** [10] - 3:8, 3:15, 4:18, 4:20, 5:17, 11:21, 122:7, 137:10, 139:10, 139:13
**Deposition** [1] - 1:19
**describe** [1] - 102:13
**described** [2] - 23:4, 29:15
**designated** [1] - 13:14
**desk** [2] - 45:22, 55:20
**desktop's** [1] - 86:18
**determine** [4] - 24:9, 39:6, 77:4, 100:22
**determined** [1] - 101:18
**Diana** [1] - 1:20
**DIANA** [2] - 139:6, 139:24
**difference** [1] - 98:11
**differences** [1] - 37:15
**different** [25] - 8:20, 10:22, 11:14, 23:6, 23:9, 23:17, 24:3, 24:6, 28:13, 36:21, 36:23, 37:3, 37:6, 39:22, 41:11, 53:10, 67:20, 68:4, 70:3, 82:5, 82:6, 101:9, 113:20
**differentiation** [1] - 97:20
**dinner** [6] - 58:6, 58:20, 58:23, 92:19, 121:5, 128:8
**direct** [3] - 29:7, 60:4, 119:22
**directed** [3] - 9:4, 48:6, 49:19
**directly** [3] - 134:6, 134:11, 134:12
**director** [1] - 17:5
**discern** [3] - 40:5,

---

42:18, 42:21
**discerning** [1] - 105:9
**discipline** [1] - 96:12
**disciplining** [1] - 96:9
**disclosed** [2] - 45:5, 45:20
**disclosure** [1] - 45:21
**disclosures** [2] - 45:23, 46:18
**discretion** [1] - 87:4
**discuss** [7] - 20:24, 21:5, 103:17, 121:3, 121:7, 121:25, 132:20
**discussed** [2] - 94:24, 103:20
**discussing** [1] - 128:22
**discussion** [9] - 91:10, 91:16, 103:10, 103:13, 111:13, 111:19, 118:13, 128:3, 128:6
**discussions** [5] - 80:20, 107:10, 112:12, 127:23, 132:21
**dispute** [1] - 128:14
**DISTRICT** [2] - 1:2, 1:3
**doctor** [1] - 71:9
**DOCUMENT** [1] - 138:6
**document** [7] - 102:11, 104:9, 105:9, 105:23, 123:23, 124:25, 126:24
**documentation** [5] - 12:16, 45:25, 46:16, 46:21, 55:22
**documents** [4] - 46:11, 46:17, 63:19, 63:22
**Dodd** [9] - 27:19, 77:11, 78:2, 107:25, 108:4, 110:10, 110:18, 111:2, 129:11
**Dodd-Frank** [9] - 27:19, 77:11, 78:2, 107:25, 108:4, 110:10, 110:18, 111:2, 129:11
**Dogwood** [1] - 4:13
**dollar** [1] - 110:3
**dollars** [4] - 75:15, 79:4, 107:24, 120:14
**domain** [1] - 50:19
**done** [13] - 8:18, 25:5, 38:23, 50:3, 50:4,

---

63:15, 64:17, 99:22, 106:10, 117:21, 129:16, 135:20, 136:13
**door** [4] - 25:14, 89:17, 90:3, 90:4
**doors** [1] - 133:10
**down** [10] - 5:9, 10:18, 17:17, 24:12, 40:8, 54:22, 110:3, 110:23, 130:5, 131:2
**downhill** [1] - 121:15
**download** [1] - 63:19
**drastically** [1] - 108:2
**draw** [5] - 15:8, 75:7, 109:6, 109:14, 109:20
**driven** [1] - 69:14
**drives** [1] - 24:24
**due** [3] - 71:6, 125:22, 126:2
**duly** [2] - 4:3, 139:11
**during** [13] - 50:21, 51:5, 53:9, 55:12, 58:10, 71:5, 72:3, 85:23, 116:19, 119:2, 121:10, 121:11, 133:24
**duties** [11] - 11:7, 11:9, 11:25, 22:23, 23:3, 28:12, 33:7, 33:8, 36:2, 36:3, 102:13

---

## E

**e-mail** [10] - 60:24, 61:2, 63:23, 63:24, 88:12, 130:11, 130:14, 130:17, 131:9, 131:10
**e-mailed** [2] - 130:6, 131:13
**e-mails** [9] - 56:8, 56:9, 60:18, 62:22, 69:5, 72:2, 131:7, 135:17, 138:13
**early** [1] - 10:8
**earned** [3] - 76:24, 119:2, 124:12
**Earnings** [2] - 99:16, 138:23
**earnings** [1] - 117:11
**East** [16] - 35:5, 35:10, 52:5, 52:13, 52:22, 55:3, 56:24, 57:25, 58:3, 64:4, 81:17, 81:21, 82:3, 82:10, 98:4, 98:14
**Easter** [1] - 72:10

---

**EASTERN** [1] - 1:3
**easy** [2] - 103:20, 131:7
**eat** [5] - 58:6, 58:9, 59:5, 59:6, 60:9
**economics** [1] - 6:14
**educate** [1] - 25:17
**education** [1] - 6:19
**educational** [1] - 6:9
**effect** [2] - 3:19, 111:9
**effort** [1] - 100:21
**either** [9] - 5:20, 13:15, 68:11, 89:10, 90:5, 111:16, 118:19, 124:19, 126:19
**either-or** [1] - 111:16
**emergency** [1] - 57:19
**employed** [1] - 100:12
**employee** [7] - 25:24, 74:3, 74:15, 100:13, 100:23, 101:22, 102:6
**Employee** [1] - 101:22
**employees** [7] - 73:23, 87:21, 95:23, 96:2, 96:9, 132:12, 132:19
**employer** [1] - 95:4
**employment** [12] - 48:24, 103:9, 106:3, 106:6, 108:19, 112:5, 112:9, 121:10, 121:11, 123:6, 135:11, 138:7
**Employment** [4] - 99:3, 99:6, 138:18, 138:19
**end** [8] - 62:7, 62:14, 66:10, 76:10, 77:2, 97:17, 101:21, 123:8
**endorsement** [1] - 68:12
**endorsing** [1] - 69:24
**engage** [3] - 27:14, 64:6, 71:22
**engaged** [1] - 77:17
**England** [2] - 13:24, 17:5
**enjoy** [1] - 79:25
**ensure** [1] - 30:17
**entering** [1] - 101:24
**entire** [1] - 27:2
**entirety** [1] - 27:8
**episodic** [1] - 75:2
**equity** [1] - 12:12
**ESQ** [2] - 2:7, 2:14
**essentially** [1] - 109:6
**estate** [1] - 70:15
**estimate** [5] - 57:5, 68:18, 72:5, 77:23,

---

98:2
**etcetera** [1] - 46:21
**evaluations** [3] - 88:3, 88:6, 88:11
**eventually** [2] - 11:6, 117:3
**exactly** [2] - 40:11, 125:20
**EXAMINATION** [2] - 4:7, 138:3
**examined** [1] - 4:4
**example** [5] - 30:15, 42:13, 65:10, 69:20, 76:6
**except** [4] - 3:10, 64:2, 84:21, 120:24
**excess** [2] - 114:11, 114:18
**excuse** [1] - 17:22
**execute** [1] - 27:16
**executing** [1] - 74:3
**executive** [1] - 11:3
**exempt** [1] - 86:8
**exhibit** [2] - 112:2, 117:7
**Exhibit** [25] - 99:2, 99:5, 99:8, 99:12, 99:15, 99:20, 102:25, 103:2, 103:22, 103:23, 104:4, 104:10, 104:14, 105:18, 105:21, 106:21, 108:22, 111:23, 114:7, 114:8, 115:4, 116:23, 122:6, 122:14, 127:24
**EXHIBITS** [1] - 138:16
**exhibits** [3] - 98:20, 98:23, 138:25
**exist** [1] - 32:4
**existed** [1] - 94:2
**exists** [1] - 34:4
**expect** [1] - 89:9
**expected** [2] - 90:17, 90:18
**expecting** [1] - 89:6
**expenses** [2] - 125:16, 125:18
**experience** [1] - 6:10
**explain** [3] - 4:23, 92:14, 110:8
**explanation** [2] - 120:16, 120:20
**exploring** [1] - 93:6
**extent** [1] - 135:24

---

## F

**fact** [1] - 121:25

144

**factors** [1] - 43:19
**fair** [2] - 23:20, 121:17
**faith** [4] - 75:19, 80:19, 108:4, 109:5
**fake** [1] - 67:15
**family** [4] - 19:6, 70:12, 71:19, 71:20
**FAN** [1] - 65:11
**Fannie** [1] - 29:10
**far** [4] - 39:23, 58:2, 110:11, 110:17
**Fargo** [2] - 29:13, 30:9, 31:18
**father** [1] - 82:25
**faxed** [2] - 12:10, 13:17
**February** [1] - 109:20
**federal** [2] - 136:3, 136:4
**Fenrich** [2] - 19:20, 22:4
**FENRICH** [2] - 1:7, 2:19
**few** [5] - 53:17, 108:14, 111:8, 119:21, 135:9
**FHA** [7] - 29:10, 36:16, 36:18, 36:20, 37:3, 39:13, 39:17
**fifteen** [1] - 37:10, 58:5
**fifth** [1] - 118:24
**figure** [4] - 41:5, 42:16, 79:2, 103:21
**figured** [1] - 19:5
**figures** [4] - 75:14, 75:21, 107:19, 129:5
**figuring** [1] - 40:12
**file** [4] - 46:22, 55:23, 132:9, 132:12
**filed** [2] - 94:11, 94:14
**files** [4] - 26:22, 36:11, 55:20, 59:23
**filing** [1] - 3:6
**filings** [1] - 49:12
**fill** [2] - 13:11, 88:2
**filling** [2] - 44:21, 44:22
**final** [3] - 78:5, 78:6, 78:25
**financial** [1] - 9:18
**Financial** [11] - 26:7, 26:13, 26:15, 26:19, 27:22, 28:3, 28:5, 28:9, 28:13, 28:17, 31:24
**fine** [1] - 98:18
**finished** [1] - 5:11
**fired** [7] - 35:18, 73:25, 77:24, 81:13,

88:19, 127:9
**first** [21] - 9:18, 10:6, 40:8, 41:4, 47:7, 47:10, 48:4, 66:8, 66:9, 76:22, 77:20, 100:2, 100:9, 104:12, 104:17, 104:18, 114:8, 117:15, 122:17, 124:2, 135:22
**fit** [4] - 24:18, 25:25, 42:22
**fits** [1] - 40:21
**five** [7] - 37:9, 37:17, 55:14, 61:9, 68:21, 71:18, 72:4
**fixed** [3] - 37:17, 37:19, 68:24
**flexible** [1] - 36:9
**fliers** [2] - 70:25, 71:2
**Florida** [1] - 71:16
**focused** [2] - 85:16, 102:8
**folks** [1] - 89:23
**follow** [3] - 42:16, 55:17, 63:14
**follow-up** [1] - 42:16
**followed** [1] - 79:9
**following** [3] - 59:20, 60:14, 76:8
**follows** [1] - 4:5
**foolish** [1] - 67:13
**FOR** [1] - 138:17
**force** [1] - 3:19
**forces** [1] - 34:2
**foremost** [1] - 66:9
**forever** [1] - 109:24
**forget** [4] - 81:11, 104:17, 104:18, 118:20
**form** [16] - 3:11, 13:12, 22:16, 26:17, 30:21, 34:25, 39:10, 41:21, 45:15, 61:14, 63:8, 69:19, 70:9, 86:10, 98:7, 136:2
**formal** [2] - 6:18, 12:19, 44:22
**forth** [1] - 139:11
**forty** [1] - 55:14
**forward** [2] - 12:17, 86:22
**four** [7] - 18:4, 47:23, 71:18, 72:3, 77:12, 108:17, 110:18
**Francesa** [1] - 65:11
**Frank** [9] - 27:19, 77:11, 78:2, 107:25, 108:4, 110:10, 110:18, 111:2,

129:11
**Freddie** [1] - 29:10
**fresh** [1] - 130:22
**Friday** [6] - 54:12, 54:13, 54:15, 54:23, 56:14, 58:22
**friends** [3] - 10:14, 19:3, 70:12
**frustrated** [1] - 121:18
**full** [7] - 4:9, 95:10, 106:6, 106:16, 129:4, 135:11, 138:7
**fully** [2] - 47:8, 118:10
**functioning** [1] - 32:20
**fund** [2] - 76:6, 77:7
**funded** [3] - 76:9, 76:11, 129:12
**funding** [3] - 122:19, 123:3, 124:3
**fundings** [1] - 128:19
**FURTHER** [2] - 3:9, 3:14
**furtherance** [1] - 115:13

### G

**gain** [1] - 70:4
**Gary** [1] - 67:2
**gather** [1] - 12:15
**gathering** [2] - 45:24, 46:11
**general** [2] - 7:9, 68:6
**generate** [1] - 5:10
**generated** [6] - 13:4, 14:18, 51:10, 122:21, 122:24, 124:24
**generates** [3] - 111:24, 112:11, 122:20
**gentleman** [1] - 33:15
**gentlemen** [2] - 33:18, 33:23
**gist** [1] - 117:9
**Given** [1] - 43:14
**given** [3] - 109:19, 137:13, 139:14
**Glenn** [1] - 67:2
**goals** [3] - 24:14, 45:11, 45:12
**golf** [2] - 80:6, 82:13
**grab** [3] - 58:11, 58:13, 58:15
**graduated** [1] - 6:11
**graduating** [1] - 6:19
**great** [2] - 88:9, 88:13
**greater** [4] - 17:8, 23:22, 132:3, 132:7

**GREENBERG** [1] - 2:3
**grew** [1] - 19:2
**grid** [1] - 73:9
**gross** [5] - 125:12, 125:16, 125:21, 126:2, 129:13
**Group** [2] - 83:20, 84:19
**group** [1] - 16:8
**groups** [2] - 9:8, 64:24
**guide** [1] - 24:3
**guidelines** [9] - 23:11, 23:12, 24:4, 25:23, 25:25, 30:16, 30:17, 30:23, 40:22
**guy** [2] - 84:8, 96:6
**guys** [1] - 90:24
**gym** [4] - 53:17, 54:4, 55:12, 69:7

### H

**half** [9] - 22:22, 62:6, 62:13, 77:13, 80:3, 124:6, 124:7, 124:22, 125:25
**hallway** [3] - 90:15, 90:16, 91:13
**hand** [1] - 139:21
**handed** [2] - 111:21, 112:8
**handing** [6] - 99:20, 104:6, 105:19, 106:22, 116:24, 122:8
**hands** [1] - 112:6
**hang** [1] - 71:2
**head** [3] - 31:22, 120:23, 130:23
**headset** [1] - 65:17
**hear** [2] - 40:11, 66:25
**heard** [3] - 50:10, 84:10, 92:22
**hearing** [1] - 40:15
**help** [2] - 113:19, 114:4
**helps** [1] - 68:20
**Hempstead** [1] - 35:11
**hereby** [2] - 137:7, 139:8
**HEREBY** [1] - 3:3
**herein** [1] - 3:5
**hereinbefore** [1] - 139:11
**hereunto** [1] - 139:21
**High** [1] - 6:25
**high** [2] - 6:10, 6:23
**higher** [4] - 14:19, 14:20, 44:2, 109:10
**himself** [1] - 67:3

**hiring** [2] - 95:22, 100:25
**hit** [1] - 65:18
**hitting** [1] - 119:19
**Hobart** [3] - 6:11, 6:20, 9:17
**hold** [2] - 58:25, 73:7
**hole** [2] - 75:15, 75:21
**holiday** [1] - 73:2
**holidays** [1] - 72:8
**home** [22] - 37:25, 53:21, 54:5, 54:21, 55:4, 56:22, 57:22, 58:7, 58:25, 59:6, 59:14, 59:16, 61:24, 62:4, 62:9, 62:12, 63:5, 63:20, 68:18, 68:23, 98:10
**homeowners** [1] - 12:5
**homes** [1] - 11:11
**honest** [2] - 7:12, 108:14
**honestly** [3] - 93:24, 111:10, 120:5
**honesty** [1] - 7:17
**hope** [1] - 87:3
**host** [1] - 68:12
**hot** [3] - 51:23, 69:13, 97:25
**hour** [4] - 44:17, 56:2, 56:4, 60:12
**hours** [25] - 40:10, 47:23, 51:16, 53:17, 55:2, 56:17, 56:24, 59:10, 61:5, 61:10, 62:6, 62:13, 68:17, 72:4, 72:6, 73:13, 86:5, 97:14, 97:21, 131:21, 132:2, 132:6, 132:7, 133:24
**house** [5] - 45:10, 58:14, 58:16, 58:17, 65:13
**housing** [2] - 23:24, 28:22
**hovered** [1] - 90:7
**HUDs** [1] - 92:11
**hundred** [4] - 17:13, 71:25, 105:11, 116:16
**hungry** [1] - 58:24

### I

**I.D** [1] - 138:17
**idea** [2] - 90:19, 105:15
**identification** [5] - 99:4, 99:7, 99:11,

99:14, 99:17
**identify** [4] - 66:13, 66:16, 67:9, 104:8
**identifying** [1] - 67:3
**idiosyncrasies** [1] - 25:10
**IDs** [1] - 46:2
**illness** [1] - 71:7
**immediate** [2] - 44:5, 71:20
**impact** [1] - 25:4
**important** [4] - 7:17, 7:20, 7:23, 134:25
**IN** [1] - 139:20
**INC** [1] - 1:11
**Inc** [10] - 1:24, 112:15, 113:8, 113:14, 114:25, 115:5, 115:9, 115:17, 135:15, 138:9
**include** [2] - 78:9, 127:6
**income** [10] - 12:12, 24:16, 45:11, 46:2, 46:16, 46:20, 114:11, 114:17, 125:12, 126:6
**increase** [1] - 108:3
**increased** [4] - 107:25, 108:17, 110:9, 110:18
**Index** [1] - 1:9
**indicate** [2] - 102:20, 126:25
**indicates** [1] - 101:13
**indicating** [1] - 112:3
**indicating)** [1] - 101:8
**individual** [1] - 133:15
**industry** [5] - 9:18, 29:14, 32:5, 45:16, 93:17
**industrywide** [1] - 94:5
**information** [8] - 24:7, 45:6, 129:6, 130:3, 130:21, 130:24, 130:25, 131:2
**initial** [4] - 40:10, 45:2, 45:3, 45:4
**injury** [1] - 71:7
**Intercontinental** [4] - 83:19, 84:19, 85:9, 102:16
**interest** [2] - 24:20, 24:25
**interested** [1] - 139:18
**Internet** [2] - 12:9, 13:5
**interview** [1] - 34:22
**interviewed** [1] - 35:2

**investors** [1] - 30:24
**involved** [4] - 28:2, 96:8, 96:11, 96:15
**IP** [1] - 65:16
**iron's** [1] - 97:24
**IS** [3] - 3:3, 3:9, 3:14
**Island** [5] - 7:2, 13:25, 49:25, 85:6, 115:23
**Islandia** [2] - 13:20, 14:2
**issue** [1] - 108:8
**issued** [2] - 63:2, 115:5
**IT** [3] - 3:3, 3:9, 3:14
**itself** [2] - 52:19, 66:20

---

**J**

**Jane** [1] - 30:5
**January** [1] - 107:16
**Jericho** [1] - 102:18
**Joanna** [2] - 113:12, 115:5
**job** [5] - 9:18, 28:12, 59:19, 88:9, 88:13
**John** [18] - 19:20, 22:4, 33:24, 82:4, 88:7, 89:14, 92:23, 96:3, 96:18, 96:20, 97:8, 103:15, 107:17, 111:17, 112:12, 118:19, 120:21, 121:8
**JOHN** [2] - 1:6, 2:19
**joined** [2] - 33:25, 132:19
**jointly** [2] - 21:13, 132:9
**Jones** [1] - 47:24
**July** [6] - 72:10, 123:8, 123:11, 124:21, 127:2, 127:5
**June** [1] - 6:8
**JUSTIN** [1] - 2:7

---

**K**

**keep** [6] - 18:8, 56:16, 73:13, 87:14, 87:17, 127:8
**Ken** [1] - 101:4
**kept** [1] - 92:3
**KEVIN** [2] - 1:7, 2:18
**Kevin** [2] - 19:20, 21:22
**keys** [3] - 52:8, 52:10, 52:23
**kidding** [1] - 91:14
**kids** [1] - 59:11
**kill** [1] - 54:23

**kind** [23] - 26:18, 45:6, 55:16, 57:12, 63:24, 72:13, 73:9, 78:23, 80:13, 80:17, 82:6, 82:7, 87:3, 88:8, 90:6, 90:8, 91:6, 113:25, 119:18, 134:23
**King** [1] - 72:12
**KJOY** [1] - 50:4
**knock** [3] - 90:2, 110:2, 110:3
**knowledge** [9] - 22:3, 22:6, 27:25, 30:22, 40:16, 73:12, 85:2, 121:20, 128:13

---

**L**

**Labor** [3] - 72:11, 72:16, 85:19
**Lane** [1] - 4:13
**laptop** [4] - 62:20, 62:25, 63:19, 64:3
**large** [2] - 13:9, 80:10
**larger** [1] - 15:23
**Larry** [4] - 82:18, 82:25, 83:3, 121:4
**last** [12] - 34:25, 48:23, 78:4, 82:20, 98:24, 100:17, 101:7, 103:2, 105:8, 108:13, 112:8, 134:24
**late** [2] - 71:10, 130:19
**laughed** [1] - 91:6
**LAW** [1] - 2:10
**LAWRENCE** [1] - 1:11
**lawsuit** [14] - 19:13, 20:2, 20:4, 21:20, 28:3, 94:12, 94:14, 94:25, 95:5, 95:19, 132:9, 132:12, 132:20, 132:25
**lawyer** [1] - 101:23
**lead** [2] - 13:14, 13:15
**leads** [4] - 12:8, 13:4, 51:9, 129:7
**leaf** [1] - 119:13
**leave** [10] - 28:16, 54:14, 55:9, 57:3, 57:4, 87:2, 91:20, 93:4, 93:6, 117:2
**leaving** [1] - 92:23
**left** [4] - 42:12, 54:18, 57:6, 57:7
**legs** [1] - 61:21
**lend** [3] - 29:9, 30:5, 30:6
**lender** [1] - 29:2, 29:4,

**29:7
**lending** [1] - 29:16
**less** [7] - 27:23, 31:12, 36:6, 58:5, 68:22, 97:15, 98:11
**lesser** [1] - 132:7
**liable** [1] - 132:4
**license** [3] - 96:23, 97:3, 97:11
**licensed** [3] - 93:17, 93:21, 117:24
**licenses** [2] - 96:19, 118:2
**licensing** [4] - 6:22, 94:2, 96:22, 118:10
**likeable** [1] - 84:8
**limit** [1] - 30:4
**limited** [1] - 11:12
**line** [4] - 30:14, 50:18, 134:6, 134:8
**line's** [1] - 86:18
**lines** [3] - 29:8, 29:17, 29:23
**list** [6] - 77:6, 129:20, 130:16, 131:15, 131:16, 131:17
**listen** [1] - 66:23
**listened** [1] - 50:15
**listener** [1] - 40:9
**listeners** [5] - 68:3, 68:6, 68:9, 68:10, 68:15
**listening** [2] - 41:4, 42:15
**lists** [1] - 92:9
**litigation** [1] - 5:20
**live** [5] - 4:13, 18:14, 18:22, 18:24, 45:10
**living** [1] - 58:3
**loan** [73] - 11:4, 11:8, 11:9, 11:15, 11:16, 11:17, 11:18, 12:15, 12:17, 14:3, 14:8, 14:15, 14:25, 20:20, 22:25, 23:19, 25:5, 26:14, 28:2, 31:2, 31:7, 31:10, 32:15, 33:4, 36:9, 36:12, 37:21, 37:22, 37:23, 39:14, 39:17, 40:5, 40:6, 41:6, 41:10, 42:5, 44:23, 45:5, 45:20, 46:6, 46:9, 46:14, 46:23, 46:24, 47:2, 47:8, 47:21, 47:25, 49:17, 73:8, 74:22, 76:2, 76:3, 77:7, 77:8, 77:9, 82:2, 84:17, 87:23, 95:12, 95:15, 101:6,

**102:20, 121:21, 121:24, 124:4, 124:12, 133:5, 133:9, 134:14, 134:17
**loans** [35] - 15:12, 15:16, 15:20, 30:18, 31:14, 36:14, 36:16, 36:18, 36:19, 36:20, 37:2, 37:5, 38:2, 38:15, 43:21, 44:10, 46:10, 46:25, 47:2, 49:13, 78:2, 78:25, 114:3, 117:25, 126:22, 128:20, 129:12, 129:20, 130:3, 130:5, 130:13, 130:14, 130:16, 130:21
**locate** [1] - 135:24
**located** [3] - 20:12, 35:9, 102:17
**location** [9] - 17:24, 18:2, 52:4, 55:3, 57:9, 57:11, 57:13, 86:15, 86:21
**log** [3] - 65:14, 73:5
**logging** [1] - 60:23
**longest** [1] - 47:18
**Longobardi** [2] - 113:13, 115:6
**look** [18] - 30:7, 63:25, 64:2, 102:10, 102:12, 104:12, 104:13, 104:16, 104:24, 105:7, 105:20, 114:6, 118:22, 119:9, 122:13, 122:17, 123:21, 127:14
**looked** [1] - 124:3
**looking** [6] - 41:25, 43:15, 69:4, 104:12, 108:21, 125:11
**looks** [5] - 24:15, 24:16, 104:22, 107:8, 123:4
**looser** [1] - 24:4
**loss** [4] - 104:23, 104:25, 105:5, 105:10
**losses** [1] - 109:16
**lottery** [1] - 119:19
**lower** [4] - 24:25, 31:10, 42:10, 42:11
**lowest** [1] - 38:19
**LUIS** [1] - 1:5
**Luis** [2] - 19:21, 22:6
**lull** [1] - 63:13
**lunch** [3] - 58:20,

58:23, 59:3
**Luther** [1] - 72:12

**M**

**Mac** [1] - 29:10
**Mae** [1] - 29:10
**mail** [10] - 60:24, 61:2, 63:23, 63:24, 88:12, 130:11, 130:14, 130:17, 131:9, 131:10
**mailed** [2] - 130:6, 131:13
**mails** [9] - 56:8, 56:9, 60:18, 62:22, 69:5, 72:2, 131:7, 135:17, 138:13
**manager** [5] - 11:5, 11:6, 16:4, 16:20, 17:7
**Manhattan** [1] - 81:11
**map** [1] - 55:19
**marathon** [1] - 109:24
**mark** [4] - 53:18, 59:8, 98:22, 98:25
**marked** [13] - 99:3, 99:6, 99:10, 99:13, 99:16, 99:19, 104:4, 105:18, 106:21, 114:7, 116:23, 122:7, 122:13
**market** [14] - 8:2, 8:16, 28:22, 29:12, 38:19, 38:24, 48:6, 49:2, 49:20, 51:22, 59:7, 69:14, 97:23, 108:9
**marketing** [8] - 8:18, 9:3, 9:13, 59:23, 59:25, 64:25, 65:2, 69:15, 69:17, 69:21, 70:5, 70:19, 70:23, 74:20, 113:5
**marriage** [1] - 139:14
**married** [1] - 19:5
**Martin** [1] - 72:12
**Massapequa** [1] - 2:6
**math** [2] - 98:13, 125:18
**mathematical** [1] - 77:18
**matrix** [4] - 23:14, 31:11, 40:21, 41:8
**matter** [1] - 139:19
**matters** [1] - 101:6
**McCutchan** [2] - 20:8, 22:12
**MCCUTCHAN** [1] - 1:6
**Meadow** [16] - 35:5, 35:10, 52:6, 52:13,

52:22, 55:3, 56:25, 58:2, 58:3, 64:4, 81:17, 81:21, 82:3, 82:10, 98:4, 98:15
**mean** [18] - 8:5, 17:23, 27:5, 29:5, 29:22, 31:4, 39:11, 47:19, 50:25, 52:3, 57:2, 75:11, 98:9, 100:18, 103:20, 109:23, 127:15, 134:16
**means** [4] - 29:6, 38:11, 102:6, 105:23, 125:13
**meant** [1] - 100:22
**meanwhile** [1] - 110:19
**media** [2] - 113:9, 116:4
**Media** [1] - 115:23
**meet** [6] - 10:6, 70:14, 70:17, 70:21, 81:9, 82:12
**meeting** [3] - 82:15, 92:17, 92:19
**meetings** [2] - 64:24, 84:15
**Melville** [1] - 20:13
**Memorial** [2] - 72:11, 72:16
**memory** [1] - 56:20
**mentality** [1] - 97:25
**mention** [4] - 66:3, 66:6, 68:9, 82:8
**mentioned** [1] - 66:8
**mentor** [1] - 133:4
**Merrick** [2] - 2:5, 85:10
**met** [6] - 10:10, 79:22, 81:3, 81:16, 83:8, 83:14
**metropolitan** [1] - 48:15
**Michael** [15] - 4:19, 10:4, 10:7, 10:10, 26:16, 33:25, 78:13, 89:14, 103:15, 122:22, 124:7, 125:3, 125:6, 125:23, 126:6
**MICHAEL** [1] - 1:5
**Michael's** [1] - 105:12
**microphone** [1] - 65:17
**mid-2015** [1] - 115:21
**middle** [1] - 127:16
**midnight** [1] - 56:11
**might** [11] - 24:10, 41:24, 42:4, 42:22, 47:6, 47:16, 50:3,

69:4, 73:3, 106:14, 118:25
**Mike** [19] - 51:3, 52:11, 65:10, 82:4, 88:7, 90:5, 90:12, 92:23, 96:3, 96:18, 96:20, 97:8, 107:17, 111:17, 112:12, 114:2, 118:19, 120:21, 121:8
**Mike's** [1] - 127:12
**million** [15] - 75:15, 78:8, 79:3, 79:10, 79:16, 80:15, 107:23, 110:3, 114:12, 114:18, 128:21, 128:25, 129:8, 129:15
**mind** [1] - 127:8
**mine** [1] - 105:12
**Mineola** [3] - 1:14, 1:25, 2:13
**minutes** [3] - 55:14, 58:5, 91:23
**missing** [2] - 55:23, 123:7
**Mission** [1] - 70:2
**MITCHELL** [2] - 139:6, 139:24
**Mitchell** [1] - 1:21
**MLD** [145] - 1:11, 8:4, 8:17, 9:3, 9:13, 25:19, 29:19, 30:11, 30:15, 30:16, 31:3, 31:8, 31:13, 34:2, 34:6, 34:17, 34:20, 34:23, 35:14, 35:17, 35:21, 36:2, 36:5, 36:15, 38:3, 38:18, 40:20, 41:9, 41:15, 45:22, 46:7, 46:15, 47:3, 48:9, 48:24, 49:9, 49:11, 49:15, 49:21, 50:9, 50:10, 50:14, 50:22, 51:6, 51:10, 51:19, 51:25, 54:10, 57:8, 58:7, 58:8, 58:18, 58:20, 59:3, 62:2, 62:13, 63:2, 63:6, 63:19, 64:10, 64:13, 64:21, 64:25, 65:21, 68:19, 68:25, 69:11, 70:7, 71:6, 71:14, 72:8, 73:13, 73:16, 74:2, 74:9, 74:16, 75:5, 75:10, 75:14, 75:16, 75:20, 76:23, 77:4, 78:15, 79:11, 79:24, 79:25, 80:8, 80:23,

82:22, 83:8, 84:11, 85:13, 85:21, 86:3, 86:23, 87:6, 87:21, 88:17, 89:13, 92:14, 93:4, 93:25, 94:15, 95:8, 95:16, 95:23, 96:2, 96:9, 96:13, 96:16, 97:7, 97:14, 97:16, 98:3, 98:9, 98:12, 102:4, 102:20, 103:4, 108:6, 109:17, 112:20, 113:8, 114:22, 115:14, 115:19, 116:13, 116:19, 117:11, 120:17, 121:22, 121:25, 128:16, 131:10, 132:4, 133:6, 133:10, 133:18, 133:21, 134:2, 134:21, 135:23, 135:24
**MLD's** [4] - 40:21, 52:13, 57:25, 60:24
**model** [1] - 29:19
**Moffett** [1] - 1:24
**Monday** [10] - 54:12, 54:13, 54:18, 54:19, 54:21, 55:7, 57:24, 58:19, 59:15, 61:25
**Monday's** [1] - 98:23
**money** [18] - 16:18, 29:9, 29:16, 30:6, 30:12, 38:22, 42:6, 44:3, 78:16, 80:4, 80:10, 80:19, 93:7, 107:19, 109:5, 111:6, 124:20, 125:23
**Money** [2] - 31:17, 83:3
**month** [7] - 62:7, 76:7, 76:10, 81:12, 97:17, 123:2, 129:21
**monthly** [4] - 38:22, 40:25, 44:2, 122:25
**months** [4] - 18:4, 54:10, 108:14, 111:8
**morning** [5] - 4:15, 4:16, 52:17, 62:23, 71:10
**MORTGAGE** [1] - 1:11
**mortgage** [19] - 6:22, 7:5, 9:15, 11:16, 11:17, 14:3, 29:13, 30:7, 32:15, 41:10, 47:2, 76:3, 87:23, 95:12, 95:15, 100:20, 110:15,

121:14, 134:14
**Mortgage** [28] - 6:3, 9:20, 19:9, 20:11, 20:24, 21:2, 21:5, 21:7, 21:10, 21:14, 21:19, 21:21, 21:23, 22:17, 22:24, 31:25, 32:2, 32:8, 32:11, 32:15, 32:17, 32:21, 33:8, 33:12, 33:16, 34:3, 64:19, 94:8
**mortgages** [3] - 36:17, 59:8, 70:22
**Morty** [5] - 82:18, 82:22, 82:24, 83:2, 83:12
**most** [6] - 4:19, 10:23, 24:18, 27:12, 66:2, 134:25
**move** [2] - 12:17, 101:2
**moved** [2] - 13:22, 13:24
**MR** [25] - 4:8, 8:7, 30:20, 34:24, 39:9, 41:20, 61:13, 63:7, 69:18, 70:8, 86:9, 93:13, 98:6, 98:21, 106:14, 135:7, 135:20, 135:21, 135:22, 136:6, 136:10, 136:11, 136:12, 136:13, 138:4
**multiply** [2] - 77:9, 77:14
**must** [1] - 4:25

**N**

**name** [14] - 4:9, 4:11, 13:10, 45:8, 66:4, 66:7, 66:9, 66:10, 66:11, 81:11, 100:3, 106:23, 124:4, 127:12
**names** [4] - 82:20, 83:11, 92:7, 96:2
**NARDO** [11] - 2:10, 2:14, 4:8, 8:7, 98:21, 135:7, 135:21, 136:6, 136:11, 136:13, 138:4
**Nassau** [1] - 89:16
**NASSAU** [1] - 139:4
**necessarily** [2] - 9:8, 10:21
**necessary** [2] - 12:16, 119:22
**need** [3] - 27:13,

41:14, 42:4
needed [3] - 38:23, 45:25, 46:17
needs [3] - 24:14, 24:19, 40:12
neighborhood [1] - 53:24
NEIL [1] - 2:3
NELSON [1] - 1:6
networking [1] - 64:7
never [10] - 56:22, 59:11, 73:15, 84:10, 85:15, 85:23, 86:25, 120:19, 123:15, 123:16
NEW [3] - 1:3, 137:4, 139:3
new [6] - 25:15, 35:4, 60:15, 69:22, 72:20, 72:22
New [11] - 1:14, 1:22, 1:25, 2:6, 2:13, 4:14, 13:24, 17:5, 48:15, 137:23, 139:8
newborn [3] - 61:8, 61:19, 62:16
next [6] - 31:23, 45:19, 71:9, 108:15, 119:9, 119:10
niche [3] - 23:18, 25:11, 28:24
niches [1] - 24:6
nonstop [5] - 59:18, 59:19, 59:22, 63:12, 63:16
normally [10] - 12:22, 42:7, 42:9, 54:18, 55:6, 55:8, 55:25, 58:6, 61:6, 62:11
Notary [4] - 1:21, 4:4, 137:23, 139:6
noted [1] - 136:14
notes [1] - 44:24
nothing [3] - 35:7, 113:6, 135:8
Notice [2] - 99:9, 138:20
number [25] - 76:17, 76:19, 76:21, 77:15, 78:5, 78:6, 79:3, 79:5, 87:3, 87:17, 87:18, 95:10, 102:12, 110:4, 118:25, 119:4, 119:18, 119:25, 120:9, 120:10, 129:4, 129:13, 129:14, 129:24, 131:21
numbered [1] - 105:8

numbers [4] - 79:8, 110:14, 111:11, 119:15

O

oath [2] - 3:18, 137:9
objection [10] - 30:20, 34:24, 39:9, 41:20, 61:13, 63:7, 69:18, 70:8, 86:9, 98:6
objections [3] - 3:10
objectives [3] - 41:19, 42:19, 42:22
obtain [2] - 43:6, 129:7
obviously [1] - 41:7
occasions [1] - 42:24
occupy [1] - 35:23
occur [2] - 42:6, 75:25
occurring [1] - 115:14
October [3] - 81:15, 130:19
odd [1] - 76:17
OF [6] - 1:3, 2:10, 137:4, 137:5, 139:3, 139:4
offered [2] - 28:10, 79:9
offers [1] - 41:13
OFFICE [1] - 2:10
office [46] - 14:4, 14:7, 15:20, 35:20, 35:24, 51:2, 51:3, 52:13, 52:24, 53:6, 53:9, 56:25, 57:18, 57:25, 62:9, 62:12, 62:19, 64:4, 65:3, 65:6, 68:24, 69:16, 69:24, 72:17, 81:17, 81:22, 86:20, 87:10, 87:12, 87:14, 88:25, 89:12, 89:17, 89:20, 90:16, 98:4, 98:5, 98:9, 98:10, 98:12, 98:15, 121:14, 133:14, 133:16, 133:18
officer [20] - 3:17, 11:4, 11:8, 11:9, 11:15, 11:16, 14:15, 14:25, 20:20, 22:25, 26:14, 28:2, 32:16, 41:10, 76:2, 76:4, 90:13, 90:14, 101:7, 134:17
officers [7] - 14:4, 14:8, 33:4, 82:2, 84:17, 133:5, 133:9
offices [1] - 10:22, 18:12, 133:10

officially [1] - 34:14
often [3] - 57:6, 122:23
old [2] - 54:7, 54:10
Old [1] - 1:24
once [6] - 12:16, 71:8, 75:14, 87:16, 121:12, 121:13
one [29] - 5:24, 20:7, 26:24, 30:8, 31:18, 38:17, 40:20, 43:16, 49:24, 50:4, 52:13, 52:21, 54:6, 71:15, 76:7, 87:18, 98:24, 104:5, 106:16, 108:15, 111:21, 111:22, 112:6, 125:9, 126:18, 133:21, 133:25, 135:10
ones [1] - 131:16
online [1] - 13:10
oOo [1] - 3:22
open [3] - 81:18, 90:4, 112:17
opened [2] - 112:23, 112:24, 115:21, 115:25
opportunities [1] - 70:3
opportunity [3] - 26:5, 28:18, 28:19
opposed [2] - 25:3, 38:3
option [2] - 43:24, 43:25
options [4] - 23:16, 40:23, 40:24, 93:6
order [2] - 110:5, 118:23
original [1] - 83:2
originally [1] - 11:2
originate [3] - 11:10, 12:2, 73:2
originated [2] - 15:13, 15:20
originating [4] - 15:15, 72:19, 72:24, 114:3
originator [5] - 11:17, 11:19, 47:3, 121:24, 124:13
originators [6] - 87:24, 95:13, 95:16, 102:21, 121:21, 134:14
otherwise [1] - 62:19
ourselves [1] - 93:10
outbound [1] - 12:5
outcome [1] - 139:18

outside [8] - 86:7, 86:11, 90:15, 98:12, 100:12, 100:23, 102:6
overall [1] - 24:14
overlay [1] - 36:10
overlays [3] - 25:23, 30:25, 31:5
overloaded [1] - 74:21
overnight [1] - 45:23
overpay [1] - 110:21
override [4] - 15:24, 15:25, 17:15, 74:15
overseeing [1] - 15:19
overtime [7] - 85:14, 85:20, 86:3, 86:8, 131:20, 132:4, 132:6
owed [32] - 75:15, 75:18, 76:14, 76:16, 77:4, 79:2, 80:4, 80:11, 85:17, 93:7, 102:9, 107:18, 107:24, 108:3, 108:6, 109:6, 109:8, 109:11, 109:22, 111:4, 118:3, 118:4, 118:9, 124:17, 124:20, 125:23, 125:25, 127:2, 127:5, 128:16, 128:24, 128:25
own [5] - 26:22, 44:24, 51:3, 113:11, 115:17
owned [2] - 33:20, 92:4
owner [2] - 33:16, 83:3

P

P.C [1] - 2:3
p.m [3] - 60:2, 61:25, 136:14
P146 [1] - 105:23
P363 [1] - 122:18
pack [2] - 91:9, 91:19
page [30] - 100:2, 100:7, 100:8, 100:9, 100:18, 101:8, 101:10, 102:11, 103:2, 104:13, 104:16, 104:17, 104:18, 105:8, 106:15, 111:22, 112:9, 114:8, 114:14, 115:3, 118:24, 119:9, 119:10, 124:9, 124:15, 125:11, 127:14, 127:16,

129:23, 134:25
PAGE [2] - 138:3, 138:17
pages [8] - 104:13, 104:21, 117:8, 122:17, 123:7, 124:2, 124:25, 135:3
paid [20] - 49:10, 76:5, 77:16, 80:23, 85:17, 86:5, 102:8, 109:3, 109:4, 109:9, 110:7, 114:21, 118:8, 120:23, 126:10, 126:12, 126:13, 126:15, 135:2
paper [2] - 33:17, 43:16
paperwork [3] - 27:17, 34:15, 55:18
paragraph [3] - 101:20, 101:21, 102:12
parameters [2] - 26:2, 41:12
paraphrasing [1] - 78:24
parents [1] - 71:21
parents' [1] - 71:16
part [4] - 10:23, 31:20, 111:18, 111:24
particular [1] - 127:24
parties [2] - 3:5, 139:16
parting [1] - 33:23
partners [2] - 10:17, 33:19
partnership [2] - 22:16, 26:19
pass [1] - 96:22
past [3] - 69:25, 70:6, 73:6
Pay [2] - 99:9, 138:20
pay [17] - 14:24, 49:11, 74:9, 76:7, 76:8, 76:21, 78:4, 79:16, 110:13, 110:22, 113:12, 113:17, 117:10, 117:15, 129:14
payable [1] - 15:5
paychecks [1] - 111:11
Payday [2] - 99:10, 138:21
paying [3] - 76:23, 78:16, 110:12
payment [7] - 40:25, 42:11, 44:2, 49:15, 103:4, 103:11, 119:23

**payments** [2] - 74:11, 122:2
**Payout** [1] - 124:9
**payout** [6] - 77:11, 107:25, 110:10, 111:3, 123:25, 124:6
**payroll** [1] - 110:15
**People** [1] - 60:2
**people** [23] - 9:5, 9:8, 9:14, 13:10, 15:19, 21:25, 24:5, 38:21, 42:9, 51:2, 56:9, 59:21, 60:11, 60:13, 69:12, 73:5, 73:8, 95:7, 95:18, 113:18, 113:24, 121:16, 134:5
**per** [1] - 132:2
**percent** [20] - 31:7, 31:10, 36:18, 38:7, 38:17, 57:16, 71:25, 77:12, 77:13, 98:12, 105:11, 108:18, 110:10, 110:19, 110:21, 110:25, 111:8, 111:15, 116:16, 130:13
**percentage** [6] - 14:21, 38:2, 38:6, 38:15, 87:5, 98:3
**perfect** [1] - 136:10
**perform** [1] - 68:25
**performance** [3] - 88:3, 88:6, 88:11
**performed** [2] - 102:14, 115:9
**performing** [1] - 16:24
**period** [12] - 17:19, 17:21, 17:25, 18:20, 38:9, 62:2, 76:7, 76:8, 76:11, 76:18, 77:8, 119:3
**permission** [1] - 27:13
**person** [13] - 7:12, 7:14, 13:13, 26:24, 50:10, 50:15, 58:12, 67:6, 90:20, 96:5, 97:2, 97:10, 128:4
**personal** [2] - 92:2, 131:14
**personally** [3] - 7:24, 46:4, 129:16
**perspective** [1] - 101:7
**pertaining** [2] - 66:20, 104:25
**perusing** [1] - 117:5
**Perusing** [1] - 99:24
**Peskin** [1] - 101:4
**petty** [1] - 67:14

**phone** [30] - 40:11, 41:4, 44:19, 45:2, 45:3, 45:4, 47:7, 47:20, 50:17, 55:25, 56:4, 57:21, 59:22, 60:21, 62:21, 69:4, 69:5, 71:25, 86:18, 87:2, 87:7, 87:10, 87:15, 87:16, 90:23, 128:4, 128:5, 134:11, 134:13
**phrase** [1] - 100:23
**physical** [4] - 52:4, 57:9, 57:11, 57:13
**physically** [3] - 13:18, 85:8, 88:23
**pick** [2] - 26:25, 52:17
**picking** [2] - 72:19, 72:22
**pictures** [1] - 92:2
**piece** [1] - 15:22
**piecing** [1] - 40:22
**pitch** [1] - 80:17
**place** [12] - 8:23, 23:19, 24:17, 25:2, 25:6, 30:8, 31:23, 49:20, 50:6, 69:8, 82:9, 86:16
**placed** [1] - 48:5
**Plaintiff** [1] - 1:19
**plaintiff** [1] - 32:16
**plaintiffs** [4] - 19:12, 19:16, 95:2, 132:25
**Plaintiffs** [2] - 1:8, 2:4
**plan** [1] - 120:6
**planning** [2] - 93:4, 93:5
**Play** [1] - 62:18
**plaza** [1] - 53:18
**plus** [5] - 30:11, 79:4, 108:23, 110:3, 111:14
**point** [12] - 10:17, 10:18, 28:21, 65:4, 73:6, 75:20, 79:5, 123:13, 126:10, 129:2, 129:3, 129:5
**points** [5] - 76:13, 101:14, 103:18, 103:25, 112:10
**Police** [1] - 89:16
**police** [2] - 90:12, 90:14
**policeman** [1] - 89:15
**popped** [3] - 90:6, 90:9, 90:22
**popular** [1] - 52:21
**portion** [5] - 33:20, 74:23, 75:4, 80:3, 80:10

**position** [2] - 11:23, 20:18
**positions** [1] - 83:7
**possession** [1] - 135:12
**possible** [1] - 31:2
**possibly** [1] - 126:20
**postgraduate** [1] - 6:16
**posttermination** [3] - 121:5, 128:9, 128:12
**practice** [1] - 8:9
**practicing** [3] - 8:14, 66:14, 66:17
**precise** [2] - 76:24, 77:4
**Precision** [17] - 26:7, 26:13, 26:15, 26:19, 27:4, 27:10, 27:14, 27:22, 28:3, 28:5, 28:9, 28:13, 28:16, 31:24, 32:25, 33:9, 51:21
**predominantly** [1] - 98:14
**Pregiato** [2] - 33:17, 33:22
**premeditated** [1] - 123:19
**premium** [2] - 30:9, 30:11
**PRESENT** [1] - 2:17
**present** [3] - 4:19, 12:15, 81:7
**Presumably** [1] - 126:5
**pretty** [12] - 23:2, 28:25, 36:3, 51:18, 53:11, 60:7, 74:24, 83:5, 100:19, 102:15, 103:20, 131:7
**previous** [1] - 122:7
**previously** [2] - 23:3, 122:13
**prioritizing** [1] - 55:20
**proactive** [1] - 59:20
**process** [5] - 5:11, 44:14, 47:19, 59:23, 100:25
**processed** [1] - 47:9
**processing** [1] - 12:18
**processors** [4] - 46:6, 46:9, 46:14, 46:24
**produced** [5] - 14:20, 105:24, 108:10, 118:24, 122:16
**product** [6] - 23:23, 39:7, 39:12, 41:25, 43:5

**products** [17] - 8:17, 23:21, 24:3, 24:10, 25:15, 28:10, 28:24, 29:18, 36:5, 37:4, 39:21, 40:4, 41:11, 41:13, 42:22, 42:25, 43:11
**professionals** [1] - 64:7
**profit** [5] - 104:22, 104:24, 105:4, 105:10, 109:16
**program** [1] - 40:25
**projected** [1] - 126:13
**promoted** [5] - 13:21, 13:23, 15:10, 15:14, 18:11
**promotional** [1] - 71:2
**properly** [1] - 83:11
**proportion** [1] - 131:21
**proposal** [1] - 69:23
**provide** [1] - 135:23
**Public** [4] - 1:21, 4:4, 137:23, 139:7
**public** [1] - 69:8
**punch** [1] - 52:20
**purchase** [4] - 11:14, 37:2, 37:22, 37:23
**purchased** [2] - 63:2, 63:3
**purchases** [1] - 38:4
**purchasing** [1] - 37:24
**purpose** [3] - 65:20, 112:22, 116:3
**purposes** [4] - 64:24, 70:18, 70:22
**pursue** [1] - 6:15
**put** [6] - 36:11, 41:6, 75:16, 86:5, 135:25, 136:8

**Q**

**qualify** [4] - 12:11, 23:13, 24:5, 44:10
**qualifying** [1] - 41:7
**questions** [4] - 4:24, 5:9, 42:16, 136:11
**quick** [1] - 61:20
**quickly** [1] - 101:2

**R**

**radio** [16] - 8:21, 8:24, 9:6, 9:11, 48:5, 48:25, 49:21, 65:4, 65:22, 65:24, 66:3, 66:13, 66:20, 67:8, 67:17, 67:22

**raise** [1] - 19:6
**RAKEMAN** [1] - 1:5
**rakeman** [1] - 82:17
**Rakeman** [55] - 10:4, 10:7, 10:11, 10:19, 17:20, 18:3, 18:8, 19:15, 19:23, 20:21, 20:23, 21:6, 21:21, 22:15, 26:16, 26:17, 27:3, 27:10, 32:11, 32:19, 32:24, 33:3, 34:18, 35:21, 35:24, 48:12, 49:7, 50:16, 50:23, 51:7, 66:16, 67:9, 75:22, 78:10, 81:5, 84:3, 84:20, 89:3, 90:22, 91:5, 91:19, 93:3, 105:2, 108:7, 116:10, 121:18, 124:7, 125:6, 126:25, 128:15, 128:24, 132:8, 132:14, 133:2, 136:7
**Rakeman's** [2] - 4:20, 66:7
**ran** [2] - 33:15, 114:5
**range** [4] - 47:5, 47:17, 57:14, 68:20
**rarely** [1] - 74:24
**rate** [7] - 24:25, 36:25, 37:20, 39:24, 42:10, 45:13, 109:10
**rate-and-term** [1] - 36:25, 37:20
**rates** [4] - 24:20, 36:23, 37:16, 38:19
**ratios** [1] - 55:21
**ray** [1] - 117:19
**Ray** [1] - 59:18
**RAYMOND** [2] - 2:10, 2:14
**reach** [3] - 9:10, 9:12, 13:12
**reach-out** [1] - 13:12
**reached** [1] - 73:5
**react** [2] - 56:9, 56:12
**reacting** [1] - 59:19
**reactive** [2] - 63:17, 71:25
**read** [4] - 134:22, 134:24, 135:3, 137:8
**ready** [1] - 46:22
**real** [1] - 70:14
**realized** [1] - 76:23
**really** [12] - 24:12, 35:7, 36:13, 54:22, 58:24, 70:11, 79:24, 98:9, 101:6, 107:22, 113:3, 118:21

receive [9] - 14:22, 51:9, 74:14, 75:9, 88:5, 88:10, 107:15, 125:7, 125:9
received [5] - 75:13, 86:2, 111:2, 111:7, 125:5
receiving [1] - 107:5
recently [1] - 73:6
reception [2] - 134:3, 134:10
receptionists [2] - 133:20, 133:22
Recess [1] - 122:11
recess [2] - 61:23, 93:15
recision [1] - 38:9
recommend [2] - 43:10, 95:25
recommending [1] - 96:12
record [10] - 4:10, 53:4, 65:7, 89:9, 93:14, 127:9, 135:9, 137:12, 137:13, 139:13
records [1] - 106:18
recovery [2] - 131:19, 132:3
reduce [1] - 109:21
refer [1] - 100:6
referral [1] - 70:7
referred [1] - 17:15
referring [4] - 11:22, 40:4, 102:25, 124:25
refers [5] - 100:11, 125:12, 125:16, 125:20, 125:22
refi's [2] - 38:3, 38:8
refinance [9] - 11:10, 12:2, 36:25, 37:2, 37:20, 38:7, 39:13, 39:16, 47:12
refinances [1] - 11:12
refinancing [2] - 12:6, 39:3
regardless [2] - 15:6, 61:11
region [1] - 12:6
regional [1] - 17:5
regroup [1] - 73:10
regular [2] - 30:23, 73:3
REILLY [17] - 2:7, 30:20, 34:24, 39:9, 41:20, 61:13, 63:7, 69:18, 70:8, 86:9, 93:13, 98:6, 106:14, 135:20, 135:22, 136:10, 136:12

reimburse [1] - 49:15
related [2] - 106:13, 139:16
relatively [1] - 97:23
religion [2] - 8:9, 8:11
religious [2] - 8:3, 8:5
remaining [1] - 20:6, 104:21
remember [4] - 84:14, 101:4, 127:18, 127:21
remind [1] - 56:22
repeat [1] - 50:12
repetitively [1] - 120:2
rephrase [5] - 5:4, 51:4, 97:4, 103:5, 131:23
report [9] - 51:24, 52:3, 52:4, 85:9, 86:16, 87:24, 122:19, 123:3, 124:19
reported [2] - 35:13, 82:3
reporter [1] - 5:8
Reporting [1] - 1:24
reports [1] - 124:3
representative [1] - 69:21
represented [1] - 94:20
represents [1] - 94:21
reps [4] - 25:13, 65:2, 69:16, 69:17
reputation [1] - 7:16
request [3] - 135:9, 135:23, 135:25
REQUEST [1] - 138:6
requests [1] - 136:6
required [2] - 97:3, 134:15
requirement [1] - 94:2
requiring [1] - 97:10
reserved [1] - 3:12
residential [1] - 11:11
resolved [1] - 94:18
respective [1] - 3:5
respond [1] - 136:4
responses [1] - 5:7
rest [1] - 72:20
restaurant [1] - 69:7
restrictive [1] - 36:6
retained [1] - 138:25
return [1] - 79:17
returns [1] - 92:3
revenue [3] - 14:18, 14:19, 14:21, 15:23, 49:17, 123:25, 124:18, 127:15

revenues [2] - 49:12, 49:13
reverse [1] - 36:17
reverting [1] - 41:3
review [1] - 99:21
reviewed [1] - 117:6
reviewing [1] - 99:22
revolving [1] - 25:14
Rich [1] - 1:24
Richard [2] - 33:17, 33:22
rights [1] - 30:13
ring [2] - 134:10, 134:12
ringing [1] - 59:22
rings [1] - 72:2
risky [1] - 31:12
road [1] - 10:18
Road [3] - 1:24, 2:5, 85:10
Robert [3] - 19:21, 22:9, 84:21
ROBERT [1] - 1:6
rock [1] - 62:17
Rock [1] - 62:18
Rockville [6] - 4:14, 18:14, 18:25, 19:2, 19:4, 85:10
role [3] - 74:6, 81:25, 82:5
Rolodex [1] - 27:7
room [1] - 133:19
rough [1] - 77:22
round [7] - 76:19, 110:14, 111:11, 119:3, 119:15, 119:18, 120:10
route [2] - 34:2, 50:14
routed [1] - 134:2
RQ [1] - 135:7
rule [1] - 97:10
rules [3] - 4:23, 136:3, 136:5
rumblings [1] - 121:13
run [6] - 13:21, 13:23, 13:25, 44:3, 53:23, 65:23, 67:17, 67:19, 73:9
running [3] - 18:12, 59:24, 109:24

**S**

safe [1] - 31:2
safer [1] - 31:12
Saint [1] - 6:25
sake [1] - 5:8
salary [10] - 15:3, 16:20, 17:10, 75:9, 75:12, 75:17,

107:22, 108:23, 109:13, 110:22
sale [1] - 101:14
sales [5] - 16:5, 74:15, 100:13, 100:23, 102:6
salesperson [1] - 86:12
salesperson's [1] - 16:5
salespersons [1] - 86:8
sat [1] - 5:16
Saturdays [4] - 56:23, 57:7, 59:2, 59:4
save [2] - 38:21, 44:3
saw [1] - 91:13
scale [1] - 15:23
schedule [1] - 54:11
Schedule [2] - 135:13, 138:9
SCHIELE [6] - 1:5, 1:20, 137:7, 137:18, 138:4, 139:9
Schiele [17] - 4:11, 4:15, 61:24, 93:16, 99:18, 112:15, 113:8, 113:13, 114:25, 115:5, 115:9, 115:16, 122:12, 125:5, 135:10, 135:14, 138:9
Schiele's [1] - 138:7
School [1] - 6:25
school [3] - 6:10, 6:24, 45:9
Schraeger [8] - 33:25, 34:9, 35:4, 89:15, 91:3, 103:16
Scott [8] - 33:25, 82:4, 88:7, 89:15, 90:12, 91:3, 92:23, 96:3, 96:18, 96:20, 97:8, 103:16, 107:18, 111:17, 112:13, 118:19, 120:21, 121:8
sealing [1] - 3:6
search [1] - 131:8
seasonal [1] - 69:10
second [5] - 67:12, 90:7, 102:11, 115:3, 135:25
secondary [1] - 29:12
sector [2] - 11:13, 11:14
see [25] - 12:11, 40:18, 44:25, 49:18, 54:5, 55:21, 59:12, 72:14,

74:3, 89:23, 100:2, 100:13, 101:25, 104:8, 104:20, 105:21, 108:24, 109:15, 109:17, 110:12, 119:14, 119:24, 120:3, 126:7, 129:22
seeing [1] - 40:23
segment [3] - 8:3, 8:6, 114:2
sell [5] - 29:11, 30:18, 31:14, 36:15, 39:7
sellable [1] - 31:2
selling [2] - 29:17, 30:13
seminars [4] - 64:9, 64:13, 64:18, 64:21
send [4] - 56:8, 56:9, 61:2, 62:21
sense [5] - 25:22, 76:20, 104:20, 110:15, 111:12
separate [2] - 18:12, 52:23
September [15] - 9:24, 35:18, 81:14, 88:20, 89:12, 95:9, 95:17, 102:22, 123:18, 124:22, 127:7, 127:10, 129:21, 130:15, 131:12
service [1] - 30:13
services [2] - 115:8, 115:12
set [3] - 61:16, 139:11, 139:21
setting [1] - 128:7
seven [6] - 37:18, 61:15, 75:14, 75:21, 107:19, 129:4
shall [1] - 3:12
share [2] - 35:20, 51:6
shareholder [2] - 114:24, 116:6
Shark [1] - 49:25
sheet [1] - 74:4
sheets [3] - 73:16, 73:23, 74:7
short [3] - 17:21, 18:20, 76:21
shortest [1] - 47:18
shortly [1] - 136:8
show [11] - 75:12, 89:9, 98:19, 99:19, 104:3, 105:17, 106:20, 116:22, 118:25, 119:23, 129:10
showed [1] - 89:11

**showing** [2] - 130:12, 130:14
**shows** [3] - 114:11, 114:17, 119:11
**shut** [1] - 54:22
**shutdown** [1] - 21:24
**shy** [1] - 78:7
**side** [1] - 122:17
**sign** [6] - 75:18, 76:3, 80:19, 108:4, 109:4, 134:15
**signature** [2] - 100:17, 107:2
**Signed** [1] - 137:20
**signed** [10] - 3:16, 3:19, 34:15, 73:15, 100:16, 102:3, 103:8, 134:20, 134:21, 134:22
**significant** [2] - 36:10, 109:11
**similar** [3] - 25:21, 51:18, 67:19
**simply** [2] - 5:6, 23:10
**situation** [1] - 6:4
**six** [3] - 52:2, 52:7, 61:9
**skimmed** [1] - 135:4
**slack** [1] - 26:25
**sleep** [2] - 61:5, 62:17
**sleeping** [1] - 61:12
**slotted** [1] - 120:13
**small** [3] - 50:3, 74:23, 110:4
**smaller** [1] - 15:22
**Smith** [2] - 30:5, 47:21
**so..** [1] - 51:3
**sole** [1] - 114:24
**someone** [4] - 5:21, 43:22, 74:21, 90:2
**sometime** [1] - 26:11
**sometimes** [3] - 54:19, 62:15, 113:10
**somewhat** [1] - 7:10
**somewhere** [3] - 57:14, 82:10, 93:22
**son** [2] - 83:4, 83:10
**soon** [1] - 65:18
**sophisticated** [2] - 7:5, 7:9
**sorry** [9] - 21:3, 72:24, 89:19, 95:19, 95:20, 97:4, 124:18, 125:8, 128:10
**sort** [2] - 22:16, 43:5
**sounds** [5] - 43:17, 43:18, 65:19, 67:14, 67:15
**Source** [1] - 31:17
**sources** [1] - 70:7

**speaking** [1] - 5:13
**specific** [6] - 9:4, 9:12, 23:12, 41:25, 43:5, 68:14
**specifically** [3] - 12:24, 31:15, 84:15
**spend** [1] - 55:11
**spent** [1] - 19:3
**split** [3] - 26:23, 27:2, 27:9
**spot** [6] - 65:25, 66:20, 67:12, 67:17, 68:24, 113:19
**spots** [5] - 65:22, 66:3, 66:13, 67:8, 67:19, 67:22
**sprained** [1] - 71:8
**ss** [2] - 137:4, 139:4
**staff** [2] - 41:15, 72:17
**stamp** [1] - 105:22
**stamped** [1] - 100:6, 100:7, 101:11, 118:23, 119:10
**standard** [1] - 45:15
**Star** [2] - 68:5
**start** [11] - 14:16, 21:9, 26:14, 34:6, 44:15, 45:24, 56:6, 66:10, 82:7, 121:12, 121:13
**started** [5] - 9:22, 13:20, 21:18, 26:12, 34:8, 34:17, 54:9, 102:17
**starting** [3] - 117:25, 123:5, 124:9
**STATE** [2] - 137:4, 139:3
**State** [3] - 1:22, 137:23, 139:7
**state** [1] - 4:9
**statement** [5] - 86:14, 104:23, 104:25, 105:5, 105:11
**Statements** [2] - 99:16, 138:23
**statements** [2] - 117:11, 120:18
**STATES** [1] - 1:2
**station** [4] - 9:7, 65:16, 67:18, 68:4
**stations** [10] - 8:21, 8:24, 9:11, 48:17, 48:21, 49:23, 50:5, 67:20, 67:22, 113:20
**steakhouse** [1] - 81:10
**step** [2] - 19:10, 45:19
**stick** [1] - 84:16
**still** [16] - 18:10, 32:4, 34:3, 49:6, 54:20,

56:11, 58:14, 72:2, 75:7, 81:17, 83:12, 85:3, 110:19, 111:11, 127:10
**STIPULATED** [3] - 3:3, 3:9, 3:14
**stop** [1] - 26:3
**Store** [1] - 83:3
**straight** [6] - 53:16, 53:25, 54:2, 54:3, 60:7, 93:9
**Street** [2] - 1:14, 2:12
**stretch** [1] - 61:21
**strictly** [2] - 28:25, 72:18
**strike** [1] - 97:24
**strong** [2] - 13:9, 41:15
**structure** [3] - 15:11, 107:21, 108:13
**stub** [2] - 78:4, 117:16
**stubs** [3] - 110:13, 117:11, 129:14
**studies** [1] - 6:16
**studio** [1] - 65:19
**stuff** [6] - 27:20, 31:22, 65:4, 91:9, 91:24, 92:2
**sub** [3] - 39:7, 39:12, 40:4
**sub-product** [2] - 39:7, 39:12
**sub-products** [1] - 40:4
**submit** [1] - 12:17
**submitted** [3] - 46:22, 135:14, 138:9
**subscribed** [1] - 137:20
**subtract** [2] - 77:15, 129:13
**subtracted** [1] - 78:3
**sued** [3] - 5:21, 94:8
**Suffolk** [1] - 50:2
**suit** [1] - 40:7
**Suite** [2] - 1:24, 35:12
**Sunday** [1] - 57:18
**Sundays** [1] - 53:7
**supervise** [1] - 87:20
**supervised** [1] - 97:7
**supervises** [2] - 97:2, 97:10
**support** [1] - 41:15
**supposed** [2] - 76:5, 76:12, 110:20
**swipe** [1] - 73:19
**sworn** [4] - 3:16, 3:20, 4:4, 139:12
**Syosset** [3] - 13:22, 14:9, 16:23

**system** [4] - 13:15, 14:17, 65:5, 65:8
**systems** [1] - 25:23

## T

**tailor** [1] - 67:21
**target** [1] - 9:7
**tax** [1] - 92:3
**taxes** [2] - 118:6, 118:17
**team** [4] - 32:20, 34:20, 50:22, 50:24
**technically** [2] - 87:9, 110:20
**telephone** [1] - 47:16
**television** [1] - 50:7
**template** [3] - 45:13, 100:19, 134:23
**ten** [7] - 14:5, 14:10, 15:19, 37:13, 37:18, 91:23, 98:11
**tenure** [1] - 85:23
**term** [12] - 36:25, 37:20, 42:12, 43:23, 43:25, 44:4, 44:6, 45:13, 69:15, 102:5, 125:12, 125:15
**terminate** [2] - 92:24, 93:2
**terminated** [9] - 88:18, 89:6, 90:25, 91:8, 94:15, 95:8, 95:16, 102:21, 123:18
**terminating** [1] - 96:16
**termination** [5] - 78:16, 88:24, 131:12, 135:19, 138:14
**terms** [11] - 8:20, 11:20, 36:23, 37:11, 37:12, 39:23, 40:6, 41:12, 113:9, 114:4, 135:5
**test** [1] - 96:22
**testified** [4] - 4:5, 80:22, 92:18, 119:15
**testifying** [1] - 56:19
**testimony** [3] - 137:9, 137:12, 139:14
**Thanksgiving** [1] - 72:10
**THE** [2] - 2:10, 106:19
**third** [3] - 108:18, 114:14, 135:23
**Third** [2] - 1:14, 2:12
**thirty** [2] - 37:9, 55:14
**thirty-five** [1] - 55:14
**thousand** [1] - 17:13

**three** [12] - 33:18, 33:23, 38:9, 38:13, 38:16, 40:23, 47:14, 54:10, 72:6, 90:21, 120:9, 136:9
**three-day-recision** [1] - 38:9
**throughout** [2] - 11:21, 45:16
**thrown** [1] - 101:3
**Thursday** [7] - 54:18, 54:20, 54:21, 55:8, 58:19, 59:15, 61:25
**Thursdays** [1] - 57:24
**tiered** [1] - 14:17
**tired** [1] - 117:20
**TMS** [1] - 127:15
**today** [1] - 6:4
**together** [8] - 10:22, 17:23, 26:20, 26:21, 26:24, 32:20, 40:22, 55:18
**Tollin** [3] - 19:21, 22:9, 84:22
**TOLLIN** [1] - 1:6
**took** [2] - 71:15, 92:5
**top** [3] - 30:25, 110:21, 124:22
**total** [5] - 49:17, 77:24, 97:14, 124:18, 128:20
**totally** [1] - 122:4
**touch** [1] - 18:8
**towards** [3] - 67:23, 76:25, 77:2
**town** [2] - 18:23, 19:6
**track** [2] - 56:16, 73:13
**transaction** [3] - 12:19, 38:13, 124:12
**transactions** [3] - 11:11, 12:2, 31:20
**transcript** [3] - 5:11, 137:8, 137:11
**transferred** [1] - 118:10
**transition** [1] - 101:2
**transitioned** [1] - 118:3
**trend** [1] - 72:14
**trial** [1] - 3:13
**tried** [2] - 79:23, 80:7
**true** [4] - 51:20, 137:11, 137:14, 139:13
**truthful** [1] - 7:14
**truthfulness** [1] - 7:17
**try** [13] - 5:7, 5:12, 5:13, 25:25, 43:6, 54:22, 57:22, 73:2, 73:11, 79:7, 110:22,

121:2, 131:6
**trying** [6] - 9:11, 55:18, 55:19, 62:17, 98:13
**tuition** [1] - 40:15
**turn** [1] - 106:8
**turned** [1] - 106:17
**Turnpike** [1] - 35:11
**twelve** [3] - 14:5, 14:10, 15:19
**twenty** [4] - 37:9, 37:10, 68:21, 68:22
**twenty-five** [2] - 37:9, 68:21
**twice** [1] - 119:19
**two** [19] - 18:12, 21:13, 34:20, 40:10, 40:23, 44:17, 62:6, 62:13, 64:17, 77:12, 83:5, 126:18, 129:9, 129:24, 133:16, 133:17
**two-hour** [1] - 44:17
**tying** [1] - 63:14
**type** [9] - 9:12, 36:9, 40:5, 40:6, 65:22, 97:3, 113:23, 116:4, 126:21
**types** [7] - 36:14, 36:21, 37:6, 37:8, 39:24, 43:20, 64:20
**typically** [2] - 44:19, 57:17

### U

**ultimately** [4] - 44:7, 94:17, 101:17, 108:5
**unbelievable** [1] - 38:19
**under** [4] - 111:2, 136:2, 136:4, 137:9
**understood** [1] - 5:14
**underwriters** [1] - 40:20
**underwriting** [4] - 12:18, 41:9, 44:13, 46:23
**underwrote** [1] - 23:11
**unexpected** [1] - 90:19
**unfortunately** [1] - 71:24
**UNITED** [1] - 1:2
**universe** [1] - 23:21
**unless** [3] - 56:6, 57:19, 123:7
**unpaid** [2] - 80:23, 93:8

**up** [42] - 9:25, 12:15, 16:21, 17:13, 19:2, 26:25, 40:23, 42:16, 44:9, 45:24, 46:11, 47:20, 47:24, 52:17, 55:17, 55:21, 59:20, 60:14, 61:17, 62:23, 63:14, 72:19, 72:22, 76:21, 77:14, 79:9, 89:9, 89:11, 91:9, 91:20, 96:4, 112:24, 113:21, 115:21, 120:2, 120:9, 123:6, 125:19, 126:10, 126:15, 128:7, 129:10
**uploaded** [1] - 13:15
**utilize** [1] - 113:7
**utilized** [1] - 113:5

### V

**vacation** [2] - 71:15, 71:23
**vacations** [1] - 71:14
**vague** [1] - 41:19
**value** [2] - 31:7, 31:10
**varied** [1] - 24:20
**variety** [1] - 37:3
**various** [2] - 43:20, 113:21
**Veracka** [8] - 33:24, 34:9, 35:3, 89:14, 90:10, 103:15, 107:6, 107:15
**verbal** [1] - 5:8
**versa** [1] - 26:25
**versed** [1] - 25:17
**versus** [3] - 87:7, 98:4, 109:21
**vice** [1] - 26:25
**violent** [1] - 90:20
**voice** [1] - 65:24
**voicemail** [1] - 87:2

### W

**W-2** [5] - 99:13, 114:9, 114:14, 114:22, 138:22
**W-2s** [2] - 78:3, 129:13
**wait** [1] - 112:18
**waiting** [1] - 117:23
**waived** [1] - 3:8
**wake** [1] - 61:16
**walked** [1] - 91:12
**walking** [2] - 58:12, 109:25
**wants** [1] - 40:12

**warehouse** [3] - 29:8, 29:17, 29:23
**ways** [5] - 33:24, 36:8, 36:10, 70:3, 129:24
**website** [1] - 50:19
**websites** [1] - 113:21
**week** [8] - 52:2, 52:7, 52:21, 53:5, 53:9, 68:17, 97:15, 132:2
**weekday** [2] - 55:13, 63:5
**weeks** [3] - 34:16, 47:14, 82:15
**weird** [1] - 90:8
**Wells** [3] - 29:13, 30:9, 31:18
**West** [2] - 56:10, 59:21
**whatsoever** [1] - 110:16
**WHEREOF** [1] - 139:20
**Whoa** [1] - 90:8
**whole** [3] - 28:21, 29:13, 125:19
**wife** [4] - 54:6, 54:23, 56:21, 60:9
**WILLIAM** [1] - 1:6
**William** [2] - 20:8, 22:12
**windows** [1] - 89:21
**withdraw** [1] - 8:8
**witness** [3] - 4:3, 139:10, 139:14
**WITNESS** [3] - 106:19, 138:3, 139:20
**Witness** [1] - 117:5
**WMCA** [9] - 48:18, 66:23, 68:2, 68:3, 68:9, 68:10, 68:14, 69:20, 69:21
**workday** [1] - 73:3
**worker** [1] - 96:6
**works** [1] - 16:15
**world** [1] - 72:21
**worth** [1] - 59:13
**write** [1] - 130:5
**written** [2] - 88:10, 136:2
**wrote** [2] - 130:12, 130:25

### Y

**yawn** [1] - 117:19
**year** [17] - 15:4, 18:5, 22:21, 27:24, 36:24, 37:9, 37:10, 37:13, 94:12, 114:12, 114:18, 119:20,

126:6
**year's** [1] - 69:25
**years** [10] - 22:19, 37:17, 37:18, 38:24, 42:12, 45:9, 97:19, 113:6, 135:16
**yesterday** [1] - 136:7
**YORK** [3] - 1:3, 137:4, 139:3
**York** [9] - 1:14, 1:22, 1:25, 2:6, 2:13, 4:14, 48:15, 137:23, 139:8
**young** [1] - 97:23
**yourself** [9] - 7:4, 7:8, 7:11, 8:13, 27:9, 61:17, 81:4, 82:17, 84:20
**yup** [4] - 13:2, 52:19, 89:4, 123:11

### Z

**Zilberman** [19] - 78:19, 81:4, 81:5, 83:15, 92:13, 92:21, 93:10, 102:19, 127:25, 128:3, 128:12, 128:14, 128:23, 130:6, 130:7, 130:12, 131:13, 135:18, 138:13
**zip** [1] - 52:22