Exhibit 7

COPY

1

2   UNITED STATES DISTRICT COURT

3   EASTERN DISTRICT OF NEW YORK

4   ------------------------------------------------x

5   MICHAEL RAKEMAN, BRIAN SCHIELE, LUIS DELGADO,

6   ROBERT TOLLIN, WILLIAM MCCUTCHAN, JOHN NELSON

7   FENRICH and KEVIN BLANEY,

8                      Plaintiffs,

9                                  Civil Index No:
                                    16CV00453(JFB)(GRB)
10          - against -

11   MLD MORTGAGE INC. and LAWRENCE DEAR,

12                      Defendants.

13   ------------------------------------------------x

14                      129 Third Street
                        Mineola, New York
15
                        April 15, 2019
16                      10:06 a.m.

17

18            Deposition of Plaintiff,

19        MICHAEL RAKEMAN, before Diana

20        Mitchell, a Notary Public of the

21        State of New York.

22

23

24        Rich Moffett Court Reporting, Inc.
          114 Old Country Road, Suite 630
25              Mineola, New York 11501
                    516-280-4664

```
 1                                                    2

 2    A P P E A R A N C E S:

 3    NEIL H. GREENBERG & ASSOCIATES, P.C.

 4    Attorney for Plaintiff

 5          4242 Merrick Road

 6          Massapequa, New York 11758

 7    BY:   JUSTIN REILLY, ESQ.

 8

 9

10

11    THE LAW OFFICE OF RAYMOND NARDO

12    Attorney for Defendants

13          129 Third Street

14          Mineola, New York 11501

15    BY:   RAYMOND NARDO, ESQ.

16

17

18

19    ALSO PRESENT:

20          BRIAN SCHIELE

21          LUIS DELGADO

22          WILLIAM MCCUTCHAN

23

24

25
```

3

1

2

3          IT IS HEREBY STIPULATED AND

4      AGREED by and between the attorneys

5      for the respective parties herein,

6      that the filing, sealing and

7      certification of the within

8      deposition be waived.

9          IT IS FURTHER STIPULATED AND

10     AGREED that all objections, except

11     as to the form of the question,

12     shall be reserved to the time of

13     the trial.

14         IT IS FURTHER STIPULATED AND

15     AGREED that the within deposition

16     may be sworn to and signed before

17     any officer authorized to

18     administer an oath with the same

19     force and effect as if signed and

20     sworn to before the Court.

21

22              - oOo -

23

24

25

*Rich Moffett Court Reporting, Inc.*

4

1

2      M I C H A E L      R A K E M A N,

3      called as a witness, having been duly

4      sworn by a Notary Public, was examined

5      and testified as follows:

6                  *              *              *

7      <u>EXAMINATION BY</u>

8      <u>MR. NARDO:</u>

9          Q      Please state your full name

10     for the record.

11         A      My name is Michael Rakeman.

12         Q      What is your address?

13         A      I live at 56 Dogwood Lane,

14     Rockville Centre, New York 11570.

15         Q      Good morning, Mr. Rakeman.

16         A      Good morning.

17         Q      This is a deposition.  I am

18     going to ask you a series of questions

19     which you must answer.  If you don't know

20     an answer you can simply say that you

21     don't know.  If you don't understand a

22     question, let me know, I'll do the best I

23     can to rephrase it.

24              And at the end of the process

25     there will be a transcript generated by

```
                                                     5
1
2      the court reporter here taking down my
3      questions and your answers, so it's best
4      if you don't speak when I'm speaking, and
5      I'll try not to speak when you're
6      speaking for the sake of the transcript.
7      Do you understand that?
8              A       I understand.
9              Q       Have you ever been deposed
10     before?
11             A       Yes.
12             Q       How many times?
13             A       Once.
14             Q       What was that in connection
15     with?
16             A       A car accident.
17             Q       How long ago?
18             A       Was the accident or the
19     deposition?
20             Q       The deposition.
21             A       Approximately two years.
22             Q       Were you a party to that
23     case?
24             A       I was the defendant.
25             Q       Other than that case, have
```

*Rich Moffett Court Reporting, Inc.*

6

1

2      you ever been deposed before?

3           A      No.

4           Q      Other than that case and this

5      current case, have you ever been a

6      plaintiff or defendant in any lawsuit?

7           A      Yes.

8           Q      How many?

9           A      Oh, two, I believe.

10          Q      I'd like to discuss those.

11                 Is it easier to discuss the

12     most recent one or the first one?

13          A      They're pretty close to the

14     same time, so it doesn't matter.

15          Q      So tell me what those

16     lawsuits were.

17          A      Well, one was MLD sued me

18     over past due marketing invoices.  What

19     they didn't realize was that there was

20     marketing invoices were for marketing

21     that ran after I was fired, and it was

22     dismissed rather quickly.

23          Q      Do you know in what year that

24     case began?

25          A      2018.

7

```
1
2          Q        Do you know in what court it
3     was?
4          A        Somewhere in New Jersey, I
5     believe.
6          Q        Who represented you in that
7     lawsuit?
8          A        Judith, I believe, it's
9     R-O-D-D-E-N.
10         Q        And was she with a law firm
11    or was she on her own?
12         A        She's with a law firm.  Off
13    the top of my head I don't recall the
14    name.
15         Q        What was the other case that
16    you were a party to?
17         A        The other was us or me and
18    some other former employees suing Contour
19    Mortgage.
20         Q        Contour is C-O-N-T-O-U-R?
21         A        Correct.
22         Q        We do that for the benefit of
23    the court reporter.
24                  When was that case filed, if
25    you know?
```

*Rich Moffett Court Reporting, Inc.*

8

1

2          A        I believe that was filed in

3    either late '15 or early '16.

4          Q        Who was your counsel for

5    that?

6          A        Same one that I have here.

7          Q        That's Neil Greenberg's

8    office?

9          A        Neil Greenberg and his

10   associates.

11         Q        Did Justin Reilly represent

12   you in that case?

13         A        Yes, I believe both Justin

14   and Neil worked on the case.

15         Q        And tell me about Contour

16   Mortgage.  When did you working there?

17         A        I started working there in

18   2009 or '10, I believe, and worked up

19   there right until I started for MLD, so I

20   believe that was late 2013.

21         Q        You left Contour to go to

22   MLD?

23         A        Correct.

24         Q        We'll discuss your duties

25   later in the deposition, but am I correct

9

1

2  in saying that your duties at Contour

3  Mortgage were strictly the same as your

4  duties at MLD?

5        A       I would say that they were

6  similar.

7        Q       How were they different?

8        A       There was not really much of

9  a difference, other than that the two

10  banks had some different products that

11  they offered.

12       Q       You know the difference

13  between plaintiff and defendant?

14       A       Yes.

15       Q       Do you know who else was a

16  plaintiff in the Contour Mortgage case

17  along with you?

18       A       Brian Schiele.  I'm not sure

19  who else was in that one.

20       Q       What is your recollection as

21  to how many plaintiffs there were in that

22  case?

23       A       Oh, I want to say maybe four

24  or five, if I can remember.

25       Q       What was your job title at

10

1

2    Contour Mortgage?

3        A     Mortgage loan originator.

4        Q     Were all the plaintiffs in

5    that case against Contour Mortgage loan

6    originators?

7        A     I don't believe so.

8        Q     Do you know how many were?

9        A     I think -- I think two.

10       Q     That would have been you and

11   Mr. Schiele?

12       A     Yes.

13       Q     Did Mr. Schiele go to MLD at

14   the same time you did?

15       A     Yes.

16       Q     Did anyone, other than

17   yourself and Mr. Schiele, go to MLD at

18   the same time you did?

19       A     Like, other employees?

20       Q     Right. Yes.

21       A     They were opening up a branch

22   in the East Meadow location at that time,

23   and there was kind of a parting of ways

24   between Contour employees and those that

25   went to MLD and those that stayed with

*Rich Moffett Court Reporting, Inc.*

11

1

2    Contour.   So there was a handful of

3    people that started around the same time

4    in MLD that we did.

5          Q      So two of those people were

6    yourself and Mr. Schiele, correct?

7          A      Yes.

8          Q      Do you remember the names of

9    any other people that started at MLD with

10   you and Mr. Schiele?

11         A      That started with us as in,

12   like, at the same time or with us as in

13   they worked with us?

14         Q      Well, let's start with at the

15   same time.

16         A      By the "same time," are you

17   saying the same day?

18         Q      Well, let's say within two

19   weeks.

20         A      Within two weeks, I mean, it

21   was probably, I could say with more

22   confidence within a month or so.

23         Q      Okay.   That's fine.

24         A      There was a number of people

25   that -- who I knew their names that were

1                                                    12

2      Contour employees that moved over to MLD

3      where you have, let's see, Ryan Veracka,

4      John Veracka, Michael Brooks, Scott

5      Schraeger, Denise Veracka, Barbara

6      Richards, Samantha Dougworth, Samantha

7      Kornhaber, I believe.

8            Q       Were any of those employees

9      you just mentioned mortgage loan

10     originators?

11           A       Ryan Veracka.

12           Q       Did you and Mr. Schiele start

13     at MLD on the same day?

14           A       As each other?

15           Q       Yes.

16           A       Probably.  I mean, depending

17     on when the paperwork actually went

18     through, whether it's, you know, if we go

19     and check the records.  If it's the exact

20     same day I can't say that.

21           Q       Did Mr. Ryan Veracka start at

22     or about the same time?

23           A       Define "at or about."

24           Q       Did Mr. Ryan Veracka start as

25     a mortgage loan originator at MLD within

13

 1    a week of you and Mr. Schiele?

 2        A       I can't say that it was

 3    within a week.  I don't know.

 4        Q       Did Mr. Schiele know that you

 5    were going to MLD while you were working

 6    at Contour Mortgage?

 7        A       Did Mr. Schiele know?

 8        Q       Yes.

 9            MR. REILLY:  Objection to

10        form.

11            Go ahead, you can answer.

12        A       Oh, both Mr. Schiele and

13    myself were working in tandem at that

14    time, and we had a meeting with the owner

15    of Contour Mortgage and explained to him

16    that we were going to become employees of

17    MLD, at which time we discussed, you

18    know, just closing out the -- the

19    existing loans that we had and, you know,

20    having the most respectful departure.

21        Q       So is it fair to say that you

22    and Mr. Schiele decided to leave Contour

23    Mortgage at or around the same time?

24        A       Yes.

14

1

2      Q      And you and Mr. Schiele had

3  conversations with each other about

4  leaving Contour Mortgage for MLD before

5  this meeting you testified about?

6           MR. REILLY:  Objection to

7      form.

8           You can answer.

9      A      Okay.

10          MR. REILLY:  I'm just

11      objecting.  I'm not going to tell

12      you not to answer.

13      A      Yes.  Correct.

14      Q      For what period of time did

15  you have conversations with Mr. Schiele

16  about leaving Contour Mortgage before you

17  had this meeting?

18      A      A week or two, I guess.  I

19  don't know.

20      Q      Did you have conversations

21  with any mortgage loan originator, other

22  than Mr. Schiele, about leaving Contour

23  Mortgage before you had this meeting

24  where you advised Contour Mortgage that

25  you were leaving?

```
1                                                    15
2          A     I -- I don't recall that.
3          Q     Who did you meet with when
4     you and Mr. Schiele advised this person
5     that you would be leaving Contour
6     Mortgage?
7          A     You mean who was the owner of
8     Contour?
9          Q     Or the person you met, yes.
10         A     That's Richard Pregiato.
11         Q     Do you know when that meeting
12    was?
13         A     I do not.
14         Q     Do you know when it was in
15    relation to when you left Contour?
16         A     Probably within a matter of
17    weeks.
18         Q     Did the meeting end
19    cordially?
20         A     Yes.
21         Q     Did you continue to perform
22    your duties for Contour within that one-
23    or two-week period?
24         A     Yes.
25         Q     The case that you brought
```

```
 1                                              16

 2     against Contour Mortgage eventually

 3     resolved, correct?

 4          A       Correct.

 5          Q       Do you know when it resolved?

 6          A       I want to say that was the

 7     early part of 2018, late 2017.  I'm not

 8     positive on that answer, though.

 9          Q       That's fine.  That's fine.

10                  Is it fair to say that you

11     were working at MLD at the time that the

12     Contour case resolved?

13          A       No, I was not.

14          Q       Where were you working when

15     the Contour case resolved?

16          A       Intercontinental Capital

17     Group.

18          Q       So you had left MLD at the

19     time that the Contour case resolved?

20          A       I was fired from MLD.

21          Q       And MLD closed its shop there

22     in East Meadow, correct?

23          A       Not -- they eventually closed

24     it, but when I was let go, it was still

25     open.
```

17

2          MR. REILLY:  Objection to

3     form.  Last question.

4          Q     Is it fair to say that in

5     your lawsuit with Contour you made

6     similar allegations to which you are

7     making in the lawsuit against MLD?

8          A     Similar, yes.

9          Q     At the time you filed the

10    case against Contour were you still

11    working at MLD?

12         A     No.

13         Q     So at the time you filed a

14    case against Contour had your employment

15    with MLD ceased?

16         A     Yes.

17         Q     What is your educational

18    background after high school?

19         A     I got a degree from Geneseo

20    State University.

21         Q     In what year?

22         A     Graduated in 2002.

23         Q     Did you go for any

24    postgraduate formal education after

25    getting a degree from SUNY Geneseo?

18

2       A       I did not.

3       Q       What was your first job in

4    the mortgage industry?

5       A       Ameriquest Mortgage Company.

6       Q       Can you spell that?

7               Oh, Ameriquest?

8       A       Yes.

9       Q       When did you work for them?

10      A       2002 'till 2006, I believe.

11   That's when they closed.

12      Q       What was your position there?

13      A       I was -- they had a different

14   title for it back then, but I believe it

15   was loan originator or loan officer, and

16   at the time that they closed I had been

17   promoted to branch manager.

18      Q       Did Ameriquest pay a salary

19   or commissions?

20      A       Yes.

21      Q       When you were a branch

22   manager, how did your pay structure

23   differ?

24      A       When I was a loan officer I

25   was paid based on the loans that I closed

19

2    solely.  As a branch manager I was unable

3    to originate loans myself, and I was paid

4    based on the production of the loan

5    officers at the branch.

6         Q     Why did you leave Ameriquest?

7         A     They were one of the first

8    lenders that closed during the start of

9    the financial crisis.

10        Q     Where did you work after

11   Ameriquest?

12        A     A place called Concord.

13              Let's make it a little more

14   difficult for everybody.

15              Concord Mortgage.

16        Q     Are they still open?

17        A     They are not.

18        Q     When did you work at Concord

19   Mortgage?

20        A     2006 through 2008.

21        Q     What was your title with

22   Concord?

23        A     Mortgage loan officer,

24   mortgage loan originator.

25        Q     Why did you stop working at

20

Concord?

    A      Better opportunity.

    Q      Where was that better opportunity?

    A      It was for a short period of time, Precision Financial.

    Q      Is Concord still open, to your knowledge?

    A      Concord, no.

    Q      I just want to go back.

          Where was Ameriquest's office?

    A      The one that I worked in?

    Q      Yes.

    A      For part of the time it was Syosset, New York, and at the time that they closed I was working out of their Babylon, New York office.

    Q      Where was Concord's office?

    A      Melville.

    Q      Where was Precision's office?

    A      Syosset.

    Q      What was your job title with Precision?

```
1                                          21

2          A       Mortgage loan originator.

3          Q       How long did you work for

4     them?

5          A       Just about a year, maybe a

6     little less than a year.

7          Q       Were your duties similar at

8     Precision, Concord and Ameriquest, other

9     than when you were branch manager at

10    Ameriquest?

11         A       Precision and Concord, they

12    were pretty similar.  Ameriquest had a

13    much different model, much different

14    structure, much different way of doing

15    business.  So although we were closing

16    mortgage loan transactions, what you did

17    on a day-to-day basis was a lot

18    different.

19         Q       Where did you work after

20    Precision Financial?

21         A       That's when we went to

22    Contour Mortgage.

23         Q       And then from Contour you

24    went to MLD?

25         A       Yes.
```

```
 1                                            22
 2          Q       Where did you go after MLD?
 3          A       Intercontinental Capital
 4   Group.
 5          Q       Is that where you are now?
 6          A       Yes.
 7          Q       What is your position there?
 8          A       Intercontinental Capital
 9   Group is the producing branch manager.
10          Q       Do you consider yourself to
11   be educated?
12          A       Yes.
13          Q       Do you consider yourself to
14   be sophisticated?
15          A       Somewhat.
16          Q       Would you say that you're
17   sophisticated in business?
18                  MR. REILLY:  Just objection
19          to form.
20          A       Somewhat.
21          Q       Would you say you're
22   sophisticated when it comes to the
23   banking industry?
24          A       I would say I have a strong
25   understanding of mortgage loan
```

*Rich Moffett Court Reporting, Inc.*

23

1

2      origination.

3             Q      Do you have a good reputation

4      in the mortgage industry?

5             A      Yes.

6             Q      Do you consider yourself to

7      be a truthful person?

8             A      Yes.

9             Q      An honorable person?

10            A      Yes.

11            Q      Am I correct in saying that

12     your reputation for truthfulness is

13     important to you?

14            A      Yes.

15            Q      And your reputation for being

16     honorable is important to you?

17            A      Yes.

18            Q      Isn't it true that in the

19     mortgage industry there are some

20     dishonorable people?

21            A      I wouldn't answer that

22     question.

23            Q      Okay.

24                   Have you ever read stories

25     about mortgage loan originators or

```
 1                                           24
 2   closing attorneys going to jail?
 3        A     I have.  I wouldn't put that
 4   strictly to mortgage people as you did in
 5   your line of questioning, because I think
 6   it happens in all facets of business, so
 7   I wouldn't want to just exclusively nail
 8   down that -- that sector.
 9        Q     Right, but with your
10   expertise in that sector you have seen
11   some people act dishonorably on occasion?
12                MR. REILLY:  Objection to
13        form.
14        A     Have I seen?
15        Q     Right.
16        A     I've not seen it myself.
17        Q     Have you heard of it?
18        A     Yes, we've all read about it.
19        Q     And some bank attorneys have
20   gone to jail through this mortgage
21   industry, correct?
22                MR. REILLY:  Objection to
23        form.
24        Q     Have you heard of that?
25        A     Yes.
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                          25
 2          Q       Do you consider yourself to
 3     be a man of faith?
 4          A       Yes.
 5          Q       What faith do you practice?
 6          A       Christian.
 7          Q       Is that part of your
 8     marketing, also?
 9          A       Can you elaborate?
10          Q       Sure.
11                  Do you market to a Christian
12     audience?
13          A       Not exclusively.
14          Q       But you partially market to a
15     Christian audience?
16          A       Well, a lot of our marketing
17     is done on various, like, radio stations.
18     That's one form of it.  Some stations
19     have a higher demographic of Christian
20     listeners.
21          Q       Can you give me an example of
22     those stations?
23          A       99.1 in New Jersey, 95.1 in
24     Baltimore.  Both of them are -- would
25     be -- would be considered positive --
```

26

1
2     positive hits, you know, reinforcing,

3     uplifting, safe for the whole family.

4           Q      Are you familiar with what is

5     broadcast on 99.1 in New Jersey?

6           A      Yes.

7           Q      Is it music or talk?

8           A      Music.

9           Q      Is it Christian-based music?

10          A      It would be deemed Christian

11    contemporary.

12          Q      Have you ever listened to

13    that music?

14          A      Yes.

15          Q      Are you familiar with 96.7

16    FM?

17          A      Yes.

18          Q      Is that also Christian

19    contemporary?

20          A      Yes.

21          Q      Would that be the same to

22    99.1 in New Jersey?

23          A      Similar.

24          Q      Do you advertise on 96.7 FM

25    here on Long Island?

*Rich Moffett Court Reporting, Inc.*

```
1                                          27

2          A       No.

3          Q       Is 95.1 also Christian

4   contemporary music?

5          A       Yes.

6          Q       Other than those radio

7   stations, is there any other marketing

8   you have performed to reach a Christian

9   base?

10         A       Outside of radio we weren't

11  doing anything that was deemed solely

12  nonsecular.

13         Q       Did you ever meet with any

14  church groups or anything like that?

15         A       In the past we have done some

16  seminars and things like that at churches

17  through, you know, pastors or church

18  leaders that we knew or got to know.

19         Q       Let me just back up for a

20  second.

21                 So did the marketing at 99.1

22  and 95.1 FM occur while you worked at

23  MLD?

24         A       Yes.

25         Q       Did the meeting with church
```

1                                              28

2      groups, if that's the right phrase, occur

3      while working at MLD?

4           A      I don't recall if the -- some

5      of the church seminars were done at that

6      time or not.

7           Q      Other than the radio

8      marketing and the church seminars, was

9      there any other way in which you tried to

10     reach a Christian audience for your

11     products?

12          A      Not that I am aware of, no.

13          Q      Can you tell me what a church

14     seminar is?

15          A      It would be just like any

16     other type of financial seminar, except

17     this one happened to be at a church

18     'cause it was the -- the pastor that kind

19     of opened the doors for the congregation.

20          Q      Did you ever do any of these

21     on Long Island?

22          A      Yes, we did one on Long

23     Island, but I am pretty sure that was

24     prior to MLD.

25          Q      Can you recall any other

29

1

2    church seminar you did while you were

3    working at MLD?

4         A      Off the top of my head, I

5    cannot.

6         Q      When you say you cannot, you

7    can't recall a specific one?

8         A      Correct.

9         Q      Do you think you did any

10    church seminars, even though you can't

11    recall a specific one, while you worked

12    at MLD?

13         A      I don't know.

14         Q      When you have done church

15    seminars, what would be the location in

16    or near the church that you would meet?

17    For instance, was this on church

18    property?

19         A      Typically, yes, so it

20    wouldn't be in the sanctuary.  It would

21    be, you know, in, like, a conference room

22    or a basement or something like that that

23    they had.

24         Q      What marketing steps did you

25    take at MLD to reach any type of

```
 1                                           30
 2    audience, other than the Christian radio
 3    station and church seminars?
 4         A      Well, secular radio we would
 5    do stuff where, you know, direct mail.
 6    If we were advertising for, like, reverse
 7    mortgage or something like that, you
 8    know, we would do, you know, mail or
 9    different radio campaigns that might
10    cater to listeners that are 60 years and
11    above in age.
12         Q      While you were working at
13    MLD, what secular radio stations did you
14    advertise on?
15         A      I believe on Long Island
16    102.3 we did for a bit.  There was a
17    country station, I believe, in New Jersey
18    that we did something with and some
19    various news stations.
20         Q      Do you remember the news
21    stations?
22         A      I do not off the top of my
23    head.  Sometimes we would do stuff where
24    you get -- you buy remnant inventory.  I
25    don't know if you're familiar with what
```

```
 1                                          31
 2      that is.  Unsold inventory for a cheaper
 3      price, so you didn't always know where it
 4      was getting placed.
 5              Q       You would buy that through a
 6      broker?
 7              A       Yeah, media buyer, so...
 8              Q       Who would pay for these ads
 9      while you worked at MLD?
10              A       Well, it's a -- MLD typically
11      would pay from their corporate account
12      either with a check or credit card, and
13      then it -- they would charge us back on
14      our ongoing profit and loss statement.
15              Q       When you say "they would
16      charge us back," is that you or is that
17      the whole group?
18              A       Brian and I.
19              Q       Am I correct in saying that
20      indirectly you and Brian were paying for
21      the ads?
22              A       Yes.
23              Q       Now, that's the same for all
24      the radio ads that would have run while
25      you were at MLD, correct?
```

*Rich Moffett Court Reporting, Inc.*

```
1                                              32
2         A      Yes.
3         Q      So when you were charged back
4    for the ads, do you know how that would
5    appear on your profit and loss statement?
6         A      Like, what it would be
7    called?
8         Q      Yes, the line item.
9         A      Radio advertising might be
10   it.  It might mention the stations
11   directly.  It really depends upon how the
12   bill came over.
13        Q      Were you and Brian referred
14   to as anything, was there a name for your
15   team?
16               MR. REILLY:  Objection to
17        form.
18        A      No.
19        Q      As you sit here today, do you
20   know how much you and Brian spent on
21   radio advertising while you were at MLD?
22        A      No, I don't know.
23        Q      Do you know how much per
24   month?
25        A      It would vary.  I would say
```

*Rich Moffett Court Reporting, Inc.*

33

2    could have been around 100,000 a month or

3    so.   I don't know I'll say with -- with a

4    hundred percent certainty, because I

5    don't remember.

6         Q       Okay.   That's understood.

7                 Did you ever do television

8    advertising when you were at MLD?

9         A       I don't recall if we did.

10        Q       Are you able to say, or give

11   a range, for how often the advertisements

12   ran, radio advertisements, while you were

13   at MLD?

14        A       They would probably run on a

15   given station anywhere, depending on the

16   day of the week and what was going on at

17   the station, anywhere from five to ten

18   times a day.   It would vary based on the

19   different contracts and whatnot.

20        Q       To the extent you had

21   expenses for church seminars, would that

22   be billed and paid by you and Brian in

23   the same manner while you were at MLD?

24        A       I don't know if we had any

25   specific church seminars that we did when

*Rich Moffett Court Reporting, Inc.*

34

1

2  we were at MLD, so I wouldn't be able to

3  say.

4       Q       Other than the radio ads, can

5  you think of any other type of marketing

6  you did at MLD where MLD would lay out

7  the money and then you would pay back

8  MLD?

9       A       There may have been some

10  digital, like, SEO stuff, maybe some

11  direct mail and maybe some -- we may have

12  done some social media, too.  Again, I

13  don't recall everything, but if there was

14  going to be something, those would be the

15  topics they'd fall under.

16       Q       Well, let's go back to the

17  radio for a second.

18              Who would determine the

19  budget for you and Brian to allocate to

20  radio advertisers?

21       A       As in who would, like, be

22  negotiating what to spend on a particular

23  station or the overall amount that we

24  could spend?

25       Q       All right.  Let's take both.

35

1

2    Let's start with the overall amount.

3         A      The overall amount would

4    correlate back to production.  You know,

5    we had to make sure that we had revenues

6    coming in to be able to cover the

7    expense.

8         Q      So am I correct that you and

9    Brian would meet, look over the

10   production numbers and then decide how

11   much to spend on marketing?

12                MR. REILLY:  Objection to

13        form.

14        A      Yeah, more or less.

15        Q      And part of that marketing

16   was radio?

17        A      Correct.

18        Q      And then you and Brian would

19   discuss how much in a certain period to

20   spend on radio marketing; is that right?

21        A      Yes.

22        Q      And then how would you go

23   about putting that in motion?

24        A      Well, whether it was through

25   a station direct or through a media

36

1

2    buyer, you know, we would collaborate,

3    get some ideas, see what sort of

4    frequency that we were getting and how

5    often it would run, size of the audience.

6    Some of the stations we had a prior

7    history with, meaning that we had

8    advertised with them in the past.  Some

9    of it were brand new campaigns, so you're

10   kind of, you know, putting your toe in

11   the water, so to speak, and, you know,

12   you monitor what's coming back from the

13   particular station, what closings you

14   have from the station, and just like

15   anything else, compare it to what you're

16   spending and make sure that they're --

17   that it's a smart business decision.

18        Q      While you were at MLD, what

19   was the radio station that you spent the

20   most money advertising on?

21        A      I would probably say that it

22   was 99.1 in New Jersey just because of

23   the longevity and frequency that we ran.

24        Q      Where was the office located

25   when you worked at MLD?

*Rich Moffett Court Reporting, Inc.*

```
1                                        37

2           A      East Meadow, New York.

3           Q      It was there for the entire

4    duration that you worked at MLD?

5           A      Correct.

6           Q      Did you ever report to any

7    other offices for MLD?

8           A      I did not.

9           Q      What were the hours of that

10   office?

11          A      Was the office opened?

12          Q      Yes.

13          A      So we -- you could get in

14   there as early as 7 in the morning, maybe

15   sometimes even a little earlier and, you

16   know, night people would -- there were

17   nights, 10:00, 10:30.  It really, you

18   know, if -- if you were able to be

19   productive and needed to be in the office

20   for whatever reason you had access.

21          Q      Did you have keys to the

22   office?

23          A      I believe I did, yes.

24          Q      So if no one was in the

25   office were you able to get in?
```

*Rich Moffett Court Reporting, Inc.*

                                                              38

1

2          A       Yes.

3          Q       Was there an alarm to the

4     office?

5          A       Yeah, I believe there was a

6     code from the outside of the building

7     that we could hit to buzz in and, you

8     know, make sure, like, the alarm was off.

9     I'm not a hundred percent sure on that,

10    though.

11         Q       Were there times that you

12    were in the office alone?

13         A       Yes.

14         Q       Were there times that only

15    you and Mr. Schiele were in the office?

16         A       Yes.

17         Q       What times of day or night

18    would that be?

19         A       If it was just he and I it

20    was typically during a snowstorm when no

21    one else would come in to work, weekends

22    where a lot of people, wouldn't be a lot

23    of people, but some people didn't report

24    in or later in the evening.

25         Q       How often were you at MLD on

39

2     either Saturday or Sunday or both?

3          A     A decent amount.  I would say

4     a few times a month.

5          Q     Would you average that to be

6     twice a month?

7          A     Yeah, maybe a little more

8     than that.

9          Q     For the occasions you went in

10    on weekends, how often did you go in on

11    both Saturday and Sunday?

12         A     In the same weekend or in the

13    same month?

14         Q     In the same month.

15         A     In the same month there would

16    be times that I would be there on a

17    Saturday and a Sunday, yeah, absolutely.

18               But a lot of the -- like, if

19    I was working on the weekend, a lot of it

20    I could do, you know, from my phone and,

21    you know, through e-mail and stuff like

22    that.  I could sell a loan or whatever

23    from my cell phone as well.

24         Q     Did you have any reservations

25    based on your religion about working on

*Rich Moffett Court Reporting, Inc.*

```
1                                              40

2    Sunday for MLD?

3         A     Not so long as it didn't

4    interfere with the family going to

5    church.

6         Q     Did anyone, to your

7    knowledge, keep track of your time when

8    you worked at MLD?

9         A     No.

10        Q     Did you ever keep track of

11   your time at MLD?

12        A     I knew what hours I worked,

13   yeah.

14        Q     Did you ever keep track of it

15   in writing?

16        A     I don't believe I did.

17        Q     Were there occasions when the

18   demands of working as a mortgage loan

19   originator would take you outside of the

20   office?

21        A     Could you elaborate on that

22   question?

23        Q     Sure.

24              Did you ever work for MLD

25   when you were not in the office?
```

41

2      A      Would I do -- are you asking

3   me if I did paperwork or client

4   interactions, like, from my house, or are

5   you asking me if I went out on the street

6   to get business?

7      Q      Let's start with the first

8   one.

9           Did you ever do interactions

10   with or on behalf of clients from your

11   home or from your car?

12      A      Yes.

13      Q      How often did you interact

14   with clients or do work on their behalf

15   from your home?

16      A      Daily.

17      Q      Is that the same with your

18   car?

19      A      Yeah, I think it would be

20   more -- my commute was fairly quick to

21   the office, and I really only went from

22   my house to the office so I didn't write

23   e-mails or anything like that from my --

24   from my car.  It's a, you know, 10,

25   12-minute ride.

*Rich Moffett Court Reporting, Inc.*

```
                                              42

1

2          Q      Was there anything that you

3   did that pertained to marketing for MLD

4   that occurred outside the office?

5          A      No.

6          Q      Did you do any networking?

7          A      Not really, no.

8          Q      Were you in any networking

9   groups?

10         A      No.

11         Q      Did you interact with any

12  real estate brokers?

13         A      No.

14         Q      Did you ever get referrals

15  from real estate brokers?

16         A      No.

17         Q      Did you interact with anyone

18  else in the business world for the

19  purpose of marketing?

20         A      Well, we ran advertisements

21  and we were glued to our desks.  When I

22  wasn't at my desk, I would, you know,

23  work from my house servicing those same

24  deals, whether it was through, you know,

25  reviewing paperwork or anything like
```

43

1  
2     that.  We didn't go out to network or get

3     business.  It was strictly consumer

4     direct advertising and sales.

5          Q      So in a workweek for MLD,

6     what percentage of the time that you

7     worked for MLD would have been physically

8     at the office and what percentage would

9     be at your house or somewhere other than

10    MLD?

11               MR. REILLY:  Objection to

12        form.

13         A      Again, it's tough to really

14    tell you, but I'll ballpark it at

15    80 percent in the office.

16         Q      Of the other 20 percent, how

17    much of that was at the house, all of it?

18         A      Pretty much all of it, yeah.

19         Q      Do you have a home office, so

20    to speak?

21         A      Sort of.  A spot that my kids

22    can't come in.

23         Q      All right.

24               Do you have a fax machine at

25    home?

```
 1                                              44
 2          A       Yes, I do.
 3          Q       Actually, you understand I'm
 4   referring to the time you worked at MLD,
 5   right?
 6          A       Yeah.  Yeah.
 7          Q       Did you have a copier at
 8   home?
 9          A       Yes.
10          Q       Am I correct in saying that
11   you would frequently check your e-mails
12   at home?
13          A       Yeah.
14          Q       Did you have any other
15   equipment at home for the purpose of
16   work, other than fax or copier?
17          A       I had a computer, but, you
18   know, most of this was -- were things
19   that we had in the house that wasn't,
20   like, I was -- I got them for the purpose
21   of working out of my house.  You know, if
22   I needed to use it was there, but mostly
23   it was, you know, it's sales, so a lot of
24   it's interacting with the customer or,
25   you know, reviewing your documents and
```

45

1

2     things like that that you could really do

3     from, you know, your home or the office

4     or whenever.

5           Q      I'm going to back up a little

6     again.

7                  What were your duties for

8     MLD?

9                  Before you answer that --

10          A      To originate mortgage loans

11    in compliance with state and federal

12    regulations.

13          Q      -- what states were you there

14    to originate mortgage loans for MLD?

15          A      I believe New York, New

16    Jersey, Pennsylvania, Connecticut,

17    California, Maryland, Florida.  I have to

18    go back and check what -- which ones we

19    interacted with at that time, but that's

20    kind of collectively between Brian and I.

21          Q      Am I correct in saying that

22    you and Brian worked together as a unit

23    during your time at MLD?

24          A      Yes, for the -- I mean,

25    there's things that, you know, a time

46

1
2      where he might have a loan that he would
3      close on and I had very little to no
4      involvement and vice versa, but we did
5      collaborate on a regular basis and, you
6      know, worked, he and I, as a unit, as you
7      said.
8           Q       Did MLD ever generate leads?
9           A       I believe that they did.  At
10     what level or, you know, who they went
11     to, I didn't really get all that.
12          Q       Am I correct in saying that
13     any leads generated by MLD did not go to
14     you?
15          A       Correct.
16          Q       To your knowledge, did MLD
17     leads go to Brian Schiele?
18          A       To my knowledge, no, they did
19     not.
20          Q       How would you originate the
21     mortgage loans?
22          A       We would -- there would be
23     some form of advertising.  A customer
24     would call in and/or e-mail us, you know,
25     whatever, and say they were interested in

47

our services.  We would take their

information from them, put together a

loan proposal, and if all parties agreed

to move forward, we would just follow the

normal steps in processing and closing a

mortgage loan transaction.

Q      Are these for residential

homes?

A      Yes.  Correct.  One- to

four-family residential owned.

Q      Did you and Brian have a

phone number that was different than

MLD's phone number?

A      Yeah, we had a number that

would be for our advertising that would

ring to us so we could monitor the calls

that came in and it helped us follow --

figure out which advertising campaign it

came from.

Q      When the number would ring to

you, would that ring to your cell phone?

A      No, it would ring to our

office, which we had, you know, call

forwarding capabilities and things like

*Rich Moffett Court Reporting, Inc.*

1                                                    48

2      that.

3           Q       So when you say your office,

4      that was a landline in East Meadow?

5           A       Correct.

6           Q       How often and under what

7      conditions did you use the call

8      forwarding?

9           A       If there was a situation

10     where nobody would be able to answer the

11     phone, otherwise.

12          Q       If a person called on a night

13     or a weekend and nobody was at the office

14     in East Meadow?

15          A       It would go to a voice

16     mailbox that we had access to check.  We

17     also would get an e-mail record of the

18     call coming in.

19          Q       What e-mail address did that

20     e-mail record go to?

21          A       Myself and Brian's.

22          Q       Was that an MLD e-mail

23     address or was that a generic Gmail or

24     Hotmail?

25          A       No, MLD.

49

Q       If you had the voicemail
capabilities why would you use the call
forwarding?

A       In case we wanted to take the
call live.

Q       How often did you do that?

A       Not very often.

Q       Am I correct in saying that
you and Brian could not call forward at
the same time?

A       Yeah, it would have to go
to -- to one or the other, because we had
the ability to check the voicemail that
came in from an outside source, and we
would get the e-mail record that showed
the number that called as well, so if we
wanted to call it back, you had that
capability.

Q       Was the e-mail record
contemporaneous with the phone call?  Did
the e-mail come at the same time as the
phone call?

A       Yes.  Yeah, it was realtime.

Q       So if you're at home at

*Rich Moffett Court Reporting, Inc.*

```
1                                               50
2      8:00 p.m. and an e-mail came in and you
3      checked the e-mail you could then call
4      that potential customer back?
5           A        Correct.
6           Q        Would the e-mail give any
7      information about the customer or would
8      it just give the phone number?
9           A        It would depend upon what
10     number they called from, if it was a cell
11     phone, who their serve -- who they had
12     their service with, and if it was a
13     landline if they had a blocked or
14     anonymous type of name along with it, so
15     at times you would get the customer's
16     first and last name with the number and
17     other times you might just get a number.
18          Q        But the e-mail would not give
19     any more information than names or phone
20     numbers, correct?
21          A        That's correct.
22          Q        Were there times when you got
23     an e-mail like that and you would call
24     the customer back while you were out of
25     the office?
```

*Rich Moffett Court Reporting, Inc.*

```
 1                                          51

 2          A       Yeah.

 3          Q       Am I correct in saying that

 4   you wanted to call the customer back as

 5   close to the time that the customer

 6   called you as possible?

 7          A       Yes.

 8          Q       So if you got a call on a

 9   Saturday and you're at home or on

10   vacation you might call a customer back?

11          A       That's correct.

12          Q       And you did that?

13          A       Yes.

14                  MR. REILLY:   Objection to

15          form.

16          Q       Did you and Mr. Schiele pool

17   your income that was derived from these

18   transactions?

19          A       Yes, it was on a combined

20   P&L, a profit and loss, and we would get

21   a record of that typically on a

22   month-to-month basis.  That would, you

23   know, show what we had spent in -- in

24   bills and other things as well as, you

25   know, what the revenues were that came in
```

*Rich Moffett Court Reporting, Inc.*

52

1
2      and what the commissions were supposed to
3      be.
4            Q       And then did you and
5      Mr. Schiele split the profit from that?
6            A       Yes.
7            Q       50/50?
8            A       Yes.
9            Q       Who generated the profit and
10     loss, you folks or MLD?
11           A       Our supervisors at our branch
12     level.
13           Q       During the time you worked at
14     MLD who was your supervisor?
15           A       There were three, John
16     Veracka, Mike Brooks and Scott Schraeger.
17           Q       In that order?
18           A       No, that's just random.
19           Q       Do you know what period of
20     time each one supervised you?
21           A       They all equally supervised
22     us for the duration of our employment
23     there.
24           Q       I see.
25                   Now, of those three, let's

```
1                                          53
2    start with one at a time.
3                What was John Veracka's
4    title?
5         A      I believe it was either
6    supervisor or manager or something.
7         Q      Was he someone who was on the
8    East Meadow premises?
9         A      Yes.
10        Q      What was Michael Brooks'
11   title?
12        A      Probably something similar to
13   that.
14        Q      Was he also on the East
15   Meadow premises?
16        A      Yes.
17        Q      What was Scott Schraeger's
18   title?
19        A      Same.
20        Q      Was he also on the East
21   Meadow premises?
22        A      Yes.
23        Q      So if a customer called and
24   wanted to secure a mortgage loan, what
25   steps would you take?
```

54

    A       Well, you start with a, you
know, initial application where you get
just basic information, you know, name,
address, phone number, and then, you
know, without going through the entire
application, you know, find out what
their goals are.  Are they looking to
purchase a home, are they looking to
refinance a home and what they want to do
within that, what their budget is, if
they have equity in the house or how much
they could put down.  We would do a
credit check on them, and then from
there, based on what goals they gave us,
we would come back to them with some
potential options and say to, you know,
Hey, you could do X, Y or Z, and if they
liked one better than the other, they
would say, Hey, I want to go with, you
know, this particular route, and then
we'd let them know what the next step in
the process to complete the transaction
would be.

    Q       How does the customer get the

55

1

2    application from the initial contact with

3    you?

4         A      So we would take down their

5    information over the phone.  Once it came

6    down to sending out the formal

7    application, the disclosures, we

8    typically send them the, you know, UPS or

9    whatever courier service we were using at

10   the time.

11        Q      So when you say "we," who

12   specifically would do that in the office?

13        A      Well, Brian and I would put

14   everything together that would spell out

15   what the customer's goals were and what

16   they qualified for, what their rate was,

17   things like that, and disclosures were

18   generated by our processor, and our

19   processor would then send them out in the

20   courier service for us.

21        Q      From that phone call would

22   the person receive an application by

23   e-mail?

24        A      No.

25               So the way that it works in

56

mortgage lending is we send them what's

called, like, a disclosure application.

So we disclose it, which would be

considered their application, what we're

taking information on the phone.

Although I referred to it as an

application it's a little bit different.

It's more of, like, a getting-to-know-you

kind of thing, for lack of a better term.

Q        Within an initial phone call,

let's suppose you were in the office and

you received a phone call, would you take

the information or would someone else

take it?

A        Either I would take it, Brian

would take it or we had, as we started

doing more business, we had -- there was

a call center that would take some of the

initial calls as we would be unable to

service all of them as two people.

Q        Did you ever go to real

estate closings?

A        No. Our closing -- the bank

attorney that they used was located in

57

the East Meadow office, so if a closing

happens to take place in the East Meadow

office, which was few and far between, we

may pop up and say hello, but that would

be about the extent of it.

     Q     Who was the bank attorney?

     A     David Makower.

     Q     How long would an initial

phone call be from a customer who called

in from an advertisement?

     A     Could be five minutes, it

could be forty-five minutes.

     Q     Some of those calls you

handled?

     A     Correct.

     Q     What percentage of those

calls, would you say, were handled by

someone other than yourself or

Mr. Schiele?

     A     It changed throughout the --

our tenure at MLD.  In the beginning I

would say we were probably handling, you

know, 60, 70 percent of them, and then

towards the end while we got a lot busier

58

1
2    throughout 2015, probably were only
3    handling about 25 percent of the initial
4    call.
5         Q       What was occupying your time
6    in 2015 as you got busier?
7         A       We were closing a lot more
8    business, so it was just, you know, the
9    sales, client interaction, you know, just
10   kind of putting all the pieces together
11   of a loan transaction, and just if, you
12   know, if we were closing five loans a
13   month it would take -- it wouldn't take
14   us that much time, but we were closing a
15   lot and had a lot of business at that
16   point.
17              So we went from in the
18   beginning a new employer where we were
19   being able to service a lot of calls.  We
20   were also getting a new brand established
21   for ourselves through 2015 where there
22   was a lot of business coming in, so we
23   were always spread thin.  It was just a
24   matter of which in -- why, what was the
25   reason for it, you know.

*Rich Moffett Court Reporting, Inc.*

59

2      Q      Did the branch office at MLD

3   ever have to hire more employees due to

4   the increase in business brought about by

5   you and Mr. Schiele?

6      A      I -- that may be a question

7   better for John, Mike or Scott, but

8   possibly.

9      Q      Did you ever recommend that

10   the branch hire more people?

11      A      I don't believe so.

12      Q      Did you have any role in

13   hiring people for that branch?

14      A      No.

15      Q      Could you recommend a hire?

16            MR. REILLY:   Objection to

17      form.

18      A      If I -- if I knew someone in

19   the business that was looking for an

20   opportunity, by all means I could always

21   recommend it.  It didn't happen, but, you

22   know, I think any job anyone could always

23   make a similar application.

24      Q      Did you ever interview

25   anybody who was a potential hire for MLD?

```
 1                                          60

 2          A       I did not.

 3          Q       Did you ever recommend anyone

 4   at MLD to be disciplined up to and

 5   including termination?

 6          A       No.

 7          Q       Did you ever terminate

 8   anyone?

 9          A       No.

10          Q       Did you and Mr. Schiele ever

11   receive an override on anyone else's

12   sales while you worked at MLD?

13          A       We had -- we had a team of

14   salespeople, and when we did our

15   advertising, if there was an overflow of

16   leads that we were unable to handle as

17   two people and we passed it off to

18   another salesperson and then closed it we

19   would receive compensation.

20          Q       Are you able to estimate how

21   often that happened?

22          A       There probably would be a few

23   transactions on a month-to-month basis.

24          Q       Did it always go to the same

25   mortgage loan originator?
```

```
                                              61
 1

 2        A      No.

 3        Q      Who were the mortgage loan

 4   originators that helped to close your

 5   overflow of leads?

 6        A      There was a group of guys

 7   that we had all known each other for a

 8   number of years that were all working

 9   there, so it was guys that Brian and I

10   have had a history with and knew and, you

11   know, trusted with working on the deals

12   that we pursued.

13        Q      Can you tell me the names of

14   those people?

15        A      Yeah, most of them would be

16   the plaintiffs in this case.

17        Q      Do you know how often that

18   occurred?

19        A      That they would close a

20   transaction?

21        Q      Yes.

22        A      A few times a month.  The

23   lion's share of the business was closed

24   between Brian and myself.

25        Q      How did you allocate the
```

62

money that the person you were referring

to would receive for the transaction?

     A     Well, every mortgage loan

originator is -- has a contract that they

get paid a certain amount of basis points

upon funding of the loan, and in this

case I believe contractually there were a

certain amount of basis points if there

was a lead that we had given to them that

would be allocated towards us as well.

     Q     So did the mortgage loan

originators that we're talking about here

that you referred to have transactions to

have written contracts with MLD?

     A     Yeah, they should have.

     Q     Did those written contracts

specify the basis points that they would

receive for transactions referred by you

and Mr. Schiele?

     A     I don't believe so.

     Q     So where was that specified?

     A     That was, I believe, on a

branch level.  That was just kind of

agreed upon.  I think when we -- they

63

come onboard, that they're, you know,
they were doing their own thing and
originating their own loans, and there
was -- an overflow was something that
wasn't really expected, I guess, but I,
you know, it was -- it would be allocated
to us when we got our monthly
spreadsheet.

     Q    What was the percentage or
number of basis points that were
allocated to you for one of these
referral transactions?

     A    I don't recall the exact
amount.

     Q    How many mortgage loan
originators, approximately, were there at
any given time in the East Meadow office?

     A    There was probably, I want to
say, 40 or 50 maybe.

     Q    That's at one time?

     A    That's in that office.

     Q    Right.

     A    It was a, like, 18,000 square
foot space or something like that.

64

1

2      Q      Did you have any supervisory

3   authority over any of the mortgage loan

4   officers?

5      A      No.

6      Q      Did you ever fill out

7   evaluations for any of the mortgage loan

8   officers?

9      A      No.

10     Q      Who supervised the mortgage

11  loan officers, other than you and

12  Mr. Schiele?

13         MR. REILLY:   Objection to

14     form.

15     A      Well, we didn't supervise

16  them.

17     Q      Right but I'm saying who did?

18     A      Oh, John, Mike and Scott.

19     Q      Same people that supervised

20  you?

21     A      Correct.

22     Q      If a mortgage loan officer

23  needed to take a vacation, who would the

24  mortgage loan officer go to?

25     A      Typically they would speak

```
                                          65
1

2    with either John, Mike or Scott.  If

3    John's wife Denise who is, like, the HR

4    rep for the branch, probably would let

5    her know as well, you know, make sure

6    they had vacation days allocated or -- or

7    whatever.

8         Q       Did anyone ever speak to you

9    about that?

10        A       Well, if it was one of my

11   friends they might tell me they're going

12   away, but not in a, you know,

13   employer/employee sense.

14        Q       They weren't seeking

15   permission from you?

16        A       Correct.  Correct.  They were

17   not seeking permission.

18        Q       After you have an initial

19   application is it necessary for you again

20   to get in contact with the customer?

21        A       Oh, absolutely.

22        Q       And is that a call you would

23   make to the customer?

24        A       Yes.

25        Q       What percentage of the time
```

```
 1                                              66
 2    were those calls made from MLD's office
 3    as opposed to when you're out of the
 4    office on your cell phone or somewhere
 5    else?
 6                MR. REILLY:  Objection.
 7         Objection to form.
 8         A       I would.  Majority of it was
 9    done in the MLD office, you know.
10    Maybe -- maybe 85 percent of it.
11         Q       What would be the nature of
12    the discussion after the customer has
13    given you the information for the
14    application?
15         A       It could be anything from a
16    discussion of, you know, rates and
17    closing costs, if a customer chooses to
18    escrow their taxes and insurance, how
19    much the appraisal will cost, when will
20    the appraiser come out there, how quick
21    until we get this all buttoned up.
22                You know, there were times
23    when we could have a loan in process and,
24    all of a sudden, we order a payoff from
25    their current servicer and then the
```

*Rich Moffett Court Reporting, Inc.*

67

1

2     current servicer would call the customer

3     and try to offer them something lower

4     than what we can -- could.  So it was

5     ongoing sales, particularly on a

6     refinance.

7          Q     What percentage of your

8     business while you were at MLD was

9     refinance?

10         A     About 90 to 95 percent.  It

11    was a good low rate market at the time.

12         Q     At what point in the process

13    would you do a credit check on the

14    customer?

15         A     After the initial phone call,

16    if given permission.

17         Q     And the customer has to

18    authorize that in writing, correct?

19         A     Yes.  We at times can take a

20    verbal as well.

21         Q     And you mentioned that there

22    are different products that you can

23    recommend to the customer, correct?

24         A     That's correct.

25         Q     Can you just give me an idea

*Rich Moffett Court Reporting, Inc.*

68

1
2    for a refinance what those products might
3    be?
4         A        Sure.
5                  You could talk about the
6    length of term for the mortgage, be it a
7    15 year, 20 year, 30 year.  We had
8    conventional financing, FHA financing, VA
9    financing if they were a serviceman or
10   woman.  You know, if it was a purchase,
11   different down payment options.  We could
12   discuss if they wanted to buy discount
13   points to get their interest rate lower,
14   how much was refinancing, if they wanted
15   to utilize equity that they wanted to pay
16   bills, which bills or cash out, how much
17   cash.  Little things like -- like that.
18        Q        As your volume was increasing
19   in 2015, would that conversation about
20   products be something that someone else
21   at MLD would speak to the customer about,
22   excluding the referral cases?
23        A        No.
24        Q        So when it came to products
25   and the type of products, that was

```
1                                    69
2      something that you would speak to the
3      customer about?
4           A      Yes.
5           Q      Always?
6           A      Yes.
7           Q      What portion of the workday
8      or workweek or however you can estimate
9      it would you spend on the phone?
10          A      We're on the phone a lot, you
11     know.  If you had a -- I would say, like
12     I say, call it a 12-hour workday, you can
13     be on the phone five of those hours easy,
14     maybe close to -- close to half a day.
15     Some days were different than others,
16     too.
17          Q      Once a customer has isolated
18     an option for the transaction, what steps
19     would you have to take?
20          A      As in once they chose the
21     product that they wanted to --
22          Q      Correct.
23          A      -- move forward with?
24                 That's when we would have the
25     disclosure sent to the borrower.  We
```

1                                               70

2      would get them a list of what documents

3      that we needed from them to complete the

4      transaction, you know.  We had to file

5      different compliance things, so when we

6      got the disclosures back, we could go

7      ahead, order the appraisal, order a title

8      search.

9                  As those -- all documents

10     were coming in, be it from the borrower

11     or one of the vendors, we were reviewing

12     those, making sure that the loans still

13     qualified under the same terms, following

14     up with the customer to see if there was

15     anything in addition that we needed, if

16     something popped up on their title, like

17     a lien or judgment that they were unaware

18     of or, oh, they forgot that their, you

19     know, mother was on the title of the

20     house or on the deed.  Things like that

21     that would pop up throughout the process

22     that would have to be addressed.

23          Q     So who would order the

24     appraisal?

25          A     So they changed the ordering

```
 1                                          71

 2     processes, so what we do is we would get

 3     the borrower's information, get a credit

 4     card authorization form filled out, and

 5     then it was sent to an appraisal ordering

 6     desk which had to put the order through

 7     the AMC, which is an appraisal management

 8     company.

 9          Q      Was the appraisal ordering

10     desk a desk in MLD?

11          A      Yes.

12          Q      Do you know where that was

13     located?

14          A      In East Meadow.

15          Q      Am I correct in saying you

16     would transmit the information and then

17     the appraisal ordering desk would order

18     the appraisal?

19          A      That's correct.

20          Q      Would you see the appraisal?

21          A      When it came back we would

22     get a copy of it.

23          Q      Did you ever have to take any

24     action based on the appraisal?

25          A      Yes.
```

72

1

2      Q      Were there times that the

3   house did not appraise for the amount

4   that you submitted?

5      A      Yeah, there were times where

6   the appraisal would come in a little

7   lower, and if we disagreed, you know, we

8   could rebut the value.  There were times

9   that you'd have an issue with the -- with

10  the house.  It could be, you know, the

11  roof needs to be replaced or, you know,

12  something's falling apart on the interior

13  that we'd have to address with the

14  customer.

15     Q      When you said that you could

16  rebut the value of the appraisal, who

17  specifically at MLD would do that?

18     A      Well, we would do our best

19  research to pull sales - nearby sales and

20  recent sales - that are comparable to the

21  subject property.

22     Q      Those are called comps?

23     A      Comps.

24     Q      When you say "we," you're

25  talking about yourself and Brian?

73

2      A      Yes.

3      Q      Okay.

4      A      Then what we do, we would

5   send back over to the appraisal ordering

6   desk or we could send it to the AMC

7   directly and say, Hey, can we have an

8   appraiser take a look at comparables.

9   These comps, we think some of them could

10   be better suited for this report.

11   Sometimes the appraiser would use them,

12   sometimes they would not.

13      Q      Was there anyone, other than

14   you or Brian, that would have researched

15   comps for an appraisal?

16      A      If it was on one of our loans

17   that we were working on?

18      Q      Right.

19      A      No.

20      Q      How would the title policy be

21   ordered?

22      A      We would typically order it

23   via e-mail.  If it was a refinanced

24   transaction --

25      Q      Who would you e-mail?

*Rich Moffett Court Reporting, Inc.*

```
                                                      74
 1

 2          A       The title company.

 3          Q       Was that sent from an MLD

 4     e-mail?

 5          A       Yes.

 6          Q       Who would review the title

 7     policies?

 8          A       There was a lady that worked

 9     in the East Meadow office who did the

10     title reviews in conjunction with the

11     bank for MLD.

12          Q       Did you ever do any reviews?

13          A       We would review them at our

14     level, but in order to get it, you know,

15     cleared in the system, it had to be done

16     by that particular MLD employee in East

17     Meadow and the bank attorney.

18          Q       And the bank attorney may

19     find subtleties that you might not know

20     about; is that correct?

21          A       Yeah, a lot of that they

22     would look at would be making sure if the

23     middle initial was in there, if that's

24     how their name appeared on the deed.

25     They always wanted to make sure that
```

75

everything on the title was copacetic

that we could sell it to one of our

investors.

Q        Now, if a lien popped up,

that would be something that you could

review, right?

A        Yeah.  It would be reviewed

on the other level as well, but let's say

the title came in and they were backed up

48 hours before they were going to be

able to get to that title review, we

could look at it and make the initial

contact with the customer and say, Hey,

I'm looking at this, can you explain to

me what's going on.

Q        If the person at MLD reviewed

it properly, would that person then

contact the customer about a lien that

popped up?

A        No, we would still have the

correspondence with the customer.

Q        How often would that

correspondence with the customer about

title report be by e-mail and how often

76

1

2    would that be verbal over the phone?

3         A      It would really depend on the

4    customer and what their preferred method

5    of communication was.  But that being

6    said, more times than not it would start

7    at least with a phone call and then if

8    they wanted to see what showed up we

9    could e-mail them a document or a copy of

10   something.

11        Q      Would that be a phone call

12   that you or Mr. Schiele would make?

13        A      Yes.

14        Q      You also indicated as parts

15   of this process you would review

16   documents.  Are there any documents you

17   would review that you haven't already

18   testified about?

19        A      We spoke about the borrower's

20   documents that we needed to collect.

21        Q      Those are the initial

22   documents, right?

23        A      Well, there's initial

24   disclosures and then the stuff we would

25   request from them, could be tax returns,

77

W-2s, pay stubs, home insurance, bank statement, mortgage statement, IDs that, you know, those could differ based on the type of loan, but we would review those as well.

     Q     Who would make the contact with the customer to obtain that information?

     A     The loan officer.

     Q     So you or Brian for one of your transactions, correct?

     A     Yes.

     Q     How often would you get these documents by e-mail, how often by regular mail?

     A     I would say a lot of them, about 50/50.

     Q     How often would you meet a customer before the transaction consummated?

     MR. REILLY:  Objection to form.

     A     Very irregularly.  Not frequently at all.

*Rich Moffett Court Reporting, Inc.*

78

1

2        Q        Less than once a month?

3        A        Yes.   If the customer was

4   local enough to East Meadow and wanted to

5   come into the office that would really be

6   the only time.

7        Q        Did customers on Long Island

8   ever say, "I have the stuff, can you pick

9   it up at my office?"

10        A        They would -- yes, sometimes

11   they would say that.

12        Q        How often was that?

13        A        Very infrequent.

14        Q        If that occurred, would you

15   and Brian be the ones to pick it up or

16   would someone else?

17        A        Usually what we would do is

18   ask them that, "Are you able to scan and

19   e-mail it?"   And if they said no, if

20   they, depending on how far away they were

21   from us, we'd be more likely to send them

22   a prepaid overnight to send it back to us

23   that way.   If it was, like, local, five

24   or ten minutes, we'd probably go pick it

25   up.

```
 1                                        79
 2          Q       When you say "we," that would
 3     be yourself or Brian?
 4          A       Myself and Brian, yes.
 5          Q       Did you have any support
 6     staff working for you at MLD?
 7               MR. REILLY:  Objection to
 8          form.
 9          A       There were -- they didn't
10     work for us.  They worked for MLD, but
11     there was staff that worked on our loans.
12          Q       What did the staff do in
13     relation to your loans?
14          A       There were loan processors.
15     There were underwriters.  There was title
16     review.  There was post closing.
17          Q       What did the loan processors
18     do for your loans?
19          A       They would also review some
20     of our documents when they came in.
21     Typically they would get them uploaded
22     and into the appropriate buckets in our
23     loan origination system that we had on
24     the computer.  They would know the form
25     in which the underwriters wanted to
```

80

1

2     review them, so they would upload them

3     that way and actually click the

4     submission button to know that they had

5     -- had a viable loan that was ready for

6     the underwriter to review.

7              Q        Ultimately the loan has to be

8     reviewed by the underwriter, correct?

9              A        Yes.

10             Q        Do you know where the

11    underwriters physically were located?

12             A        The ones that underwrote our

13    loans were in the East Meadow office.

14             Q        Were you able to have contact

15    with the underwriters?

16             A        Yes.

17             Q        Could you have contact with

18    the underwriters about specific loans?

19             A        Yes.

20                      Do you mind if we take a

21    quick five-minute break?

22             Q        Sure.  Absolutely.

23                      (Recess taken.)

24             Q        Mr. Rakeman, to your

25    knowledge, does Mr. Schiele share your

*Rich Moffett Court Reporting, Inc.*

```
1                                              81
2     same religious convictions?
3          A      Yes.
4          Q      Did any other loan officers
5     at MLD share those religious convictions?
6          A      I'm -- probably, yeah.
7          Q      Do you and Mr. Schiele go to
8     the same church?
9          A      No.
10         Q      Did any other MLD loan
11    officer go to the same house of worship
12    or church as you?
13         A      No.
14         Q      Were there occasions where
15    underwriters did not approve loans you
16    submitted?
17         A      Yes.
18         Q      Did you ever get into
19    discussions with them about that?
20         A      Yes.
21         Q      What percentage of loans
22    would you say were not approved and never
23    approved by underwriters?
24         A      That even after discussion
25    didn't get approved?
```

```
 1                                          82
 2        Q      Right.
 3        A      Three percent, two percent.
 4        Q      Were there transactions that
 5   you would cease processing because you
 6   knew it would never get to an
 7   underwriter?
 8        A      Yes.
 9        Q      What percent of the time did
10   that occur?
11        A      Twenty percent.
12        Q      What is the post-closing
13   department at MLD?
14        A      So if MLD sold their loans to
15   investors, so if there was a post-closing
16   issue, and what I mean by that, if the
17   investor wanted documentation or an
18   explanation on something in order to
19   purchase the loan, they would correspond
20   with MLD's post-closing department, and
21   then often times that would trickle down
22   back to us to obtain documents, if we
23   needed to, from, you know, the customer
24   or whomever they needed.
25        Q      Other than yourself or
```

83

1
2     Mr. Schiele, who at MLD would have direct
3     phone communication with a customer
4     during an ordinary loan transaction?
5          A      On a loan that we were doing
6     ourselves --
7          Q      Right.
8          A      -- or just, like, an
9     applicant?
10         Q      Well, isn't the applicant for
11    one of your loans?
12         A      What I'm asking you is are
13    you asking kind of a general question or
14    are you saying if Mike Rakeman has a loan
15    that he is selling, who else speaks to
16    that customer during the process?
17         Q      Right.
18         A      Is that the question?
19         Q      Yes.
20         A      Typically, no one.
21         Q      When you worked at MLD, did
22    you have a license?
23         A      Yes.
24         Q      Were there ever any
25    complaints to the licensing agency about

*Rich Moffett Court Reporting, Inc.*

84

2      you?

3              A      During the time at MLD?

4              Q      Yes.

5              A      No.

6              Q      Prior to the time you worked

7      at MLD were there any complaints?

8              A      Yes.

9              Q      Did the license authority

10     ever take any discipline against you?

11             A      While we worked at MLD?

12             Q      At any time.

13             A      Yes.

14             Q      When did that occur?

15             A      When we worked at Contour

16     Mortgage.

17             Q      And was this only one

18     occasion of discipline?

19             A      Well, we were -- we got it

20     two times.  A second time when we were at

21     Intercontinental Capital Group.

22             Q      When you say "we," are you

23     referring to yourself and Mr. Schiele?

24             A      Yes.

25             Q      So when you were at Contour,

85

    what were you and Mr. Schiele disciplined

    for?

                MR. REILLY:  Just note my

        objection to the question.

                Go ahead.

        A       The website was not

    authorized with the New York State

    Department of Banking.

        Q       Was there a penalty for that?

        A       Yes.

        Q       What was the penalty?

        A       For myself it was, I believe,

    either 5 or $10,000.

        Q       Was that your own discipline

    at Contour Mortgage?

        A       Yes.

        Q       What were you disciplined for

    at Intercontinental?

                MR. REILLY:  Again, objection

        to the question.

                Go ahead.

        A       The same thing where this

    time we had gone over it with in-house

    legal and they gave us the green light,

86

but the banking department saw it

differently so it was the same for

unlicensed -- not unlicensed,

unregistered website.

Q       Were you fined?

A       Yes.

Q       How much was the fine?

A       Twenty-five thousand.

Q       Other than those two

instances, have you ever been the subject

of any discipline by the licensing

authority?

A       No.

Q       Contour Mortgage, who paid

the fine?

A       We did, Brian and myself.

Q       What about Intercontinental?

A       Same thing.

Q       I want to go back to the

advertising.  Who usually made the call

to the entity that would do the

advertising, yourself or Mr. Schiele?

A       Either one of us but --

either one of us.

87

Q     Was there any paperwork that was involved in the purchasing of the advertisements?

A     Yes.

Q     Who usually filled those out?

A     It was really more just a signature agreeing to the terms, and it would be signed by -- really anyone could sign it, myself, Brian could have someone from MLD sign it.  It didn't make a difference.

Q     How much time did you and Brian spend a week or a month discussing the advertising?

A     For a new campaign?

Q     Yes.

A     I would say probably around a week.

Q     One week per month?

A     Oh, are you talking about starting the new campaign or insights on how to advertise differently within an already running campaign?

Q     Let's start with starting a

1                                          88

2    new campaign.

3              How much discussion would you

4    have between yourself and Mr. Schiele

5    about starting a new campaign?

6         A    Usually it was in conjunction

7    with the media buyer and/or the station

8    rep where, you know, a proposal would be

9    rolled out to us, he and I would discuss

10   it, we would do some research, we would,

11   you know, kick the tires on how we wanted

12   to approach it, how much frequency we

13   wanted to run it, and that probably was

14   all within a week or two's time.

15        Q    In that one to two weeks, how

16   many hours would you spend on that?

17        A    I don't know, maybe four.

18        Q    Did you ever go meet a media

19   buyer or a station rep in person?

20        A    Go meet, no, they would come

21   to our office.

22        Q    How often would they come to

23   your office?

24        A    Typically when they were --

25   if it was either a new campaign or if

89

they had some ideas or just wanted to
come out and, you know, say hi and
discuss some ways in which they can
improve upon what we're already doing.

Q       How often did you and Brian
do a new campaign?

A       While at MLD?

Q       Yes.  Yes.

A       I'd have to go back and look,
but I would say we probably started four
or five different ones throughout that
time.

Q       How did you and Brian monitor
a campaign?

A       We would look at how many
applicants that we had from it, how much
call volume and frequency we got from it,
how much -- how many website inquiries or
hits we got from it, and then ultimately
what was most important was how many
closed transactions.

Q       And you still advertise in
your current position?

A       Yes.

```
 1                                          90
 2         Q      While you were working at MLD
 3   did you ever complain about how you were
 4   being compensated?
 5         A      Yes.
 6         Q      Whom did you complain to?
 7         A      John, Mike and Scott.
 8         Q      What did you complain about?
 9         A      That we weren't getting paid
10   what we were supposed to.
11         Q      Could you be more specific?
12         A      Yeah, that our commission
13   check was pretty short pretty much every
14   pay period.
15         Q      Did you ever complain to
16   anyone at MLD that you should have been
17   paid overtime?
18         A      No, we didn't complain about
19   overtime specifically.
20         Q      When is the first time that
21   you believe that you were not compensated
22   properly because you did not receive
23   overtime?
24         A      Well, when we were let go and
25   fired and we were owed, realizing that we
```

91

were working well above and beyond a

typical 40 hour workweek and realizing

that by law we should have been

compensated for, you know, those

additional hours coupled with, you know,

a large amount of unpaid commissions, you

know, that we needed to rectify the

matter.

       Q     What is your belief as to

what the unpaid commissions are?

       A     Collectively between Brian

and myself?

       Q     If that's the best way you

can measure it, yes.

       A     About 1.5 million.

       Q     What do you base that on?

       A     Contracts with them that we

were supposed to be paid on funded loans

that closed while employed at MLD coupled

with our compensation structure.

       Q     Do you believe that there

were loans that funded while you were

employed at MLD that you never received

compensation for?

*Rich Moffett Court Reporting, Inc.*

92

1

2      A       Absolutely.

3      Q       Is that the entirety of the

4  1.5 million?

5      A       So that's what the 1.5 would

6  make up.  So we had contracts that

7  specified a certain amount of basis

8  points that we were to be paid when a

9  loan funded, and when you do the math on

10  something like that, your commission

11  check should never really be a

12  rounded-off number.

13          A contract says loans fund

14  within a certain period of time.  The

15  next pay period you get paid based on

16  your basis-point contract with the

17  organization, which we never got much.

18  It was always, you know, light of what it

19  should have been.  It was always a

20  perfectly round number that it was almost

21  like they were just pulling a number out

22  of the sky.

23      Q       Is any of your claim for

24  commissions owed based on loans which you

25  brought in but funded after you were

93

1
2    terminated?

3            MR. REILLY:   Objection to

4        form.

5        A       No, I don't believe so.

6    There was a number of loans that we

7    originated and when we were let go on

8    September 21, 2015, I believe, that then

9    funded out throughout October and

10   November, but I'm not including those in

11   that number.

12       Q       Do you believe you are owed

13   for those loans that closed

14   posttermination?

15       A       Typically you would be, yes,

16   if the employer is honorable, but I don't

17   think that's the case here.

18       Q       What makes you believe that

19   MLD is not honorable?

20       A       Because they knowingly did

21   not pay us what they agreed to

22   contractually.

23       Q       You did have a contract with

24   MLD, correct?

25       A       Yes.

*Rich Moffett Court Reporting, Inc.*

94

2      Q      And you believe that contract

3    should be honored?

4      A      Yes.

5      Q      That's the purpose of a

6    contract, right?

7      A      Correct.

8      Q      And you entered that contract

9    in good faith believing that MLD would

10   rely on the terms of that contract,

11   correct?

12     A      Yes.

13            MR. REILLY:  Objection to

14       form.  Last question.

15     Q      Do you know how much you are

16   owed allegedly on your overtime claim?

17     A      I'd have to go back and look.

18   I know there's some interest involved as

19   well, but it was a large number based on

20   our time that we had worked there and the

21   calculations that New York State requires

22   you to follow.

23     Q      How many hours a week do you

24   estimate that you worked while you were

25   at MLD?

*Rich Moffett Court Reporting, Inc.*

```
                                              95
 1

 2          A       About 90 hours a week.

 3          Q       Were there hours of operation

 4   for the MLD office for the general

 5   public?

 6          A       What do you mean by "the

 7   general public"?

 8          Q       I believe you testified

 9   earlier that the office could be open as

10   early as 7:00 a.m.; is that right?

11          A       Yes.

12          Q       And it could be open as late

13   as 10:00 p.m.?

14          A       Correct.

15          Q       Did the office advertise

16   hours to the general public if someone

17   wanted to come into MLD?

18          A       I don't think that they did.

19   We didn't really have much walk-in

20   business.  It wasn't a storefront office

21   where you would kind of see that.

22                  Typically a company like MLD

23   in that branch setting would have

24   advertisements that would run or they

25   would purchase leads and it would be
```

96

phone sales done from there.

Q       Were your hours with MLD the same Monday to Friday?

A       Monday through Thursday they were pretty consistent.  Friday was usually a little bit of a shorter day, but it wasn't, you know, weeks could change and days could change based on the demand.

Q       What were your typical hours Monday to Thursday?

A       I was -- I was working some facet of mortgage loan originating from about 7:00 a.m. to 10:00 p.m.

Q       How many of those hours were at the office?

A       I would say the majority of them, depending on what time I actually stepped foot in the office, I would usually leave around 7:30, 8:00 at night, so some of that work was done from home after I got home.

Most dinners were consumed in the office, so when I got home, you know,

97

2  it wasn't like I was sitting down to --

3  to another meal or anything like that, so

4  majority.

5          Q        What time did you usually get

6  into the office?

7          A        Between 7 and 8.

8          Q        During the time you were

9  there, I believe you testified you had a

10  short commute?

11          A        Yes.

12          Q        How long was that commute?

13          A        Ten, fifteen minutes.

14          Q        You gave an address earlier

15  today.  Was that the address that you

16  were living in when you worked at MLD?

17          A        No, I lived at 153 Cleveland

18  Avenue in Rockville Centre.

19          Q        So your commute was from that

20  point to East Meadow?

21          A        If I went directly from my

22  house, yes.

23          Q        Where else would you go to

24  work from?

25          A        Sometimes the gym.

98

Q       What time would you go to the gym?

A       Sometimes I would go at 6 in the morning.  Sometimes I would go a little bit later, depending on the day, you know, depending on what time I woke up or what I had going on.  You know, all of our e-mails and faxes and everything came to our phones, so there were times where, you know, you wake up, you're on that.  You're pulling up PDFs and reviewing documents, so I would be doing that and then maybe go, get a workout and then head to the office.

I also had a membership at the gym that was in the same shopping center as the office.

Q       So I am sorry, were you checking your e-mails and pulling up the PDFs and documents before you left for the gym?

A       Some days, yes.  Some days, no.

Q       Would you check your e-mail

```
 1                                      99

 2     between when you arrived at the gym and

 3     before you got to the office?

 4          A       Yeah, at times I would go

 5     through my phone, yes.

 6          Q       Did you have lunch when you

 7     worked for MLD?

 8          A       Yes.

 9          Q       When did you have lunch?

10          A       Midday, 12, 1, 2, around

11     there.

12          Q       What did you do for lunch?

13          A       Ordered in.

14          Q       Where did you order from?

15          A       We get Frantoni's.  There is

16     a pizza place right by the office.

17     Coliseum Deli, and for a while I was

18     buying some precooked meals so I would

19     have them in the fridge so I didn't have

20     to do anything.  It would be right there

21     ready for me.

22          Q       When lunch was ordered, was

23     that something that was paid for by MLD?

24          A       No, myself or Brian would

25     pay.
```

*Rich Moffett Court Reporting, Inc.*

100

2      Q     How did you pay?

3      A     Sometimes credit card,

4  sometimes cash.

5      Q     But that would have been your

6  own credit card?

7      A     Yes.

8      Q     Did MLD give you a credit

9  card?

10     A     No.

11     Q     Is that something you would

12  expense?

13     A     No.

14     Q     Where would you eat lunch?

15     A     At my desk.

16     Q     With anyone?

17     A     Like, was anyone sitting at

18  my desk with me?

19     Q     Or near you.

20     A     Brian and I shared an office,

21  so if we ate at the same time I guess you

22  could say we were eating together.

23     Q     Okay.

24           Did you take time off from

25  work while you were eating?

```
 1                                      101
 2        A      If I was chewing I wouldn't
 3   take a phone call, but I would pick up
 4   and say, "Hang on a second," swallow and
 5   then get back on the phone.  I mean, it
 6   was all commissioned.  It was, you know,
 7   you ate when you could so to speak.
 8                So we, you know, there was no
 9   time for doing anything other than work
10   at that point.  It was a terrific market.
11        Q      Other than MLD, have you ever
12   complained to anybody about being
13   improperly compensated in the mortgage
14   industry?
15        A      There were times with past
16   employers where, you know, we may argue
17   over commissions.  I guess that's pretty
18   typical for the industry.
19        Q      Other than MLD and Contour,
20   have you ever complained that any
21   employer has not paid you overtime?
22        A      No.
23        Q      Do you get overtime in your
24   current position?
25        A      No, I do not.
```

1                                              102

2          Q        Weren't there employees at

3     MLD who completed time sheets?

4                    MR. REILLY:   Objection to

5          form.

6          A        I couldn't answer if they did

7     or did not.

8          Q        Did you ever see any time

9     sheets while you were at MLD?

10         A        I personally never saw any

11    time sheets, but I would imagine that

12    they -- they probably had them.  I think

13    I saw -- I believe there were e-mails

14    about completing them, but I never saw

15    them and they weren't directed towards

16    us.

17         Q        Did you ever ask anyone why

18    you didn't complete time sheets?

19         A        I never asked anyone, no.

20         Q        Did you ever ask anyone for a

21    time sheet to complete?

22         A        No.

23         Q        Did you ever recruit anyone

24    to join this lawsuit?

25         A        Did I recruit someone to join

*Rich Moffett Court Reporting, Inc.*

```
 1                                          103
 2    the lawsuit?
 3            Q       Yes.
 4            A       No.
 5            Q       When you worked at MLD, who
 6    lived in the house where you lived?
 7            A       Myself, my wife and my two
 8    daughters.
 9            Q       What years were your
10    daughters born?
11            A       2010 and 2012.
12            Q       So they were toddlers when
13    you worked at MLD?
14            A       Yes.
15            Q       Did you bring any clients to
16    MLD when you started there?
17                    MR. REILLY:  Objection to
18            form.
19            A       When you say "clients," like,
20    did I come in -- into the bank with
21    customers?
22            Q       Right.
23            A       So any customers that we had,
24    as I had mentioned previously, when we
25    had a meeting with Contour, when we had a
```

104

Contour meeting and we closed out
whatever because the pipeline that we had
there, and then any new origination at
that point would have been a new
customer, not anything that we were
coming in with.

Q       Other than churches, did any
of your customers come from institutions?

A       I don't believe so.

Q       Did you have a Rolodex at
Contour?

A       No.

Q       Did you ever mentor loan
officers at MLD?

A       No.

Q       Did anyone in your office
have a door on their office at MLD?

A       Yes.

Q       You and Mr. Schiele were in
that office?

A       Yes.

Q       Was anyone, other than you
and Mr. Schiele, in that office --

A       No.

```
1                                    105

2           Q       -- when you worked at MLD?

3           A       No.

4           Q       Was there a ranking of loan

5    officers at MLD?

6           A       As in, like, who produced the

7    most?

8           Q       Yes.

9           A       Nothing official.

10          Q       Was there a ranking in

11   authority of the loan officers?

12          A       Not that I'm aware of.  I

13   think all loan officers were on the same

14   level just as mortgage loan originators.

15          Q       You identified three people

16   who were supervisors before.  Do you

17   recall that?

18          A       Yes.

19          Q       Were any of them mortgage

20   loan originators?

21          A       None of them were.  Oh, I

22   believe that Scott Schraeger had a -- had

23   a license to originate.

24          Q       To your knowledge, did he use

25   that while he worked at MLD?
```

```
 1                                    106

 2          A      I'm not sure.

 3          Q      Did you and Mr. Schiele run

 4   the department insofar as it pertained to

 5   the mortgage loan officers?

 6                 MR. REILLY:  Objection to

 7          form and objection to the question.

 8          Go ahead.

 9          A      No, we didn't run anything.

10          Q      Did any loan officers report

11   to you and/or Mr. Schiele?

12          A      No.

13          Q      When you left MLD, did you

14   and Mr. Schiele go together to the next

15   employer?

16          A      Yes, we did.

17          Q      Was that Precision Financial?

18          A      No, this was Intercontinental

19   Capital Group.  Precision was the one

20   prior to Contour.

21          Q      That's where you are right

22   now, Intercontinental?

23          A      Yes.

24          Q      Did any loan officers go from

25   MLD to Intercontinental Capital, other
```

107

2      than yourself and Mr. Schiele?

3            A      Yes.

4            Q      How many others?

5            A      I think about five or so.

6            Q      Did they all go at the same

7      time?

8            A      Yeah, right around the same

9      time.  Not everyone but a majority of

10     them.

11           Q      Before you left MLD did you

12     discuss going to Intercontinental Capital

13     with Mr. Schiele?

14           A      Prior to getting fired from

15     MLD?

16           Q      Right.

17           A      Well, towards the end of our

18     tenure there, you know, we were having

19     major issues being compensated, so much

20     so that one month I think I personally

21     funded over 30 units, which in the

22     business is pretty unheard of, and I

23     think one of my checks was less than

24     $33,000 where it probably should have

25     been closer to a high five figure, maybe

108

even low six figure.

So at that point we had

discussions of, you know, the -- what the

financial state of the company was and if

we should look at other options.

Q        Can you give me a timeframe

on that?

A        Maybe August, September,

around there.

Q        That's 2015?

A        Yes.

Q        Were those discussions with

you and Mr. Schiele only, or were there

other people involved?

A        There was -- those were

conversations that he and I had.

Q        Just the two of you?

A        Yeah.

Q        How many discussions would

you say you had about that?

A        It's tough to recall how

many.  I don't know how many.

Q        At the time you had those

discussions did you know that the branch

109

1

2    would close?

3           A       No.

4           Q       Do you recall when the branch

5    closed?

6           A       So we were fired in September

7    of 2015.  I believe that they completely

8    closed down maybe the summer of '16.

9           Q       Did you think your leaving

10   had to do with the branch closing?

11          A       I think that they thought

12   that they would be able to sustain the

13   branch and all the expenses and

14   everything like that without our

15   production or somehow be able to replace

16   our production, because looking back on

17   it, it was our revenue and the difference

18   of what we were supposed to get paid and

19   got paid that basically funded their

20   entire operation it seems.

21          Q       Let me follow up on that.

22                  Did anyone ever tell you that

23   he or she believed that the branch closed

24   because you and Mr. Schiele left or were

25   terminated?

*Rich Moffett Court Reporting, Inc.*

```
 1                                              110

 2        A      No one ever said that to me

 3   specifically.

 4        Q      How many discussions did you

 5   have with Mr. Schiele about leaving MLD

 6   before you left or were terminated by

 7   MLD?

 8        A      I think you asked me that

 9   before.

10        I don't recall how many.

11        Q      Did you ever involve anyone,

12   other than Mr. Schiele, in those

13   discussions?

14        A      No.

15        Q      Before you left MLD did you

16   ever advise any MLD loan officers where

17   you were going?

18        A      No.

19        But just for the record, you

20   keep saying that when we left.

21        Q      Right.

22        A      We were terminated.

23        Q      Okay.  Understood.

24        MR. REILLY:  Objection to

25        form.  Last question.
```

```
                                                    111
 1
 2          Q       Let me rephrase that.
 3                  Before you were terminated
 4     from MLD did you ever advise any loan
 5     officers, other than Mr. Schiele, where
 6     you were going?
 7          A       No, we didn't know anything
 8     as of that period of time because, you
 9     know, we were literally working
10     originating loans when we were told to
11     pack up our stuff.
12          Q       We'll get to that.
13                  What was the period of time
14     between your last day working at MLD and
15     your first day working at
16     Intercontinental Capital?
17          A       I have to go back and see
18     when we started at Intercontinental, but
19     I would venture to guess a week or so.
20          Q       Who were you talking to at
21     Intercontinental Capital about possibly
22     working there?
23          A       When?
24          Q       When you were at MLD.
25          A       Well, when we were at MLD, I
```

112

mean, on any given time, no matter where

we're working, you know, good, bad or

indifferent, other bank owners will

contact myself and/or Brian with

opportunities, because they're aware of

our reputation in terms of, you know,

production and, you know, doing good,

clean business.

So, you know, there's many

bank owners that would contact us and

speak to us and, you know, it's something

that when you're in a sales position,

it's foolish not to hear people out.

Q       Am I correct in saying that

your discussions with Intercontinental in

August to September of 2015 while you

worked at MLD were more serious than the

discussions you were having with the

other companies?

A       No, not necessarily.  I don't

even know if there was any as far as back

as in August or anything like that.  You

know, the two gentlemen that at the time

owned Intercontinental Capital Group I

113

1

2      had known since, you know, I had known

3      them for over a decade.  So there were

4      people that I would speak to

5      semi-regularly anyway.

6          Q     Who were the people at

7      Intercontinental you spoke with about

8      potentially working there in August or

9      September of 2015?

10         A     I don't recall what the date

11     was, but the people that owned the bank,

12     that would be the only ones that I would

13     have any correspondence with, would be

14     Dustin Damisa and Richard Steinberg.

15         Q     Tell me that first person.

16         A     Dustin Damisa.  All with Ds.

17         Q     During the period between

18     when you were terminated by MLD and you

19     worked with Intercontinental did you

20     speak with any other possible employers?

21         A     There were some other banks,

22     I believe, that we had spoken to that had

23     contacted us.  I don't recall off the top

24     of my head who they were, but, you know,

25     there was kind of one of those things

*Rich Moffett Court Reporting, Inc.*

114

1

2      where there would be bank owners that

3      would periodically check in, "Hey, how's

4      it going?  You want an opportunity?"

5      That type of conversation.

6           Q      Did you use a laptop computer

7      when you worked at MLD?

8           A      No.  Well, I shouldn't say --

9      did MLD provide me with a laptop

10     computer?

11          Q      Yes, either one.

12          A      No, they didn't.  I had a

13     computer at my house that I would use.

14          Q      Was that a desktop or a

15     laptop?

16          A      I had one of each.

17          Q      Did those have MLD

18     information on them?

19          A      Anything that I use

20     pertaining to MLD was a web-based thing

21     so I could pull it up that way.

22          Q      Did you ever store any of

23     that on either of your hard drives?

24          A      I don't think it was

25     something that you were able to store.

```
 1                                      115
 2           Q       Mr. Rakeman, I think I asked
 3     you your hours Monday through Thursday
 4     and you said you had shorter hours on
 5     Friday, correct?
 6           A       Yeah, and it would vary, you
 7     know.  Typically on a Friday I wouldn't
 8     be going home until 10:00 p.m.  I usually
 9     would start around the same time but, you
10     know, if I could wrap up by, you know, 7
11     or 8 or so, you know, I would try to do
12     that.  It wouldn't always happen, but...
13           Q       Would it be the same start
14     time?
15           A       Yes.
16           Q       What were your average hours
17     on Sunday?
18           A       It was always as needed but,
19     you know, just the nature of the business
20     and the nature of our position, when you
21     wake up in the morning, you got to do
22     what you got to do.  Once you put your
23     hands on your phone you basically got
24     work to do.  You're going to see e-mails,
25     faxes, potential leads, whether it's an
```

1                                                   116

2      online inquiry or phone calls that came

3      in, voicemails to check, and you may have

4      scheduled time to talk to a customer

5      about their transaction 'cause that may

6      be a good time for, you know, a husband

7      and a wife to both be able to sit down

8      together and chat.  So it wasn't

9      necessarily set time but, you know, it

10     was very easy that you could put in, you

11     know, seven, eight, nine, ten hour days

12     on a weekend.

13            Q      What would you say was the

14     average that you worked on Saturdays?

15            A      Total duration or time to

16     time?

17            Q      Time to time.  Let's start

18     with that.

19            A      I would say, you know, 7,

20     8:00 in the morning would be the time

21     that I would get my, you know, phone and

22     have stuff going on, and that could be up

23     until 6, 7:00 p.m., you know, with breaks

24     in the interim.

25                   You know, if I was at my

117

kid's sporting events or something, you
know, I would do my best not to take my
phone out.

    Q      What about Sunday?

    A      Same thing, except I would
start a little bit later.

    Q      What time would you start?

    A      You know, the morning we'd
have, you know, breakfast, we'd go to
church, and then I usually would get back
home and be able to get to my phone, if
that was our typical Sunday morning, by,
you know, 11, 11:30.  And same thing, I
could go 'till, you know, 8:00 or so at
night.

    Q      How often would you actually
go to MLD's office on a Saturday?

    A      Give or take, two, three
times a month.

    Q      How often on a Sunday?

    A      Not often.  Only if there was
something that I needed to do that I
could not do from my house, so if once a
month that would be...

*Rich Moffett Court Reporting, Inc.*

```
 1                                              118
 2           Q      Am I correct in saying that
 3      if you went to the office for MLD on
 4      Saturday it would be for a short period
 5      of time?
 6           A      Depending.  If there was
 7      something that -- that I needed to do or
 8      if there was -- let's say there was a
 9      bunch of deals that I needed to, you
10      know, as we say, pitch or sell to a
11      customer, you know, I just wanted to be
12      where I had access to things easier than
13      if I was at home.  I can go in there and
14      do that, you know, over a few hours.
15                 Sometimes if there was a
16      local customer that wanted to come into
17      the office and discuss things face to
18      face I could meet them on a Saturday, so
19      it could be a few hours, though.
20           Q      On Saturdays wouldn't you try
21      to do as much work from home as you
22      possibly could?
23           A      If I had the option.  If I
24      could get it done from my house as
25      opposed to going to the office I would,
```

```
 1                                     119
 2   but, you know, there were times, you
 3   know, I'd be in Saturday for five hours,
 4   so...
 5          Q       What do you think is the
 6   average amount of time you spent in MLD's
 7   office on a Saturday?
 8          A       When I would go in, you're
 9   saying?
10          Q       Yes, the average amount of
11   time you would spend at MLD's physical
12   office in East Meadow on a Saturday.
13          A       Okay, so if it was a Saturday
14   that I did go to the office I probably
15   would be there for about four to
16   five hours.
17          Q       That was two to three times a
18   month?
19          A       Yeah, give or take.
20          Q       What would be the average
21   amount of time you spent working at MLD's
22   office on a Sunday, if you went in on a
23   Sunday?
24          A       It would really only be if
25   there was something that I, as I said,
```

*Rich Moffett Court Reporting, Inc.*

120

1

2      that I had to do there that I couldn't do

3      from my house.  So depending on the task

4      it could be an hour to three the most.

5          Q       Am I correct in saying that

6      when you worked on Sunday you would try

7      to work from home as much as possible?

8          A       Absolutely.

9          Q       Am I correct in saying that

10     on Saturdays and Sundays you wanted to

11     spend as much time as you could with your

12     family?

13         A       Yeah, you know, absolutely I

14     would want to spend as much time with the

15     family, but my wife was understanding in,

16     you know, work and being okay with that

17     if it pulled me away from the kids.

18         Q       And she still is

19     understanding?

20         A       Off the record.

21         Q       Did you ever meet with a

22     chamber of commerce about marketing for

23     MLD?

24         A       I did not.

25         Q       Did you ever meet with other

121

1

2   professionals, attorneys, real estate

3   brokers, accountants concerning marketing

4   for MLD?

5          A       I did not.

6          Q       Did you ever have seminars

7   for any groups, other than church groups

8   as we have discussed before, for MLD?

9          A       I did not.  I don't even know

10  if we did any trip seminars during our

11  tenure at MLD.

12                 MR. REILLY:  That was my

13          objection to form on that last

14          question.

15         Q       Other than possible church

16  seminars, you don't recall any other

17  seminars?

18         A       Correct.

19         Q       What percentage of your leads

20  were generated from your advertisements?

21         A       Almost all of them, 95,

22  97 percent.

23         Q       Where did the rest come from?

24         A       If, like, we were doing a

25  loan for a friend or family.

-*Rich Moffett Court Reporting, Inc.* -

```
 1                                    122
 2          Q       Were there times you would be
 3     at a restaurant with your family and you
 4     had to do work related to MLD?
 5          A       Yes.
 6                  MR. REILLY:  Objection to
 7          form.
 8          Q       That might be in the form of
 9     an e-mail or a phone call, correct?
10          A       Yes.
11          Q       Was there any slow season for
12     MLD?
13          A       No, it was more market driven
14     kind of where rates were and things like
15     that since we did a lot more refi.
16                  As far as purchase business,
17     we didn't really rely too heavily on,
18     like, the buying season, which would be,
19     like, spring and summer.
20          Q       Did you set an alarm to wake
21     up when you worked at MLD?
22          A       Usually, yes.
23          Q       What time was the alarm set
24     for?
25          A       5:45.
```

*Rich Moffett Court Reporting, Inc.*

```
1                                      123

2          Q       How often was your first stop

3     the gym?

4          A       Usually it was.

5          Q       Do you remember the alarm

6     code?

7          A       For?

8          Q       For MLD.

9          A       No, it changed so many times.

10    They had an issue with, like, homeless

11    people coming in and companies coming in

12    and out and changing, so it was probably

13    five or ten different ones, and Contour's

14    in the same building, so I wouldn't be

15    able to differentiate anyway.

16         Q       Aside from phone calls and

17    e-mails, did you ever text with potential

18    customers?

19         A       Yes.

20         Q       Is that something that you

21    would do when you were out of the office?

22             MR. REILLY:   Objection.

23    Form.

24         A       Yes, I would.  I would also

25    do it in the office if the customer
```

*Rich Moffett Court Reporting, Inc.*

```
 1                              124

 2    preferred to communicate it that way.

 3        Q       Was that your own cell phone

 4    or was that an MLD cell phone?

 5        A       Mine.

 6        Q       What vacations did you take

 7    while you were at MLD?

 8            MR. REILLY:  Objection to

 9        form.

10        A       I believe that one year I

11    went to Florida over April break.

12        Q       What was the duration of time

13    that you worked at MLD?

14        A       December of 2013 through

15    December of 2015.

16        Q       Other than that one week in

17    Florida, do you recall any other

18    vacations?

19            MR. REILLY:  Objection to

20        form.

21        A       I think I went to the

22    Atlantis in the Bahamas with my wife for

23    a weekend during that period of time.

24    And she's from upstate New York.  I

25    believe we went to her dad's place over
```