UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

MICHAEL RAKEMAN, BRIAN SCHIELE,          16-CV-0453 (ENV)(GRB)
LUIS DELGADO, ROBERT TOLLIN, WILLIAM
MCCUTCHAN, JOHN NELSON FENRICH and
KEVIN BLANEY,

                   Plaintiffs,

   -against-

MLD MORTGAGE INC. and LAWRENCE DEAR,

                 Defendants.
-------------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Respectfully submitted by,

      /s

Justin M. Reilly, Esq.
Neil H. Greenberg & Associates, P.C.
*Attorneys for the Plaintiffs*
4242 Merrick Road
Massapequa, New York 11758
Tel: 516.228.5100
justin@nhglaw.com

Dated: Massapequa, New York
      January 10, 2020

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... i

I.  RELEVANT PROCEDURAL HISTORY ...................................................1

II.  COUNTER-STATEMENT OF FACTS ......................................................2

III.  LEGAL ARGUMENT ...................................................................................8

    A.  Summary Judgment Standard ..........................................................8

    B.  Defendants' Burden of Proof on a Motion for Summary
        Judgment to Prove a FLSA Exemption ..........................................9

    C.  Plaintiffs Were Not Outside Salesmen ..........................................10

    D.  Plaintiffs Do Not Qualify for the Highly Compensated
        Employee Exemption under the FLSA .........................................15

        1.  Salary Basis Test.......................................................................15

        2.  Exempt Duties and Responsibilities ......................................16

    E.  Plaintiffs Are Owed Commissions..................................................22

    F.  Defendant Dear Is An Employee .....................................................22

IV.  CONCLUSION ............................................................................................23

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................8, 9

*Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388 (1960) ........................................................9

*Beard v. Banks*, 548 U.S. 521 (2006) ..............................................................................8

*Belton v. Premium Mortg., Inc.*, 03-CV-0964 (HFS), 2006 WL 561489
    (W.D. Mo. Mar. 6, 2006) ........................................................................................11

*Binder & Binder PC v. Barnhart*, 481 F.3d 141 (2d Cir. 2007) ......................................9

*Bouder v. Prudential Fin., Inc.*, 06-CV-4359 (DMC), 2010 WL 3515567
    (D.N.J. Aug. 31, 2010) ...........................................................................................11

*Cangelosi v. Gabriel Bros.*, 15-CV-3736 (JMF), 2015 WL 6107730
    (S.D.N.Y. Oct. 15, 2015) .................................................................................... 9-10

*Carhuapoma v. New York-Presbyt. Healthcare Sys., Inc.*, 2013 WL
    1285295 (S.D.N.Y. Mar. 29, 2013) .......................................................................10

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................8

*Chenensky v. N.Y. Life Ins. Co.*, 07-CV-11504 (WHP), 2009 WL 4975237
    (S.D.N.Y. Dec. 22, 2009) .........................................................................................9

*Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012) .............................. 10, 10-11

*Clougher v. Home Depot, U.S.A., Inc.*, 696 F. Supp. 2d 285
    (E.D.N.Y. 2010) .....................................................................................................18

*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974) ..................................................9

*Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009) ..................................20

*Donovan v. Agnew*, 712 F.2d 1509 (1st Cir. 1983) .........................................................22

*Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219 (2d Cir. 1994) ....................9

*Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137 (2d Cir.2013) ................................................10

*Hamilton v. Newburgh-Beacon Bus Corp.*, 2014 WL 7398908 (S.D.N.Y.
    Dec. 4, 2014) ............................................................................................................9

*Hernandez v Alpine Logistics, LLC*, 2011 WL 3800031 (W.D.N.Y. Aug.
    29, 2011) .................................................................................................................10

## TABLE OF AUTHORITIES
### (continued)

**Cases Continued**                                                                                 **Page**

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ...................................................................8, 9

*Karropoulos v. Soup du Jour, Ltd.*, 128 F. Supp. 3d 518 (E.D.N.Y. 2015) ...............................19

*Khan v. IBI Armored Services, Inc.*, 474 F. Supp. 2d 448 (E.D.N.Y. 2007) ...............................9

*Khurana v. JMP USA, Inc.*, 14-CV-4448 (SIL), 2017 WL 1251102
    (E.D.N.Y. Apr. 5, 2017)........................................................................................22

*Kinney v. Artist & Brand Agency LLC*, 13-CV-8864 (LAK)(DF), 2015 WL
    10714080 (S.D.N.Y. Nov. 25, 2015), *report and recommendation
    adopted*, 13-CV-8864 (LAK), 2016 WL 1643876 (S.D.N.Y. Apr.
    22, 2016) ........................................................................ 11, 12, 12-13, 13, 14

*Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611 (2d Cir. 1991) ......................................9

*Nunn v. Massachusetts Cas. Ins. Co.*, 758 F.3d 109 (2d Cir. 2014)..............................8

*Oetringer v. First Residential Mortg. Network, Inc.*, 06-CV-0381-H, 2007
    WL 2990921 (W.D. Ky. Oct. 11, 2007) ..................................................... 15-16

*Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545 (E.D. Mich. 2004) ...........................11

*Reiseck v. Universal Communications of Miami, Inc.*, 591 F.3d 101 (2d Cir.
    2010) ............................................................................................................9

*Zheng v. Liberty Apparel Co., Inc.*, 617 F.3d 182 (2d Cir. 2010)....................................10

**Statutes**

29 U.S.C. § 213(a)(1)...........................................................................................10

N.Y. Lab. Law § 651(5)........................................................................................10

**Rules**

Fed. R. Civ. P. 56(a) ..........................................................................................8

**Regulations**

29 C.F.R. §§ 541.2 .............................................................................................11

29 C.F.R. § 541.100(a).........................................................................................19

**TABLE OF AUTHORITIES**
(continued)

**Regulations Continued**                                                                              **Page**

29 C.F.R. § 541.102 ..................................................................................................18

29 C.F.R. § 541.200(a)(2) .........................................................................................20

29 C.F.R. § 541.200(a)(3) .........................................................................................20

29 C.F.R. § 541.500(a)..............................................................................................10

29 C.F.R. § 541.502 .................................................................................................13

29 C.F.R. § 541.601 .................................................................................................15

29 C.F.R. § 541.601(a)(2).........................................................................................16

29 C.F.R. § 541.601(b)(1).........................................................................................15

29 C.F.R. § 541.602(a)..............................................................................................15

29 C.F.R. § 541.700(a)..................................................................................... 17, 17-18

29 C.F.R. § 541.701 ........................................................................................ 16-17

## I.   RELEVANT PROCEDURAL HISTORY

Defendant, MLD Mortgage, Inc. ("MLD"), is a New Jersey based banking institution licensed to originate mortgage loans in New York State and over forty (40) additional states across the United States. During the time period December 2013 to April 7, 2016, MLD operated a branch office at 1900 Hempstead Turnpike, East Meadow, New York ("NY branch office") that was licensed by the New York State Banking Department to perform mortgage loan origination activities. The sudden closure of the NY branch office, as well as MLD's willful disregard of federal and New York state wage and hour laws, has resulted in a multitude of litigation in New York federal and state courts involving MLD's alleged unlawful treatment of its employees.[1]

MLD's New York litigation counsel is Keith J. Frank, Esq. of Moritt, Hock & Hamroff, LLP. Mr. Frank was formerly a partner of the firm Silverman Acampora, LLP. Mr. Frank's firm could not represent MLD in the instant action because Plaintiffs Michael Rakeman and Brian Schiele were former clients of Silverman Acampora, LLP. Thus, Mr. Frank handpicked Raymond Nardo, Esq. to represent Defendants herein.

Plaintiffs' Fed. R. Civ. P. 26 disclosures identify, *inter alia*, Michael Brooks, John Veracka, Denise Veracka, and Lawrence Dear as having discoverable information that Plaintiffs may use to support their claims (**Ex. 1**). Defendants' automatic disclosures identify Lawrence Dear, Ziamora Larrosa, David Zilberman, Denise Veracka, John Veracka, Scott Schrager, and Michael Brooks as having discoverable information that Defendants may use to support their defenses (**Ex. 2**). MLD's Executive Vice-President, David Zilberman, has given sworn testimony as a Fed. R. Civ. P.

---

[1] In addition to the instant action, Plaintiffs' attorneys are aware of the following cases against MLD arising out of the NY branch office alleging either wage and hour claims, failure to pay earned commissions, or discrimination claims: *Davis-Lavecchio v. MLD Mortgage, Inc.*, 16-CV-6275 (ADS)(ARL); *Veracka v. MLD Mortgage, Inc.*, 16-CV-7152 (WFK)(AYS); *Costa v. MLD Mortgage, Inc.*, bearing Suffolk County Index No.: 61509/2016; *Costa v. MLD Mortgage, Inc.*, bearing Suffolk County Index No.: 611599/2019; and *Lullo v. MLD Mortgage, Inc.*, bearing Nassau County Index No.: 613592/2018.

30(b)(6) witness in three (3) cases arising out of the NY branch office.[2] In the *Veracka* matter, Keith J. Frank, Esq. took the depositions of non-party witnesses, Michael Brooks (**Ex. 3**), John Veracka (**Ex. 4**), and Denise Veracka (**Ex. 5**). During those depositions, Mr. Frank asked numerous questions about the Plaintiffs in this action. Thus, it was determined that taking these witnesses' depositions again would have been duplicative. In *Veracka*, Plaintiffs' counsel herein traveled to MLD's corporate headquarters in New Jersey and took the deposition of Defendant, Lawrence Dear (**Ex. 28**), who traveled from Florida to New Jersey to give sworn testimony. At his deposition, Lawrence Dear was represented by MLD's general counsel, Seth Kreiner, Esq. Given that the same questions would have been asked of Mr. Dear at a deposition in this action with Seth Kreiner, Esq. again representing Mr. Dear, it was determined that taking such testimony again would have been duplicative.

Plaintiffs Michael Rakeman ("Rakeman") (**Ex. 7**), Brian Schiele ("Schiele") (**Ex. 6**), John Nelson Fenrich ("Fenrich") (**Ex. 8**), Kevin Blaney ("Blaney") (**Ex. 9**), Luis Delgado ("Delgado") (**Ex. 10**) and Robert Tollin ("Tollin") (**Ex. 11**), all appeared and gave sworn deposition testimony in the subject action.

## II.    COUNTER-STATEMENT OF FACTS

MLD opened the NY branch office in December 2013 (**Ex. 27, p. 43, lines 15-17**). MLD signed the lease for the NY branch office (**Ex. 27, p. 45, lines 11-25**). MLD obtained a license for the NY branch office and paid the license fees (**Ex. 27, p. 43, lines 22-25, p. 44, lines 2-3**). Anything that happened in the NY branch office was the responsibility of MLD (**Ex. 27, p. 44, lines 4-6**). The NY branch office employed loan originators, loan processors, underwriters, sales managers, and telemarketers (**Ex. 27, p. 22, lines 11-25, p. 48, line 25, p. 49, lines 2-17**); (**Ex. 12,**

---

[2] David Zilberman has appeared as a 30(b)(6) witness in the *Davis Lavecchio* matter, *Veracka* matter (**Ex. 27**), and this action (**Ex. 12**).

p. 35, lines 24-25, p. 36, lines 2-13); (Ex. 29, p. 22, lines 12-22).[3] John Veracka was the Operations Manager of the NY branch office and oversaw the loan processors and underwriters (Ex. 4, p. 6, lines 6-19). Michael Brooks and Scott Schraeger were sales managers, and their sole responsibility was to oversee the loan originators and telemarketers (Ex. 4, p. 6, lines 14-19, p. 15, lines 5-20, p. 32, lines 6-12); (Ex. 3, p. 9, lines 2-8, p. 28, lines 2-9). The employees at the NY branch office were MLD employees who received an IRS Form W-2 (Ex. 5, p. 97, lines 16-25, p. 98, lines 2-3); (Ex. 29, p. 23, line 25, p. 24, lines 2-5).

Rakeman, Schiele, and Delgado were employed by MLD as mortgage loan originators at the NY branch office from December 9, 2013 to September 21, 2015 (Ex. 13). Blaney was employed by MLD as a mortgage loan originator at the NY branch office from December 23, 2013 to September 21, 2015 (Ex. 13). Fenrich was employed by MLD as a mortgage loan originator at the NY branch office from February 6, 2014 to September 21, 2014 (Ex. 13). Tollin was employed by MLD at the NY branch office from April 28, 2014 to September 21, 2015 first as a telemarketer and then as a mortgage loan originator (Ex. 13). There is no dispute in this action that Plaintiffs' primary duty was sales.[4] Michael Brooks, Scott Schraeger, and John Veracka, operated the NY branch office as a fully equipped inside sales location and required the mortgage loan originators to work there all day every day just like they did when they operated a branch office at the same location for Contour Mortgage immediately prior to the MLD branch office opening (Ex. 3, p. 9, lines 2-8, p. 13, lines 8-13, lines 21-25, p. 14, p. 15, lines 2-17, p. 27, lines 14-25, p. 28, lines 2-9, lines 22-24, p. 58, lines 17-21, p. 72, lines 12-20, p. 74, lines 9-25, p. 75, p. 76, lines 2-12, p. 78, lines 2-16); (Ex. 4, p. 6, lines 6-19, p. 28, lines 10-25, p.

---

[3] Xiomara Larrosa testified at a deposition in the *Veracka* matter while represented by MLD's General Counsel, Seth Kreiner, Esq.

[4] *See* Plaintiffs' Response to Rule 56.1 Statement at par. 2.

29, lines 2-6, p. 32, lines 6-12, p. 34, lines 10-17, p. 70, lines 8-22); (Ex. 6, p. 34, lines 6-25, p. 35, lines 2-19); (Ex. 9, p. 19, lines 24-25, p. 20, p. 21, lines 2-6).

Rakeman, Schiele, Blaney, Fenrich, Delgado and Tollin all had set work schedules that they adhered to (Ex. 6, p. 51, lines 24-25, p. 52, lines 2-7, p. 53, lines 8-25, p. 54, p. 55, lines 2-10, p. 56, lines 23-25, p. 57, lines 2-4, p. 86, lines 7-21, p. 98, lines 2-15); (Ex. 7, p. 94, lines 23-25, p. 95, p. 96, p. 97, lines 2-13); (Ex. 8, p. 28, lines 12-25, p. 29, lines 21, p. 30, lines 19-25, p. 31, lines 2-12); (Ex. 9, p. 60, lines 5-25, p. 61, lines 2-10, p. 63, lines 9-17); (Ex. 10, p. 49, lines 21-25, p. 50, lines 2-17, p. 52, lines 16-19, p. 53, lines 5-25, p. 79, lines 7-18, p. 80, lines 19-21); (Ex. 11, p. 43, lines 21-25, p. 44, p. 47, lines 6-9).[5] Rakeman spent 80% to 90% of his work time at the NY branch office and the remainder working from a home office (Ex. 7, p. 42, lines 17-25, p. 43, lines 2-4, 16-18, p. 213, lines 2-10). Schiele worked at no other fixed location other than the NY branch office or a home office (Ex. 6, p. 68, lines 17-25, p. 69, line 2). Blaney spent 95% of his work time working at the NY branch office (Ex. 9, p. 100, lines 17-22). Fenrich spent 99.9% of his work time working at the NY branch office (Ex. 8, p. 45, lines 19-25, p. 46, lines 2-3). Tollin spent 95% of his work time working at the NY branch office and then 5% working from home (Ex. 11, p. 101, lines 13-20). Delgado spent most of every day at his desk at the NY branch office because live lead transfers would come to his desk phone and there would only be one ring and one shot to pick up the call (Ex. 10, p. 53, lines 8-25). John Veracka testified that the loan originators spent 99% of their time working at the NY branch office (Ex. 4, p. 28, lines 20-24).

Rakeman, Schiele, Delgado, and Blaney had previously worked for Contour at the same branch location before MLD took it over (Ex. 6, p. 33, lines 4-25, p. 34, p. 35, lines 2-

---

[5] It is clear from this testimony that Plaintiffs worked well in excess of 40 hours a week and it is undisputed in this action that they were not paid overtime compensation.

15). The same bosses that ran the Contour branch, Michael Brooks, John Veracka, and Scott Schraeger, also ran the MLD NY branch office **(Ex. 6, p. 35, lines 2-15)**. Nothing about the work environment changed from Contour to MLD **(Ex. 6, p. 35, lines 2-8)**. However, several months after Rakeman, Schiele, Delgado, and Blaney continued working in the same loan originator position, except for a different bank, MLD had them sign Employment Agreements **(Ex. 14, 16, 21, 23)**. Although Fenrich began his employment on February 6, 2014, MLD had him sign an Employment Agreement on April 3, 2014 **(Ex. 22)**. There is no Employment Agreement for Tollin. Denise Veracka, the Human Resources Manager at the NY branch office, testified that MLD Corporate only gave her one standard Agreement for the mortgage loan originators to sign even though the NY branch office was set up as an inside sales location **(Ex. 5, p. 106, lines 5-25, p. 107, lines 2-13, p. 109, lines 15-25, p. 110, line 2)**.

Rakeman testified that 95%-97% of the leads that he received were generated from the consumer direct radio advertisements that he did and that all of the work he did for MLD was servicing the leads that were generated from such advertisements **(Ex. 7, p. 121, lines 19-22, p. 42, lines 17-25, p. 43, lines 2-4)**. Schiele only received leads that were generated from the consumer direct radio advertising that he and Rakeman did while working at MLD **(Ex. 6, p. 48, lines 23-25, p. 49, lines 2-3, p. 51, lines 9-15)**. Delgado testified that 90%-95% of the leads that he received were generated by the NY branch office and that is the reason why he and other loan originators were at their desks most of the day **(Ex. 10, p. 53, lines 8-25)**. Tollin testified that the whole point of him going to MLD was because the NY branch office provided all of the marketing and all of the leads **(Ex. 11, p. 38, lines 20-25, p. 39, lines 2-17)**. Fenrich testified that he would use the branch provided leads and then work the referrals from those branch provided leads **(Ex. 8, p. 42, lines 23-25, p. 43, p. 44, lines 2-22)**. In fact, David

Zilberman, MLD's Executive Vice-President, was expressly aware that the NY branch office spent hundreds of thousands of dollars a month on advertising out of state radio ads that had the sole purpose of getting borrowers from different states to take out a loan funded by MLD **(Ex. 12, p. 17, lines 10-24).**

Rakeman, Schiele, Delgado, Blaney, Fenrich, and Tollin were all paid on a commission-only basis **(Ex. 13, Ex. 14, 16, 21, 22, 23); (Ex. 11, p. 37, lines 21-25, p. 38, lines 2-4).** This meant that nobody got paid until a loan that they worked on not only closed, but actually funded **(Ex. 7, p. 207, lines 15-20); (Ex. 12, p. 10, lines 24-25, p. 11, lines 2-3).** Zilberman confirmed the commission-only compensation package that the loan originators had **(Ex. 12, p. 10, lines 4-25, p. 11, lines 2-9, p. 23, lines 21-25, p. 33, lines 20-24).**[6] In fact, Defendants readily concede in their Rule 56.1 Statement at par. 33 that "From January 2015 through the end of their employment, on September 21, 2015, the pay structure changed from commission only to salary plus commission."[7] Plaintiffs, of course, sharply contest that their pay structure changed in January 2015 and claim that MLD only started paying them bi-weekly pay as a good faith gesture because MLD was so far in the hole in the amounts of commissions that it owed them **(Ex. 6, p. 75, lines 4-19, p. 107, lines 14-25, p. 108, lines 2-4, p. 109, lines 2-12); (Ex. 7, p. 132, lines 6-13, p. 149, lines 19-25, p. 150, lines 2-22, p. 152, lines 19-25, p. 153, lines 2-8, p. 209, lines 20-25, p. 210, lines 2-8); (Ex. 8, p. 36, lines 4-12, pp. 80-83); (Ex. 9, p. 35, lines 21-25, p. 36, p. 37, line 2, p. 85, lines 23-25, p. 86, lines 2-9, p. 87, lines 2-5, p. 109, lines 2-4, p. 112, lines 16-25, p. 113, line 2); (Ex. 10, p. 48, lines 8-25, p. 49, lines 2-8); (Ex. 11, p. 37, lines**

---

[6] Ex. 15 and Ex. 17 show that Rakeman and Schiele were paid commission only ("Com") from at least the beginning of their employment to 2015.

[7] Defendants' Rule 56.1 Statement at par. 33.

21-25, p. 38, lines 2-4, p. 70, lines 22-25, p. 71, p. 72, lines 2-14, p. 81, lines 23-25, p. 82, p. 83, lines 2-13); (**Ex. 5, p. 13, lines 14-25, p. 14, line 2, p. 47, lines 12-25, p. 48, lines 2-12**).

Regarding the payment of commissions, Denise Veracka made it ever so clear that the loan originators did not receive their direct deposit on time and that they did not receive their commissions on time (**Ex. 5, p. 13, lines 14-25, p. 14, line 2**). Denise Veracka testified that MLD just "wouldn't pay people" (**Ex. 5, p. 47, lines 16-25**). Denise Veracka testified that loan originators were not paid on loans that they should have been paid on (**Ex. 5, p. 48, lines 10-12**). Denise Veracka would input the payroll for the employees at the NY branch office and then send it to Corporate in New Jersey where Xiomara and then Zilberman had to okay it (**Ex. 5, p. 28, lines 2-8**). Then Corporate would convey the payroll information to ADP (**Ex. 5, p. 28, lines 17-21**). Zilberman confirmed that "Corporate had to hit the final approval button" (**Ex. 12, p. 55, lines 17-21**). John Veracka testified that he spoke with Zilberman about payroll on a regular basis and that Zilberman would make adjustments in lowering payroll (**Ex. 4, p. 17, lines 2-23**). John Veracka testified that Zilberman would cut the earned commissions of Rakeman and Schiele and that a large majority of them were never made up (**Ex. 4, p. 20, lines 2-21**). Zilberman, of course, blamed John Veracka and Michael Brooks and testified that they were the ones deferring the earned commissions of Rakeman and Schiele (**Ex. 12, p. 56, lines 12-21**). Regardless of who cut their commissions, the fact remains that commissions were earned by Plaintiffs in this case, but not paid by MLD.

For example, both **Ex. 25** and **Ex. 26** are funding reports for loans that Rakeman and Schiele closed during their employment with MLD (**Ex. 6, p. 122, lines 16-25**). For self-generated leads, Rakeman and Schiele were supposed to be paid 275 basis points (2.75% of the loan amount) for a period of their employment, then 400 basis points (4% of the loan amount) for a period of

their employment, and then 250 basis points (2.5% of the loan amount) for a period of their employment **(Ex. 12, p. 75, lines 8-25, p. 76, lines 2-8).**[8] Schiele testified as follows: "if you take our Dodd-Frank compensation, you take the funded loans times our compensation, you get a gross number. Subtract our W-2s and pay stubs from that number, that's where you're going to get 1.5 million" **(Ex. 6, p. 129, lines 6-15).**[9] Attached to **Ex. 25** is a damages calculation that shows that prior to liquidated damages, interest, and attorney's fees, Rakeman and Schiele are owed a total of $1,594,789.56 in commissions alone.

## III.   LEGAL ARGUMENT

### A.   Summary Judgment Standard

Summary judgment is warranted where the record before the court shows that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[10] The party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact.[11] In making this determination, the court must view all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.[12] On a motion for summary judgment, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor.[13] The court must endeavor to resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion for summary judgment.[14]

---

[8] Ex. 14, 16, 18, and 20 show the particular time periods that Rakeman and Schiele were to be paid specific basis points.

[9] Rakeman's and Schiele's W-2s are annexed to Defendants' moving papers as Ex. J.

[10] Fed. R. Civ. P. 56(a).

[11] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[12] *Nunn v. Massachusetts Cas. Ins. Co.*, 758 F.3d 109, 114 fn. 4 (2d Cir. 2014).

[13] *Beard v. Banks*, 548 U.S. 521, 530–31 (2006); *Hunt v. Cromartie*, 526 U.S. 541, 550–55 (1999); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[14] *Anderson*, 477 U.S. at 247–48.

Summary judgment is unwarranted if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[15] If there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain summary judgment.[16] So long as more than one reasonable inference can be drawn, and one inference creates a genuine issue of material fact, the trier of fact is entitled to decide which inference to believe and summary judgment is not appropriate.[17] The trial court's responsibility is limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined to issue-finding, not issue-resolution.[18]

**B.    Defendants' Burden of Proof on a Motion for Summary Judgment to Prove a FLSA Exemption**

It is beyond cavil that employers bear the burden of proving that their employees fall within an exempted category of the FLSA.[19] Moreover, it is well-settled that exemptions to the FLSA are "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirits."[20] Indeed, the Second Circuit has held that courts must narrowly and strictly construe the FLSA's exemptions against the employer because of the remedial purposes of the FLSA.[21] Thus, here, Defendant, as an employer, has the burden of proving its affirmative defense and establishing that the exemptions under the FLSA apply to Plaintiffs.[22]

---

[15] *Id.* at 248.

[16] *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 147 (2d Cir. 2007).

[17] *Hunt*, 526 U.S. at 552.

[18] *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

[19] *See Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991); *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974) ("[T]he application of an exemption under the [FLSA] is a matter of affirmative defense on which the employer has the burden of proof.").

[20] *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *Chenensky v. N.Y. Life Ins. Co.*, 07-CV-11504 (WHP), 2009 WL 4975237, at *5 (S.D.N.Y. Dec. 22, 2009) (citing *Bilyou v. Dutchess Beer Distrib., Inc.*, 300 F.3d 217, 222 (2d Cir.2002)).

[21] *Reiseck v. Universal Communications of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010).

[22] *Corning*, 417 U.S. at 196–97; *Hamilton v. Newburgh-Beacon Bus Corp.*, 2014 WL 7398908, at *2 (S.D.N.Y. Dec. 4, 2014); *Khan v. IBI Armored Services, Inc.*, 474 F. Supp. 2d 448, 452 (E.D.N.Y. 2007) (citation omitted);

Notably, the Second Circuit has recognized that "FLSA claims typically involve complex mixed questions of fact and law" and "mixed questions [of law and fact] are especially well-suited for jury determination."[23] Further, "[w]here an employee who is not receiving overtime compensation contends that he is entitled to such compensation under the FLSA, it is incumbent upon the employer to establish by clear and convincing evidence that one of the FLSA's exemptions to the overtime requirements applies, and therefore the employee is not entitled to overtime pay."[24]

### C. Plaintiffs Were Not Outside Salesmen

The FLSA exempts from the overtime provisions those "employees employed . . . in the capacity of outside salesman."[25] While the FLSA does not define "outside salesman," the Department of Labor defined and delimited the term to mean any employee whose primary duty is making sales or obtaining orders or contracts for services, and "who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty."[26] Importantly, the United States Supreme Court defined "capacity" to mean the "outward condition or circumstances; relation; character; position."[27] The Supreme Court reasoned that "the statute's

---

*Cangelosi v. Gabriel Bros.*, 15-CV-3736 (JMF), 2015 WL 6107730, at *3 (S.D.N.Y. Oct. 15, 2015) (citing *Chen v. Major League Baseball Props., Inc.*, 798 F.3d 72, 81–82 (2d Cir.2015)).

[23] *Zheng v. Liberty Apparel Co. Inc.*, 617 F.3d 182, 185–86 (2d Cir. 2010) (citations and internal quotations omitted).

[24] *Hernandez v Alpine Logistics, LLC*, 2011 WL 3800031, at *3 (W.D.N.Y. Aug. 29, 2011); *See also Carhuapoma v. New York-Presbyt. Healthcare Sys., Inc.*, 2013 WL 1285295, at *7 (S.D.N.Y. Mar. 29, 2013) ("Because whether an employee is exempt from the overtime pay provisions is a fact intensive inquiry, even where there has been full discovery, courts are often reluctant to grant summary judgment based on an exemption.") (internal citations and quotations omitted). As such, in the context of a FLSA claim, an employer's burden on a summary judgment motion, such as Defendant's burden here, is particularly high.

[25] 29 U.S.C. § 213(a)(1). The NYLL incorporates the FLSA's exemptions. *See* N.Y. Lab. Law § 651(5) (exempting an "outside salesman" from the definition of "employee" for purposes of the NYLL's minimum wage requirement); *Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 145 (2d Cir.2013) (finding FLSA's outside salesman exemption incorporated into the NYLL's overtime requirement).

[26] 29 C.F.R. § 541.500(a).

[27] *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2170 (2012) (citing Webster's New International Dictionary 396 (2d ed. 1934); *see also* 2 Oxford English Dictionary 89 (def. 9) (1933) ("Position, condition, character, relation")) (internal brackets omitted).

emphasis on the 'capacity' of the employee counsels in favor of a functional, rather than a formal, inquiry, one that views an employee's responsibilities in the context of the particular industry in which the employee works."[28]

To this end, Courts have consistently looked beyond whether an employee has merely made outside sales, and instead have also considered the "hallmark activities" of outside salesmen to determine if such an employee works in the capacity of an "outside salesman."[29] Common factors that Courts utilize include: (1) whether the employee generates commissions for himself through his work, (2) the level of supervision of the employee, (3) the amount of work done away from the employer's place of business, (4) whether the employee independently solicits new business, (5) the extent to which the employee's work is unsuitable to an hourly wage, and (6) whether the employee was required to meet minimum production standards.[30]

Here, Defendants have utterly failed to establish the focal point of the outside sales exemption—the requirement that the employee performs his primary duties outside of the employer's office. Defendants rely solely on two points: (1) Plaintiffs signed employment agreements that labeled them as "outside salesmen;" and (2) Plaintiffs received phone calls from clients on their cell phones. Neither of these points establishes that Plaintiffs were customarily and regularly engaged away from the employer's place of business in performing their primary duty.

First, titles alone are "insufficient to establish the exempt status of an employee."[31] Thus, the "Outside Salesman" job title that Defendants included in Plaintiffs' employment agreements

---

[28] *SmithKline*, 132 S. Ct. at 2170.

[29] *See Kinney v. Artist & Brand Agency LLC*, 13-CV-8864 (LAK)(DF), 2015 WL 10714080, at *12 (S.D.N.Y. Nov. 25, 2015), *report and recommendation adopted*, 13-CV-8864 (LAK), 2016 WL 1643876 (S.D.N.Y. Apr. 22, 2016); *Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 550 (E.D. Mich. 2004); *Belton v. Premium Mortg., Inc.*, 03-CV-0964 (HFS), 2006 WL 561489, at *2 (W.D. Mo. Mar. 6, 2006); *Bouder v. Prudential Fin., Inc.*, 06-CV-4359 (DMC), 2010 WL 3515567, at *4 (D.N.J. Aug. 31, 2010).

[30] *See Kinney*, 2015 WL 10714080 at *12 (citing *Chenensky*, 2009 WL 4975237 at *5); *Olivo*, 374 F. Supp. 2d at 545.

[31] 29 C.F.R. § 541.2 ("The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part.")

11

is completely irrelevant given that Plaintiffs' actual job duties do not reflect the nature of the title. This Court must look to the actual locations where Plaintiffs performed their job duties to determine whether they qualify as "outside." Defendants argument that Plaintiffs were not required to work in the office is simply nonsensical; tellingly, Defendants cannot cite to a single case supporting such a position. The cases on which they do rely— *Vasto v. Credico (USA) LLC*, 15-CV-9298 (PAE), 2017 WL 4877424 (S.D.N.Y. Oct. 27, 2017), aff'd, 767 F. App'x 54 (2d Cir. 2019), and *Torrenegra v. Grameen Am., Inc.*, 15CV3153 (RER), 2017 WL 1401291 (E.D.N.Y. Apr. 19, 2017)—did not address whether the employee was mistitled or worked away from the employer's place of business (the employees in those cases unquestionably performed their duties outside). Second, Plaintiffs answering telephone calls from potential borrowers does not rise to the level of making them outside salesmen.

  *Kinney v. Artist & Brand Agency LLC* is instructive. In *Kinney*, an employee worked from his home office and a satellite office for his employer; he also worked from a Starbucks and a hotel lobby, where there was Wifi available.[32] In moving for summary judgment on the grounds that the employee was an outside salesman, the employer argued that the employee's "primary duty was obtaining orders for contracts for services . . . [he] never worked at the [main] offices of [the employer], instead working from his home, the [satellite] office in New York, and various other locations where wireless Internet was available . . . frequently attended meetings and events, and that he was out of the office two to five times per week, meeting with clients and buyers."[33] The *Kinney* Court held that "these facts fall far short" of establishing that the employee qualified as an exempt outside salesman. The Court found that the employer failed to demonstrate, as a matter of law, that the employee performed his primary duties "away from his employer's place of business"

---

[32] *Kinney*, 2015 WL 10714080 at *3.
[33] *Id.* at *20 (internal quotations omitted).

and emphasized that the defendants "ignore[d] the fact that 'any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property.'"[34] The *Kinney* Court also recognized that "outside sales does not include sales made by mail, telephone, or the Internet unless such contact is used merely as an adjunct to personal calls."[35] Thus, the Court concluded, "any work that Plaintiff performed via telephone or email, from his home office, the [satellite] office, or any other location, did not constitute outside sales."[36] Finally, the *Kinney* Court noted that the employer "point[ed] to no evidence in the record showing that [the employee] generally closed deals during the course of meeting with clients and buyers outside of the office, such that the work he conducted via email and phone should be considered incidental to those face-to-face meetings."[37]

Here, like the employer in *Kinney*, Defendants failed to demonstrate that Plaintiffs performed any work outside of MLD's NY branch office or their home offices.[38] Tellingly, Defendants do not point to a single instance of Plaintiffs meeting with clients, attending business meetings, closings or open houses, or engaging in any other activities outside of the office to advance their ability to sell loans. Conversely, Plaintiffs testified at length that they primarily worked in the branch office during the week and on Saturdays, and then worked additional hours at home during the weekend. Even their supervisor, Michael Brooks, testified that Plaintiffs were required to work in the office and that the only reason he—Brooks—went to the office on

---

[34] *Id.* at *21 (citing 29 C.F.R. § 541.502; *Tracy v. NVR, Inc.*, 599 F. Supp. 2d 359, 361 (W.D.N.Y. 2009).

[35] *Id.* at *21 (citing 29 C.F.R. § 541.502; *Marcus v. AXA Advisors, LLC*, 307 F.R.D. 83, 93 fn.12 (E.D.N.Y.2015).

[36] *Id.* at *21.

[37] *Id.* at *21.

[38] *See* 29 C.F.R. § 541.502 ("any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property.").

Saturdays was to ensure that the loan originators were there fielding calls from potential borrowers (**Ex. 3, p. 75, lines 5-19**). Plaintiffs' testimony was corroborated by John and Denise Veracka who each testified that all loan originators, including Plaintiffs, were required to work in the office and were expected to work set schedules. Even Defendants' own corporate witness, David Zilberman, admitted that the outside sales exemption would be inapplicable if the loan originators did not in fact work outside of the office (**Ex. 27, p. 115, lines 8-22**). Far from being customarily and regularly engaged away from the employer's place of business, Plaintiffs never worked away from MLD's place of business.

Furthermore, even if Plaintiffs took calls from clients on their cell phones, such calls do not qualify as the performance of outside duties. Aside from the fact that they only took such calls while in the branch office, at home, or in the car while traveling to work, Defendants have not proffered any evidence that Plaintiffs actually met face-to-face with clients to close deals, "such that the work [they] conducted via . . . phone should be considered incidental to those face-to-face meetings."[39]

Even if this Court were to look past the fact that Plaintiffs did not perform work away from MLD's place of business, Defendants have still failed to establish that Plaintiffs performed the "hallmark activities" of outside salesmen. Indeed, several factors weigh in Plaintiffs' favor: (1) Plaintiffs were heavily supervised by their managers; (2) Plaintiffs never performed work away from MLD's place of business; (3) for most Plaintiffs, leads were distributed to them from management; (4) their time worked could have easily been tracked, thus making it suitable to an hourly wage; and (5) there is no evidence that they were required to meet minimum production standards. Clearly, these factors weigh against Plaintiffs qualifying for the outside sales exemption.

---

[39] *See Kinney*, 2015 WL 10714080 at *21.

**D.     Plaintiffs Do Not Qualify for the Highly Compensated Employee Exemption under the FLSA**

An employee is deemed exempt under the Highly Compensated Employee ("HCE") exemption of the FLSA only if (1) the employee earns a total annual compensation of $100,000 or more, which includes at least $455 per week paid on a salary basis; (2) the employee's primary duty includes performing office or non-manual work; and (3) the employee customarily and regularly performs at least one of the exempt duties or responsibilities of an exempt executive, administrative or professional employee.[40]

**1.     Salary Basis Test**

The Regulation setting forth the HCE exemption specifically provides that an employee's total annual compensation "*must include at least $455 per week paid on a salary or fee basis*."[41] Pertinent here, the Regulations further provide that an employee will be considered to be paid on a "salary basis" if the employee "regularly receives each pay period on a weekly, or less frequent basis, *a predetermined amount* constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed."[42] Thus, in order to prove the salary basis requirement is met, Defendants are required to establish that Plaintiffs were guaranteed to, and actually paid, a predetermined amount of at least $455 each week.

As noted *supra*, by their own admission, Plaintiffs were all paid on a commission only basis until January 2015. Thus, Plaintiffs cannot qualify for the HCE during this time. Defendants admit this in their moving brief. In addition, a pro-rata analysis for Delgado demonstrates that he does not qualify for the HCE for the year 2015, or any part of his employment for that matter. Such

---

[40] *See* 29 C.F.R. § 541.601.
[41] 29 C.F.R. § 541.601(b)(1) (emphasis added).
[42] 29 C.F.R. § 541.602(a) (emphasis added).

15

a commission-only payment arrangement clearly fails to meet the salary basis requirement of the HCE exemption.[43] In addition, as noted *supra*, there is clear and unequivocal testimony from Plaintiffs, John Veracka, Michael Brooks, Denise Veracka, and even David Zilberman that MLD either fell behind or deferred paying commissions to Plaintiffs. The substantial witness testimony makes it clear that any bi-weekly payments that began in January 2015 for any Plaintiff was simply a good faith gesture by MLD because it was so far in the hole in the amounts of commissions that it owed them. In addition, Defendants' reliance on the Notice and Acknowledgment of Pay Rate and Payday forms that Plaintiffs signed in January 2015, more than one year after their employment began, is misplaced. When asked about a particular Notice and Acknowledgment of Pay rate and Payday form, Denise Veracka testified as follows: "It is incorrect. It says outside sales associate, but that's incorrect because he was inside and they didn't want to pay overtime so I was directed to do that so employees weren't paid overtime and this is a form that I felt very uncomfortable in having him sign" **(Ex. 5, p. 79, lines 12-20)**. Clearly, at the very least, there is a trial issue of fact as to whether MLD can satisfy the salary basis test for the HCE to apply during the time period of January 2015 to September 2015.

## 2.     Exempt Duties and Responsibilities

The Regulations setting forth the HCE exemption state that the employee must customarily and regularly perform at least one of the exempt duties or responsibilities of an exempt executive, administrative or professional[44] employee.[45] The Regulations define "customarily and regularly" to mean "a frequency that must be greater than occasional but which, of course, may be less than

---

[43] *See Oetringer v. First Residential Mortg. Network, Inc.*, 06-CV-0381-H, 2007 WL 2990921, at *2 (W.D. Ky. Oct. 11, 2007).

[44] Defendants do not address the professional exemption in any way. For the purpose of judicial economy, Plaintiffs will refrain from addressing it as well; however, a review of the record will show that there is no evidence that Plaintiffs were professional employees.

[45] 29 C.F.R. § 541.601(a)(2).

constant . . . includ[ing] work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.["]46

As Defendants' argument pertains to exempt duties of an executive, they do not allege that either Tollin, Delgado, Blaney, or Fenrich performed such duties. As for Rakeman and Schiele, Plaintiffs and their supervisors provided extensive testimony that demonstrates that both Rakeman and Schiele did not perform any managerial duties, supervise or direct employees, or hire or fire employees; they did not even have authority to exercise such duties **(Ex. 6, p. 87, lines 20-25, p. 88, lines 2-4, p. 95, lines 22-24, p. 96, lines 8-17); (Ex. 7, p. 59, lines 9-14, 24-25, p. 60, lines 2-9, p. 64, lines 2-21, p. 106, lines 3-12); (Ex. 8, p. 13, lines 18-25, p. 14, lines 2-3); (Ex. 9, p. 19, lines 4-14); (Ex. 10, p. 32, lines 6-11, p. 63, lines 4-5); (Ex. 11, p. 50, lines 12-17, p. 96, lines 4-25, pp. 97-99).** Rakeman and Schiele spent their days originating loans.

Additionally, Rakeman's and Schiele's primary duty was not management. The Regulations provide that an employee's "primary duty" must be the performance of exempt work and further that "primary duty" means the principal, main, major or most important duty that the employee performs.[47] The Regulations further provide that the determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.[48] The Regulations identify the following factors for such consideration: (1) the relative importance of an employee's exempt duties as compared with other types of duties; (2) the amount of time the employee spends performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work

---

[46] 29 C.F.R. § 541.701.
[47] 29 C.F.R. § 541.700(a)
[48] *Id.*

performed by the employee.[49] In determining whether an individual's primary duty is managerial,

district courts have held that consideration of these factors is a highly fact-intensive inquiry, "to

be made on a case-by-case basis in light of the totality of the circumstances."[50] Also relevant to

the issue of whether an employee's primary duty is managerial, the Regulations provide that

"management" includes, but is not limited to, the following:

> Activities such as interviewing, selecting, and training of employees; setting and
> adjusting their rates of pay and hours of work; directing the work of employees;
> maintaining production or sales records for use in supervision or control; appraising
> employees' productivity and efficiency for the purpose of recommending
> promotions or other changes in status; handling employee complaints and
> grievances; disciplining employees; planning the work; determining the techniques
> to be used; apportioning the work among the employees; determining the type of
> materials, supplies, machinery, equipment or tools to be used or merchandise to be
> bought, stocked and sold; controlling the flow and distribution of materials or
> merchandise and supplies; providing for the safety and security of the employees
> or the property; planning and controlling the budget; and monitoring or
> implementing legal compliance measures.[51]

Here, Defendants admit that Rakeman's and Schiele's primary duty was sales while

arguing that they were exempt as outside salesmen; they now want to reframe their primary duty

as managerial, while at the same time being unable to point to any actual managerial duties they

performed—they cannot have it both ways. The substantial testimony, as cited to *supra*, clearly

establishes that the primary duty of John Veracka, Michael Brooks, and Scott Schraeger was

management of the enterprise and the primary duty of Rakeman and Schiele was to originate

mortgage loans.

Further, Rakeman and Schiele did not customarily and regularly direct the work of two or

more other employees. As discussed at length herein, Plaintiffs deny that they supervised or

---

[49] *Id.*

[50] *Clougher v. Home Depot, U.S.A., Inc.*, 696 F. Supp. 2d 285, 290 (E.D.N.Y. 2010) (quoting *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 908 (E.D. La. 2009)).

[51] 29 C.F.R. § 541.102.

directed the work of any other employees and Defendants have not presented a single piece of evidence supporting this allegation. Conversely, all of the evidence shows that Michael Brooks, Scott Schrager, and John Veracka managed the employees at MLD's NY branch office and Rakeman and Schiele did not direct the work of anyone else. Moreover, Defendants could not find one (let alone two) employees to provide testimony affirming that either Rakeman or Schiele supervised them.

Regarding the factor which requires that the employee "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight,"[52] there is no evidence that Rakeman and Schiele had any such authority. The Regulations put forth three factors to determine whether an employee has such authority: (1) whether it is part of the employee's job duties to make such suggestions and recommendations; (2) the frequency with which such suggestions and recommendations are made or requested; and (3) the frequency with which the employee's suggestions or recommendations are relied upon.[53] Importantly, an occasional suggestion is insufficient to demonstrate that an employee's opinion was given particular weight.[54] Here, it is unquestionably clear that Rakeman's and Schiele's job duties did not involve hiring, firing, or making suggestions or recommendations regarding hiring and firing.

As Defendants' argument pertains to exempt administrative duties, Defendants posit generic, blanket contentions such as that Plaintiffs "were required to exercise independent discretion and judgment to tailor a menu of financial products to the consumer's lending needs, while simultaneously educating the consumer." These are standard duties of a salesman that foster

---

[52] 29 C.F.R. § 541.100(a)

[53] *Karropoulos v. Soup du Jour, Ltd.*, 128 F. Supp. 3d 518, 534 (E.D.N.Y. 2015) (citing 29 C.F.R. § 541.105).

[54] *Id.* at 535 (citing 29 C.F.R. § 541.105; *Costello v Home Depot USA, Inc.*, 928 F. Supp. 2d 473, 489 (D. Conn. 2013)).

the ability of the salesman to make the sale, not administrative functions that would qualify them as exempt.

The duties performed in the process of originating and processing mortgage loans have been found by the Second Circuit not to be administrative duties subject to the exemption. For an employee to qualify for the administrative exemption, his primary duty must be: (1) "the performance of office or nonmanual work directly related to the management or general business operations of the employer or the employer's customers," and (2) "includes work requiring the exercise of discretion and independent judgment with respect to matters of significance."[55] *Davis v. J.P. Morgan Chase & Co.* is instructional.[56] In *Davis*, which weighed the application of an administrative exemption at the summary judgment stage, the Second Circuit held that a loan underwriter's work was not related to management policies or general business operations, "but rather concerns the 'production' of loans—the fundamental service provided by the bank."[57] The court noted that their work "was primarily functional rather than conceptual," and did not play a role in determining future strategy or the direction of the business.[58] Moreover, the underwriters "were trained only to apply the credit policy as they found it" in their employer's credit guide.[59] Because the underwriters did not both perform work directly related to management policies or general business operations, and regularly exercise discretion and independent judgment, they were not administrative employees.[60]

Similarly, the U.S. Department of Labor addressed the duties performed by mortgage

---

[55] 29 C.F.R. § 541.200(a)(2), (3).
[56] *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009).
[57] *Id.* at 534.
[58] *Id.* at 535.
[59] *Id.*
[60] *Id.* at 537.

originators in a 2010 Administrator's Interpretation.[61] The DOL determined that the primary duty of a loan originator is sales, and therefore, they cannot be exempt under the administrative exemption.[62] The DOL reasoned that loan originators directly produce the goods and services that are the primary output of a business rather than perform general administrative work applicable to the running of any business.[63] The DOL noted that it was "not aware of any Court that has found that mortgage loan officers . . . have a primary duty other than sales."[64]

Here, like the underwriters in *Davis*, who have more decision-making authority than loan originators because they ultimately approve the loan for funding, Plaintiffs' duties were exclusively related to the production of loans, which is admittedly MLD's fundamental purpose as a mortgage bank. Plaintiffs did not play a role in determining MLD's future strategy or the direction of MLD's business, and consistently applied MLD's policies as they were directed to do. Like the underwriters in *Davis*, Plaintiffs did not perform work directly related to management policies or general business operations, nor did they regularly exercise discretion and independent judgment. In fact, as discussed *supra*, Plaintiffs supervisors testified that they had no independent discretion to make decisions regarding a potential loan. Far from customarily and regularly performing exempt administrative duties, Plaintiffs never performed them. Consequently, Plaintiffs do not meet the requirements of the administrative exemption or the corresponding partial duties test of the HCE exemption.

Defendants largely ignore their responsibility to demonstrate that Plaintiffs performed exempt duties, and in doing so, completely failed to meet their burden of proof. They also did not

---

[61] *See* Administrator's Interpretation No. 2010-1, U.S. Department of Labor, Wage and Hour Division, dated March 24, 2010, attached as Ex. 30.
[62] *Id.*
[63] *Id.*
[64] *Id.*

bother to demonstrate the frequency in which these alleged exempt duties were customarily and regularly performed by Plaintiffs, making the analysis an impossible task and surely not appropriate at this stage of the action.

### E.    Plaintiffs Are Owed Commissions

As discussed, *supra*, both **Ex. 25** and **Ex. 26** are funding reports for loans that Rakeman and Schiele closed during their employment with MLD **(Ex. 6, p. 122, lines 16-25)**. Attached to **Ex. 25** is a damages calculation that shows that prior to liquidated damages and interest, Rakeman and Schiele are owed a total of $1,594,789.56 in commissions alone.

### F.    Lawrence Dear Is An Employer

"A corporate officer with operational control of a corporation's covered enterprise is an employer, along with the corporation, jointly and severally liable" for unpaid wages under the FLSA.[65] "An employer may include an individual owner who exercises a sufficient level of operational control in the company's employment of employees."[66] "In determining whether an individual is an employer, courts consider the same factors that apply to corporations, namely 'whether the individual: (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'"[67]

Here, Defendant Dear is unquestionably an employer in his individual capacity, jointly and severally liable for the wage and hour violations alleged by Plaintiffs. Defendant Dear is the

---

[65] *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983).

[66] *Khurana v. JMP USA, Inc.*, 14-CV-4448 (SIL), 2017 WL 1251102, at *9 (E.D.N.Y. Apr. 5, 2017) (citing *Kalloo v. Unlimited Mech. Co. of NY, Inc.*, 977 F. Supp. 2d 187, 201 (E.D.N.Y. 2013)).

[67] *Id.* (citing *Gillian v. Starjam Rest. Corp.*, 10-CV-6056, 2011 WL 4639842, at *4 (S.D.N.Y. Oct. 4, 2011); *Gayle v. Harry's Nurses Registry, Inc.*, 07-CV-4672, 2009 WL 605790, at *9 (E.D.N.Y. Mar. 9, 2009) (quoting *Keun–Jae Moon v. Joon Gab Kwon*, 248 F. Supp. 2d 201, 237 (S.D.N.Y. 2002) (quoting *Donavan*, 712 F.2d))) ("The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liab[le] under the FLSA for unpaid wages.") (internal quotation marks omitted)).

22

President and CEO of MLD, participates in running the day-to-day operations of MLD, is the sole signatory to MLD's tax returns and payroll account, approves MLD's accounts payable, sets MLD's hours of operation, and has final authority on decisions.[68] He supervises MLD's employees, participates in determining employees' bonuses and raises, has authority to set the pay rates and compensation plans for employees, approves MLD's bi-weekly payroll, has authority to hire and fire employees, and has authority to set the hours that the employees work.[69] Defendant Dear signed Plaintiffs' employment agreements.[70] As the President of MLD, Defendant Dear was the ultimate decision-maker for all things related to MLD's East Meadow Branch.[71]

Clearly, given Defendant Dear's extensive involvement with the corporate operations of MLD, the NY branch office, and Plaintiffs' employment, Defendant Dear can be held personally liable along with Defendant MLD for the wage and hour violations alleged by Plaintiffs.

## IV.    CONCLUSION

Defendants' motion papers fall far short of demonstrating that Plaintiffs' claims should be dismissed. They have completely failed to meet their burden on any of their affirmative defenses, and in the process, have only wasted judicial resources and the parties' time and money. Plaintiffs have provided admissible evidence to contradict every single allegation made by Defendants. Plaintiffs did not perform their duties away from MLD's place of employment, they did not perform managerial duties, did not supervise employees, were not free from direct supervision, did not interview, recommend, hire, fire, promote, evaluate, or discipline any employees, did not exercise independent, discretionary, decision-making authority, and did not make decisions that

---

[68] Zilberman Tr. (Ex. 27) at 24:23-25:3, 159:25-160:10, 160:20-161:10, 161:20-162:2; Dear Tr. (Ex. 28) at 14:5-15, 32:11-14, 34:12-14, 35:22-36:2, 37:16-22, 38:10-13, 78:2-6; Larrosa Tr. (Ex. 29) at 12:5-11.

[69] Zilberman Tr. (Ex. 27) at 82:18-20, 149:2-15, 161:11-19; Dear Tr. (Ex. 28) at 16:20-17:2, 77:7-25, 78:7-11; Larrosa Tr. (Ex. 29) at 10:9-16, 10:23-24:7, 11:22-12:4, 18:18-21.

[70] Zilberman Tr. (Ex. 12) at 68:2-9; Dear Tr. (Ex. 28) at 20:14-21; *See* (Ex. 14, 16, 21, 22, 23).

[71] Zilberman Tr. (Ex. 27) at 83:4-15.

affected the business operations of MLD. In short, Plaintiffs were not subject to the executive, administrative, outside salesman, or HCE exemptions. For all the reasons set forth herein, as well as Plaintiffs' Response to Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, Defendants did not meet their heavy burden to establish that Plaintiffs' claims should be dismissed as a matter of law. As such, Defendants' motion for summary judgment must be denied in its entirety.