UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
MICHAEL RAKEMAN, BRIAN SCHIELE, LUIS :
DELGADO, ROBERT TOLLIN, JOHN NELSON :
FENRICH and KEVIN BLANEY, :
                                          :    <u>MEMORANDUM & ORDER</u>
                      Plaintiffs,    :
                                          :    16-cv-453 (ENV) (ARL)
            -against-             :
                                          :
MLD MORTGAGE INC. and LAWRENCE :
DEAR, :
                                          :
                      Defendants.    :
------------------------------------------------------------- x

VITALIANO, D.J.

       On January 21, 2016, plaintiffs commenced this action against their former employer,

MLD Mortgage Inc. ("MLD") and its president and chief executive officer, Lawrence Dear,

claiming violations of wage and overtime provisions of the Fair Labor Standards Act ("FLSA")

and New York Labor Law ("NYLL") during their employment with MLD from 2013 to 2015.

Am. Compl., Dkt. 45.  Specifically, plaintiffs claim that defendants failed to (1) pay overtime

compensation for all hours worked in excess of 40 hours per week, as required by 29 U.S.C.

§ 207(a)(1) and New York's Minimum Wage Act, NYLL § 650 *et seq.* and 12 NYCRR § 142;

(2) pay the full amount of plaintiffs' earned commissions on mortgage loans they closed and

funded, in violation of NYLL §§ 191 and plaintiffs' employment agreements; (3) pay certain

plaintiffs minimum wages in violation of NYLL § 652; and (4) provide plaintiffs wage notices

and statements under NYLL § 195.  Defendants now move for summary judgment.  *See* Dkt. 54.

For the reasons that follow, the motion is granted in part and denied in part.

1.    <u>Background</u>

       MLD is a banking institution that originates mortgages throughout the United States and

1

sells them in the secondary market.  Pls.' 56.1, Dkt. 59, ¶ 1.  Plaintiffs were based out of MLD's East Meadow branch office.  *Id.*  Plaintiffs Michael Rakeman, Brian Schiele, Luis Delgado, and Kevin Blaney were employed as mortgage loan originators from December 2013 to September 2015.  Pls.' 56.1 ¶ 5.  Plaintiff John Nelson Fenrich was similarly employed as a mortgage loan originator from February 2014 to September 2015.  Plaintiff Robert Tollin was employed from April 2014 to September 2015 as a telemarketer.[1]  Plaintiffs were all terminated on September 21, 2015.  *See* Pls.' Opp'n Mem. at 8; *see also* Reilly Opp'n Aff. Ex. 7 ("Rakeman Tr."), at 109:4–8.[2]

Central to the dispute is the characterization of plaintiffs' employment, that is, whether plaintiffs were "outside salesmen," as that term is set forth in 29 U.S.C. § 213(a)(1) and defined in 29 C.F.R. § 541.500.  Plaintiffs' employment agreements characterize them as "Outside Sales Employee[s]," pursuant to N.J. Admin. Code § 12:56-7.2.  *See* Reilly Opp'n Aff. Ex. 16, at 2.  According to plaintiffs, however, their roles at MLD were far from "outside."

Titles aside, there is agreement as to plaintiffs' primary job responsibilities.  They were, namely, responsible for soliciting and originating mortgage loans on behalf of MLD and advising customers of available loan opportunities.  Pls.' 56.1 ¶¶ 2, 8.  According to their employment agreements, their tasks, which are largely undisputed, consisted of:

> (a) taking information from the applicant and completing the application in a timely manner; (b) educating the prospective applicant in the financing process and advising the applicant about the different types of loan products available; (c) collecting financial information . . .; (d) maintaining regular contact with the applicant between application and closing to inform them of the status of their

---

[1] The parties dispute whether Tollin was ever employed as a mortgage loan originator, and defendants could not locate Tollin's employment agreement.  *See* Defs.' 56.1, Dkt. 59, ¶ 6; *see also* Reilly Opp'n Aff. Ex. 13, Dkt. 58, at 2 (Tollin is titled a "telemarketer").

[2] With the exception of citations to deposition transcripts, which refer to their original pagination, all citations to pages refer to the Electronic Case Filing System ("ECF") pagination.

application, to respond to any questions posed, and to gather any additional information as needed . . .; (e) assisting, when necessary, in collecting all fees applicable to the application and the closing process; and (f) performing such other duties and/or operational related functions necessary to the origination of mortgage loans as the Employer may assign.

Pls.' 56.1 ¶ 8.[3]

There is sharp disagreement, though, regarding the extent to which sales employees were required to be present at the East Meadow branch offices.  Defendants contend plaintiffs had total freedom to come and go as they pleased.  Defs.' 56.1, Dkt. 56, ¶ 13.  According to plaintiffs, however, they were expected to be in the office at least five days a week, if not six or seven.  *See*, *e.g.*, Reilly Opp'n Aff. Ex. 8 ("Fenrich Tr."), at 28:12–14.  They contend the loan officers followed set schedules.  Pls.' 56.1 ¶ 13.  Branch manager Michael Brooks confirmed their contention, testifying at his deposition that plaintiffs were told they needed to be in the office from as early as 7:00 in the morning until 9:00 or 10:00 at night, as "leads," or potential borrowers, may contact MLD during those hours.[4]  Reilly Opp'n Aff. Ex. 3 ("Brooks Tr."), at 27:14–20; *see also* Rakeman Tr. at 96:11–15; Fenrich Tr. at 28:15–22; Reilly Opp'n Aff. Ex. 10 ("Delgado Tr."), at 49:21–50:17.  As a result, they say, they were required to be present in the office on weekdays, and often Saturdays.  *See* Brooks Tr. at 25:9–26:9, 74:16–75: 19; 78:2–16.

Filling in details that reinforced the battle lines, Rakeman testified that he worked approximately 90 hours per week.  Rakeman Tr. at 94:23–95:2.  Though there is disagreement as to whether they were required to do so, plaintiffs claim they spent almost all of their working

---

[3] Plaintiffs deny having collected fees, according to the description in subsection (e).  Pls.' 56.1 ¶ 8.

[4] Brooks' deposition was taken in *Veracka v. MLD Mortgage*, 16-cv-7152 (WFK) (AYS), a similar case before this court involving other MLD mortgage loan originators' FLSA and NYLL claims.  Given the overlap between the cases, the parties did not retake the depositions of Brooks and other non-party witnesses.  *See* Reilly Opp'n Aff. ¶ 7.

hours at the East Meadow branch office.  When they were not physically working at that office, they often fielded calls and emails from their mobile devices.  *See, e.g.*, Rakeman Tr. at 40:24–41:25.  Rakeman testified that he interacted with clients daily by phone, and that he could "sell a loan or whatever from [his] cell phone."  *Id.* at 39:18–23; *see also* 41:13–16.  No plaintiff worked regularly from any location other than the East Meadow branch or his home.  Schiele, for example, estimated he worked 20 to 25 hours per week from home, including two hours per day once he got home from the East Meadow branch.  Pls.' 56.1 ¶¶ 17–18.  Later, he testified that he worked less than 10 percent of the time outside the East Meadow branch.  Reilly Opp'n Aff. Ex. 6 ("Schiele Tr."), at 98:2–15.  Rakeman similarly testified, at first, that he worked approximately 80 percent of the time from the East Meadow branch and the other 20 percent from his home office, but later estimated he may have spent closer to 90 percent of the time in the branch office.  Pls.' 56.1 ¶ 16; Rakeman Tr. at 213:4–10.  Others recounted conducting little to no work outside the East Meadow office.  *See, e.g.*, Reilly Opp'n Aff. Ex. 9 ("Blaney Tr."), at 66:17–68:2; Fenrich Tr. at 26:21–27:5.

Certain plaintiffs often generated their own leads, while others pursued those that were company-generated.  Rakeman and Schiele testified that they advertised and generated their own leads almost entirely, *see* Rakeman Tr. at 121:19–25; Schiele Tr. at 51:9–15, aided by their hiring of MLD staff to perform marketing and advertising services.  Pls.' 56.1 ¶ 28.  Tollin testified that he once received checks from Rakeman and Schiele's "marketing companies" in exchange for advertising help.  Reilly Opp'n Aff. Ex. 11 ("Tollin Tr."), at 80:9–14.  Occasionally, Rakeman and Schiele referred loans to other mortgage loan officers when they were overloaded and agreed to receive a share of commissions earned.  Pls.' 56.1 ¶ 29.  In contrast, Delgado and Tollin testified that they acted on entirely company-generated leads.

Delgado Tr. at 25:14–17; Tollin Tr. at 38:20–39:2.  Fenrich and Blaney occupied a space

somewhere in between, generating some leads themselves and receiving others from MLD.  *See*

Fenrich Tr. at 42:23–43:7; Blaney Tr. at 51:15–20.  Blaney also attended networking events on

weekends while at the beach and golf clubs to which he belonged.  Defs.' 56.1 ¶ 19.  Plaintiffs

did not attend any outside events, such as real estate open houses, to seek leads.  *See, e.g.*,

Blaney Tr. at 66:21–68:5; Tollin Tr. at 100:4–9.

At any rate, the parties agree that, at least until January 2015, plaintiffs were

compensated on a commission-only basis, receiving payment only after a loan they originated

had closed and funded.  *See* Pls.' Mem., Dkt. 60, at 9; Tollin Tr. at 38:3–14.  Pursuant to their

employment agreements, plaintiffs earned a higher commission on self-generated leads than on

company-generated leads.  Nardo Aff. Ex. F at 9, 17, 25, 33, 41.  According to defendants,

plaintiffs' pay structure shifted to a "salary plus commission" basis from January 2015 until the

end of their employment in September 2015, meaning plaintiffs received a fixed amount

biweekly in addition to commissions.  Defs.' 56.1 ¶ 33; Nardo Aff. Ex. M (Notice of Pay Rate

and Acknowledgement Forms).  Plaintiffs acknowledge defendants began characterizing their

compensation as "salary plus commission," but they contend the portion of their earnings

designated as salary consisted entirely of commissions in arrears.  Pls.' 56.1 ¶ 33.  The parties'

disagreement aside, it is uncontroverted that each plaintiff earned more than $100,000 per year

during the relevant time period, with the exception of Delgado, who earned approximately

$60,000 in 2015.  Nardo Aff. Ex. J at 10.

There is substantial agreement on the *dramatis personae* for operations.  The East

Meadow branch management included Michael Brooks, John Veracka, and Scott Schraeger, who

supervised the day-to-day operations of the branch, distributed leads and carried out employees'

terminations.  *See* Fenrich Tr. at 42:13–16; *see also* Rakeman Tr. at 169:15–170:2; Reilly Opp'n

Aff. Ex. 5 ("Denise Veracka Tr.") at 19:11–18; Tollin Tr. at 39:3–11.  In addition, the parties

agree that certain employees wrote "Mike and Brian," or "M&B," on their timesheets,

referencing Rakeman and Schiele, but there remains a dispute as to whether such references

indicated executive or administrative roles.  Pls.' 56.1 ¶ 26.

      MLD itself was, during all relevant times, owned by a trust in Dear's name.  Reilly

Opp'n Aff. Ex. 27 ("Dear Tr.") at 34:18–35:17.  Dear, as president and chief executive officer,

was the sole signatory to MLD's tax returns.  Pls.' 56.1 ¶ 11.  In his testimony, Dear asserts he

had practically no involvement with plaintiffs' employment nor with the East Meadow branch

generally.  *See generally* Dear Tr.  For instance, when asked whether he spoke to branch

management about East Meadow affairs, he recounts nothing more than a "hello conversation."

*See* Dear Tr. at 94:4–11.  His signature appeared on the bi-weekly paycheck issued to plaintiffs,

but Dear claims this was merely a formality, and that he never reviewed the payroll.  Dear Tr. at

32:23–33:6.  His signature also appears on plaintiffs' employment agreements, but he claims to

have no knowledge as to whether he expressly approved their compensation packages.  *Id.* at

42:17–24.

      Significantly, the record reveals no direct communication between Dear and plaintiffs

during their employment, though Dear testified that he "kn[ew] who [ ] Rakeman [was]."  *Id.* at

67:2–19.  Dear visited the East Meadow branch only once, as he testified at his deposition.  *Id.*

at 30:12–14.  He hired MLD employees prior to 2010 but allegedly did not hire or fire any

employees during plaintiffs' employment.  *Id.* at 77:11–13.  He claims not to have been involved

with employees' termination, *id*. at 20:5–8, though as president and chief executive officer, Dear

had the authority to hire and fire employees.  *See id.* at 77:7–25; Reilly Opp'n Aff. Ex. 27

("Zilberman Tr."), at 161:11–15.  Critically, Brooks testified that Vice President David Zilberman made "[almost all] of the decisions relating to the East Meadow location," including final decisions on payroll.  Brooks Tr. at 83:12–16, 84:24–85:6.

## 2.    Standard of Review

Summary judgment is warranted if the "movant shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if it can be reasonably resolved in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 253, 106 S. Ct. 2505, 2511, 2512, 91 L. Ed. 2d. 202 (1986).  The motion court's responsibility "is not to weigh the evidence."  *Gen. Star Indem. Co. v. Driven Sports, Inc.*, 80 F. Supp. 3d 442, 449 (E.D.N.Y. 2015) (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004)).  Rather, "in determining if a genuine dispute of material fact exists, 'the court must resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought.'" *Fletcher v. Standard Fire Ins. Co.*, 80 F. Supp. 3d 386, 390 (E.D.N.Y. 2015) (quoting *Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 415 (S.D.N.Y. 2012), *aff'd*, 541 Fed. App'x 62 (2d Cir. 2013)).

"Once the moving party has met its burden . . . '[t]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'"  *Gen. Star Indem. Co.*, 80 F. Supp. 3d at 449 (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002)). If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.  *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997).

3.    Discussion

I.    FLSA Exemptions

FLSA § 206 requires employers to pay employees a minimum wage, while § 207 requires employers to provide overtime compensation to employees who work more than 40 hours per week.  29 U.S.C. §§ 206(a), 207(a)(1).  Congress's goal in enacting FLSA was to "protect[] all covered workers from substandard wages and oppressive working hours."  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147, 132 S. Ct. 2156, 2162, 183 L. Ed. 2d 153, 165 (2012) (quoting *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 739, 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981)).  In view of this remedial purpose, certain employees who "'typically earn[] salaries well above the minimum wage' and enjoy[] other benefits that 'se[t] them apart from the nonexempt workers entitled to overtime pay,'" do not fall within FLSA's protections.  *Id.* at 166.  Specifically, employers are exempt from providing minimum wage and overtime compensation to those "employed in the capacity of outside salesmen" and those employed in an executive, administrative or professional capacity.  29 U.S.C. § 213(a)(1).  An FLSA exemption is an affirmative defense for which the employer bears the burden of proof.  *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S. Ct. 2223, 2229, 41 L. Ed. 2d 1 (1974).[5]

In the absence of any textual indication that FLSA is to be construed narrowly, courts must adopt a "fair," rather than a narrow, reading of FLSA's exemptions.  *Encino Motorcars,*

---

[5] NYLL incorporates FLSA's exemptions into its minimum wage and overtime requirements, so the Court does not engage in a separate analysis under NYLL.  *See Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 105 (2d Cir. 2010) (NYLL "mandates overtime pay and applies the same exemptions as the FLSA," including the administrative exemption); *see also Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 145 (2d Cir. 2013) (finding NYLL incorporates FLSA's outside salesman exemption); *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 n.1 (2d Cir. 2012) (executive exemption).

*LLC v. Navarro*, 138 S. Ct. 1134, 1142, 200 L. Ed. 433 (2018); *see also Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 228 (2d Cir. 2018) (recognizing that *Encino Motorcars* changed the appropriate construction of FLSA exemptions).  Stated differently, though FLSA's purpose is remedial, courts are not to construe the exceptions so narrowly so as to provide a remedy "at all costs."  *Encino Motorcars*, 138 S. Ct. at 1142.

A. *Outside Salesperson Exemption*

Defendants first claim plaintiffs are exempt from FLSA as outside sales employees.  Defs.' Mem., Dkt. 57,  at 7–11.  U.S. Department of Labor ("DOL") regulations define an outside salesperson as an employee (1) whose "primary duty" is "making sales within the meaning of [29 U.S.C. § 203(k)]" or "obtaining orders or contracts for services"; and (2) who is "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty."  29 C.F.R. § 541.500(a).  The paradigmatic, pre-cyber age outside sales employee is one who makes sales by going door-to-door at customers' homes or businesses.  29 C.F.R. § 541.502.[6]  Because there is no dispute that plaintiffs' primary duties were making sales, the principal focus is on the second factor of the test—whether they were customarily and regularly engaged away from MLD's East Meadow branch in performing their primary duties.

The phrase "'customarily and regularly' means a frequency . . . greater than occasional but . . . less than constant."  29 C.F.R. § 541.701.  The definition does not lend itself to bright-line formulations, requiring courts to adopt a functional, not formal, approach, taking stock of

_____

[6] The Court observes that sales employees working remotely during the COVID-19 pandemic do not automatically become outside sales employees.  As discussed below, sales calls made from a fixed site, such as an employee's home office, are considered calls made from the employer's place of business.  *See* 29 C.F.R. § 541.502.

employees' responsibilities in the context of their industry. *Christopher*, 567 U.S. at 161. The "hallmark activities" of outside salespersons, therefore, provide the guide for the functional assessment of MLD's East Meadow branch employees' status:

> (1) whether the employee generates commissions for himself through his work, (2) the level of supervision of the employee (3) the amount of work done away from the employer's place of business, (4) whether the employee independently solicits new business, and (5) the extent to which the employee's work is unsuitable to an hourly wage.

*Flood v. Just Energy Marketing Corp.*, 15-cv-2012 (KBF), 2017 WL 280820, at *4 (S.D.N.Y. Jan. 27, 2017), *aff'd*, 904 F.3d 219 (2d Cir. 2018) (quoting *Chenensky v. N.Y. Life Ins. Co.*, 07-cv-11504 (WHP), 2009 WL 4975237, at *5 (S.D.N.Y. Dec. 22, 2009)). The Court's assessment is also aided by the Second Circuit's finding that an employee is "customarily and regularly engaged away from the employer's place . . . of business" when he "regularly [meets] with clients outside of work," and his responsibilities include "go[ing] out [and] meet[ing] people" and "clos[ing] deals." *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 145–46 (2d Cir. 2013).

It goes without saying, moreover, that an employee's agreed-upon job title is not dispositive of his or her exempt status. 29 C.F.R. § 541.2 ("A job title alone is insufficient to establish the exempt status of an employee."). Rather, courts must consider the duties employees performed, or how they "spent their working time." *Flood*, 2017 WL 280820, at *4; *see also Kadden v. VisuaLex, LLC*, 910 F. Supp. 2d 523, 538 (S.D.N.Y. 2012) (because "binding regulations make clear that" formal job titles are not dispositive, "what matters is what this particular employee's primary duties *actually were*"). That question is one of fact, "but the question of whether those activities exempt him from the FLSA is one of law." *Chenensky*, 2009 WL 4975237, at *5.

    i.   <u>New Business and Commissions</u>

Two hallmarks of outside sales employees are generating new business and getting paid

for that business on commission. *Flood*, 2017 WL 280820, at *4. Rakeman and Schiele testified that the commissions they generated resulted almost entirely from their own advertisements and efforts. *See* Rakeman Tr. at 46:20–47:20; Schiele Tr. at 70:5–13. Significantly, however, they never left the office to attend open house auctions or networked with professionals in the search for new leads. Rakeman Tr. at 199:23–200:6; Schiele Tr. at 64:6–22, 70:14–71:4; *see also* DOL Wage & Hour Op. Ltr. No. FLSA2006-11 (Mar. 31, 2006) (opining that meeting clients in person is indicative of mortgage loan officers' status as outside sales employees); *Hartman v. Prospect Mortg. Co.*, 11 F. Supp. 3d 597, 603 (E.D. Va. 2014) (attendance of "open houses, auctions, closings, settlements, and chamber of commerce meetings" indicative of an outside salesperson). They instead primarily ran advertising campaigns via radio, "glued to [their] 'chair[s]'" in the branch office. Rakeman Tr. at 88:3–17, 89:6–13, 214:15–215:8. Schiele and Rakeman voiced the advertisements, sometimes wrote the scripts themselves and, during a six-week period, relied on Tollin's help. Rakeman Tr. at 200:7–13; Schiele Tr. at 65:24–66:12; Tollin Tr. at 78:13–25, 80:6–17.

This is not to say that these employees were inflexibly tethered to their chairs in East Meadow to perform assigned tasks. Rakeman testified that he and Schiele had personal phone numbers, independent of their MLD phone numbers, which they used to receive calls generated from advertisements, Rakeman Tr. at 48:12–18, but email recordings of voicemails left on those personal phone lines would go to their MLD email addresses, *id.* at 48:19–25. Nevertheless, Schiele classified the leads generated from these advertisements as MLD-generated and, as plaintiffs emphasize, the process was conducted from MLD's East Meadow branch. *See* Schiele Tr. at 51:9–15; Rakeman Tr. at 88:18–21. Marketing representatives would meet with Rakeman and Schiele in the East Meadow office, and Rakeman and Schiele recorded the advertisements

11

from the office.  Schiele Tr. at 64:23–64:24.

As to the other plaintiffs, Delgado and Tollin testified that they acted on entirely MLD-generated leads, Delgado Tr. at 25:14–17; Tollin Tr. at 38:20–39:2, while Fenrich and Blaney made sales based on a mix of MLD- and self-generated leads.  *See* Fenrich Tr. at 42:23–43:7; Blaney Tr. at 51:15–20.  Plaintiffs were paid commissions on the loans generated from these leads.  Pls.' 56.1 ¶¶ 9, 33.  On balance, then, given that plaintiffs' leads were generated almost entirely either by MLD or out of the East Meadow branch office, this factor weighs against granting summary judgment in defendants' favor.

ii.   Level of Supervision

The question of supervision is, ultimately, a close call.  On the one hand, plaintiffs were, pursuant to their employment agreements, allowed to come and go as they pleased—a point defendants highlight, noting that plaintiffs possessed the key code to enter the building.  Defs.' 56.1 ¶ 13.  Further, plaintiffs neither had set hours nor kept records of the hours they worked. *See id.*; Delgado Tr. at 50:18–23.  Plaintiffs also had control over the lifespan of a loan transaction, exercising responsibility from the marketing stage to closing.  *See* Pls.' 56.1 ¶ 8; *see also* Rakeman Tr. at 83:12–20.  *But see* Brooks Tr. at 55:19–23, 67:14–20 (though a major event for timing purposes, mortgage loan originators did not decide which customers' loans would be approved).

At the same time, however, plaintiffs contend the "expectation" was that they were present in the office from early morning to late at night, a contention supported by the record. *See, e.g.*, Rakeman Tr. at 96:16–97:7.  Furthermore, and importantly, Brooks, plaintiffs' supervisor, testified that plaintiffs needed to be in the office to field inquiries from potential borrowers.  Pls.' Opp'n Mem. at 13–14.  He said the only reason he went into the office was to ensure mortgage loan officers—plaintiffs included—were there.  *Id.*; Brooks Tr. at 75:10–15.

12

Because it is defendants' burden to carry, that this factor remains in dispute must favor plaintiffs.

    iii.    <u>Amount of Work Done Away from the "Office"</u>

Next, the amount of time employees spend working away from the office can be an indicator of whether they are outside sales employees, depending on the nature of that work. Plaintiffs seize primarily on the time they spent working at the East Meadow branch office to argue that they were "Outside Sales Employees" in name only. *See* Pls.' 56.1 ¶ 9. Defendants, on the other hand, while acknowledging that plaintiffs often worked long hours at the East Meadow branch, argue that an employee may be considered an outside salesperson even if he works the majority of his hours from the employer's place of business. *See* Defs.' Mem. at 9 (citing *Hartman*, 11 F. Supp. 3d at 603). They capitalize on the fact that plaintiffs regularly worked from their homes, executed employment agreements which did not expressly require them to work from the East Meadow branch, and could come and go from the office independently. Defs.' Mem. at 9.

Two DOL regulations render defendants' arguments on this point unavailing. First, to count as outside sales work, telephone and Internet communications must be incidental to an employee's sales generated through personal visits to customers' homes and businesses, or through in-person appearances at real-estate closings, meetings with financial advisors and "other potential referral sources to develop borrower leads." *See* 29 C.F.R. § 541.502; DOL Wage & Hour Op. Ltr. No. FLSA2006-11. Therefore, defendants' appeals to time plaintiffs spent on the phone away from the East Meadow Branch are unpersuasive. Defs.' Mem. at 6. The record does not indicate plaintiffs were developing contacts made from personal calls but rather suggests a continuation of the same work they performed in the office. For example, what little work Rakeman and Schiele performed outside the East Meadow branch was in service of the leads generated from the advertising campaigns they ran at MLD. Pls.' 56.1 ¶ 24. Tollin,

who professed to generating some of his own leads, testified that his time outside the office was spent "follow[ing]-up on e-mail[s]" related to MLD-generated leads.  Tollin Tr. at 38:20–39:2; 46:24–47:5; *see also* Defs.' 56.1 ¶ 23.  Fenrich, who received MLD-generated leads and leveraged them to generate more leads, Fenrich Tr. at 42:23–43:7, testified that he answered emails for about an hour in the morning or evening "above and beyond" the time spent at the East Meadow branch.  *Id.* at 45:11–18.

Indeed, no plaintiff, with the exception of Blaney, came close to engaging in tasks while away from the office that would qualify as outside sales activities.  Even at that, the parties dispute the extent to which Blaney generated new business from contacts at the beach and country clubs he belonged to but, as plaintiffs point out, Blaney testified that only five percent of his time was spent working outside the MLD branch.  *See* Pls.' 56.1 ¶ 19.  Accordingly, defendants do not show Blaney was indisputably hunting down leads at these locations.  Moreover, upon direct questioning, no other plaintiff testified to ever having "[met] with clients, attend[ed] business meetings, closings or open houses." Pls.' Mem. at 18; *see*, *e.g.*, Fenrich Tr. at 43:8–44:12, 45:3–5.  Though Rakeman and Schiele relied on their advertising to generate new leads, they conducted this activity from the East Meadow office.  Schiele Tr. at 64:23–64:24.

The second DOL regulation is equally as damaging as the first. It provides that sales calls made from an employee's home do not constitute work "away from" the office.  Instead, "any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business."  *See* 29 C.F.R. § 541.502.  Based on this, plaintiffs argue, correctly, that their home offices may be considered part of MLD's places of business, such that they were not "engaged away from" the East Meadow branch when they spent the remainder of their working hours responding to phone calls

and emails from home.  Pls.' Mem. at 13 (citing *Kinney v. Artist & Brand Agency LLC*, 13-cv-8864 (LAK) (DF), 2015 WL 10714080, at *21 (S.D.N.Y. Nov. 25, 2015) (categorizing emails and calls made from a "home office" as part of employer's place of business)).  Plaintiffs did write emails and take calls while on the move, including during their commutes, at the gym, from restaurants or on vacation. *See, e.g.*, Rakeman Tr. at 98:25–99:5; 122:2–10; Schiele Tr. at 69:3–9, 71:13–72:6; Fenrich Tr. at; Tollin Tr. at 67:4–17, 101:9–20. These communications, however, occupied a minimal percent of their working days and, as discussed above, were not the type of work that qualifies as outside sales.  *Cf. Cangelosi v. Gabriel Bros., Inc*, 15-cv-3736 (JMF), 2015 WL 6107730, at *2 (S.D.N.Y. 2015) (finding employee who spent up to 50 percent of his time conducting sales at customers' places of business was outside salesperson); *see also Hartman*, 11 F. Supp. 3d at 603 (citing plaintiff's testimony that she spent 25 to 30 percent of the time outside of the office engaging in promotional work).  Accordingly, this is another factor weighing in plaintiffs' favor.

    iv.   <u>Classification and Suitability for Hourly Work</u>

      If an employee's work is ill-suited to an hourly wage and would be difficult to transfer to other employees after reaching a forty-hour cap, that employee is more likely to be exempt from FLSA requirements.  *See Torrenegra v. Grameen America, Inc.*, 15-cv-3153 (RER), 2017 WL 1401291, at *8 (E.D.N.Y. Apr. 19, 2017) (finding plaintiff whose daily hours varied based on events requiring him to work outside the office, and whose tasks could not be transferred easily, was not suitable for hourly pay); *Chenensky*, 2009 WL 4975237, at *5.  Though MLD paid plaintiffs on a commission, rather than hourly, basis, their schedules were seemingly uniform. Plaintiffs estimated that they worked approximately the same number of hours per day and week. Am. Compl. at 4–8.  Further, despite defendants' arguments to the contrary, plaintiffs' work was almost entirely performed from an established location—the East Meadow branch—allowing for

the tracking of hours plaintiffs worked there.  *Cf. Meza v. Intelligent Mexican Mktg.*, 720 F.3d 566, 581 (5th Cir. 2013) ("[B]ecause most of the [outside] salesman's work is performed away from the employer's place of business, the employer often has no way of knowing how many hours an outside salesman works.").  Moreover, plaintiffs' work could be transferred between employees, as evidenced by Rakeman's and Schiele's referrals of overflow transactions to other team members.  *See* Pls.' 56.1 ¶ 29.

Cutting the other way, that plaintiffs were paid, in very substantial part, on a commission basis, and on a scale dependent on who generated the loan, means their compensation does not easily lend itself to a wage-per-hour conversion.  *See* Rakeman Tr. at 92:13–17.  Moreover, plaintiffs received well above the minimum wage—Rakeman and Schiele were each compensated over $1 million in both 2014 and 2015, *see* Nardo Aff. Ex. J. at 2–3, 8–9—calling into question whether employees with such high earnings fall within FLSA's protective scope. *See Christopher*, 567 U.S. at 166 ("Petitioners . . . earn[ing] an average of more than $70,000 per year . . . are hardly the kind of employees the FLSA was intended to protect."); *see also Torrenegra*, 2017 WL 1401291, at *8 (weighing employee's compensation levels against suitability for hourly pay).  Nevertheless, an employee's relatively high salary is not dispositive of his coverage under FLSA.  *See Kadden*, 910 F. Supp. 2d at 538 ("[T]he binding regulations make clear that . . . a relatively high salary is [not] dispositive of the exemption determination.").  Because plaintiffs' suitability for hourly pay is a close call, especially in light of their consistent work schedules, this factor is for defendants, at best, neutral.

\* \* \*

In sum, viewing the evidence in its totality, defendants have not met their burden of establishing plaintiffs were outside sales employees under FLSA.  To the contrary, the record

evidence establishes that plaintiffs do not qualify as outside salespeople under FLSA regulations, as their primary duties did not fall within the letter or spirit of the exemption.  Rather than making sales by visiting customers at their homes and businesses, as the exemption envisions, plaintiffs made their sales during long hours spent at the office.  There being no genuine issue of material fact on this point, defendants' "outside salesman" affirmative defense fails.

B.    *Executive and Administrative Employee Exemptions*

Beyond and apart from the outside salesperson exemption, FLSA exempts "bona fide" administrative, executive and professional employees from its overtime and minimum wage protections.  29 U.S.C. § 213(a)(1).[7]  Here, the burden is on the employer to prove that employees are paid on a salary basis of at least $455 per week and that their primary duties fit within the statutory requirements.[8]  An administrative employee's primary duty is "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," which must require the "exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200.  Executive employees are engaged in the "management of the enterprise . . . or of a customarily recognized department or subdivision thereof," have supervisory roles and are involved in hiring and firing.  29 C.F.R. § 541.100(a).

---

[7] Defendants do not argue plaintiffs are professionals under the FLSA exemption, so the Court evaluates only the administrative and executive provisions.

[8] The $455 weekly salary requirement and the $100,000 annual compensation requirement for highly compensated employees, discussed below, were the rates in effect during plaintiffs' tenure at MLD.  *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 84 Fed. Reg. 51230 (Sept. 27, 2019) (codified at 29 C.F.R. § 541) (increasing the rates for the first time since 2004, to $684 per week in salary and $107,432 in annual compensation).  NYLL had a slightly higher weekly salary requirement for the administrative and executive exemptions during the period in question, increasing from $600 to $675.  *See* Notices of Adoption, N.Y. Dep't of Labor, 2013 N.Y. Reg. Text 339656(NS) (Dec. 11, 2013).

Because highly paid employees tend to "enjoy[] other benefits that 'se[t] them apart from the nonexempt workers entitled to overtime pay," *Christopher*, 567 U.S. at 166, their employers need only meet a truncated version of the administrative or executive exemption in order to obtain the defense.  High compensation is "a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties."  29 C.F.R. § 541.601.  An employee is considered "highly compensated" if he or she is paid $100,000 annually, including at least $455 per week on a salary or fee basis.  29 C.F.R. § 541.601.  When this is the case, an employer need only show the employee is "customarily and regularly" engaged in *any one* of the "exempt duties or responsibilities of an executive, administrative or professional employee," rather than all of them, to be exempt from FLSA's wage and overtime protections.  *Id.*

    i.   <u>Salary Basis</u>

The parties agree that plaintiffs earned over $100,000 per year during the relevant time period, except Delgado, who earned about $60,000 in 2015.  Nardo Aff. Ex. J at 10.  At issue is whether this compensation included a fixed salary, a point which, as here, can be outcome-determinative.  Employers, the law makes plain, cannot take advantage of FLSA's administrative or executive exemptions, even under the short-form highly compensated employee test, if they did not pay employees at least $455 per week on a salary basis.  *See* 29 C.F.R. §§ 541.100, 541.200, 541.601; *see also Anani v. CVS RX Services, Inc.*, 788 F. Supp. 2d 55, 61 (E.D.N.Y. 2011) (recognizing that salary requirement still needed to be met even if a highly paid employee was a "professional").  DOL regulations instruct an employee can qualify as being paid on a "salary basis" when that employee is paid, in whole or in part, "a predetermined amount . . . which is not subject to reduction because of variations in the quality or quantity of the work performed."  29 C.F.R. § 541.602.  Defendants admit plaintiffs were paid on a commission-only

basis until January 2015.  Defs.' Reply Mem., Dkt. 61, at 2.  As a consequence, defendants

cannot invoke FLSA's administrative or executive exemptions for that period despite the high

pay collected by these employees.

 The parties dispute whether plaintiffs were paid on a commission-only basis or, instead, a

commission-plus-salary basis from January 2015 through their termination.  Defendants note that

the "Notice of Pay and Acknowledgment Forms" signed by plaintiffs Rakeman, Schiele,

Delgado, Blaney and Fenrich include a handwritten note indicating plaintiffs are to receive a

fixed amount plus commission.  Defs.' Mem. at 14; Nardo Aff. Ex. M.  Rakeman's and Schiele's

compensation plans, dated January 1, 2015 and June 1, 2015, nine and three months prior to their

termination, respectively, provide that each will be paid a $4000 "salary" biweekly.  Reilly

Opp'n Aff. Exs. 18, 20.  Other plaintiffs similarly recount receiving fixed biweekly sums in

2015.  *See* Tollin Tr. at 82:4–83:2; Fenrich Tr. at 23:15–24:20; Blaney Tr. at 85:23–86:5.

Defendants argue this is indicative of a salary, such that plaintiffs received more than $455 per

week in the form of both salary and commission.  Defs.' Mem. at 14.  They press, therefore, that

the salary basis test is satisfied for this period.  *Id.*

 Striving to stand defendants' claim on its head, plaintiffs assert that any non-

commissioned payment they received was not a true salary, but a way of assuaging plaintiffs'

concerns about receiving the commissions they contend they were owed by MLD.  Pls.' Opp'n

Mem. at 21; *see also* Reilly Opp'n Aff. Ex. 13 (MLD employee list describing all plaintiffs

except Tollin as receiving commission-only compensation at the time of their termination).

Plaintiffs contend that the whole-number sums they received, even if on a regular basis, were

attempts by MLD to "chip away" at the commissions owed the loan officers.  *See* Schiele Tr. at

76:2–21, 107:14–108:11, 109:2–18; Fenrich Tr. at 23:15–24:20; Blaney Tr. at 85:23–86:5; Tollin

Tr. at 82:4–83:2.  Rakeman also testified as follows:

> Q: Then this [employment agreement, *see* Reilly Opp'n Aff. Ex. 18 at 4] also says
> that you will get a $4,000 salary biweekly. A: Yes, and again, salary, I believe that
> is to stay within banking regulations, but it was in, you know, reality it was a draw.
> Q: So you're saying that the document is incorrect to the extent that it's a salary?
> A: If—if by definition a salary is paying me something irregardless of what I close
> and is not against my commission, yes.  Then, yes, the document is incorrect.

Rakeman Tr. at 152:19–153:8.  Plaintiffs argue that, at the least, this disagreement creates a

triable issue of fact as to whether plaintiffs were paid on a salary basis after January 2015.

Viewed in the light most favorable to the non-moving party, as to that latter observation,

plaintiffs are correct.  There appears a genuine issue of material fact as to whether what

defendants have characterized as a salary amounts to a payment guaranteed irrespective of work

product, as required under 29 C.F.R. § 541.602.  Further, defendants have not supplied an

employment agreement or Notice of Pay Rate and Acknowledgement Form for Tollin.

Consequently, as their status is in limbo with this foundational element in dispute, summary

judgment is not warranted on defendants' claimed administrative and executive exemptions.

The inquiry, however, does not end there.  Apart from the "salary basis" test, invocation

of the highly compensated employee affirmative defense obligates the employer to make a

showing that plaintiffs "customarily and regularly" performed one of the exempt duties or

responsibilities of an "administrative" or "executive" employee.  29 C.F.R. § 541.601(c).  It is

widely accepted that "'customarily and regularly' is not a majority of the time test." *Hartman*,

11 F. Supp. 3d at 603.  Duties are performed "customarily and regularly" with a frequency

"greater than occasional but which . . . may be less than constant."  29 C.F.R. § 541.701.

Although the two categories of exempt duties share certain qualities, the administrative and

executive exemptions must be addressed in turn because they "require the employer to show [ ]

different facts regarding an employee's work." *Paganas v. Total Maintenance Solution, LLC*,

726 F. App'x 851, 855 (2d Cir. 2018).

    ii.   <u>Administrative Capacity</u>

    Work performed in an "administrative capacity" consists of (1) "office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (2) work involving "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(2)–(3). For highly compensated employees, employers need only show employees are customarily and regularly engaged in one of these two administrative responsibilities to claim the exemption. 29 C.F.R. § 541.601(c); *see also Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 478 (S.D.N.Y. 2008). This short-form test applies to all plaintiffs but Delgado, who was not paid $100,000 per year. Nardo Aff. Ex. J at 10. To assert the defense that Delgado was exempt from FLSA coverage, then, defendants must show he was employed in a "bona fide administrative capacity," such that his primary duties involved *both* administrative responsibilities. 29 C.F.R. § 541.200.

    The first administrative duty covered by the statute requires that employees' tasks center on the "management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). This exempts "employees performing general administrative work applicable to the running of any business," including customers' businesses, but not employees "directly producing the good or service that is the primary output of a business." *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2d Cir. 2009). Plaintiffs were not customarily and regularly engaged in managing MLD's business and operations. The record is clear that plaintiffs' primary duties consisted of "merely [selling] financial products," rather than helping run MLD. *Davis*, 587 F.3d at 533. MLD is in the mortgage loan business; plaintiffs sold mortgage loans for MLD. In doing so, they "directly produc[ed] the good or

service that is the primary output" of MLD. *Id.* at 535; *see also* U.S. Dep't of Labor, Wage & Hour Div., Administrator's Interpretation 2010-1 (Mar. 24, 2010) (distinguishing nonexempt work "related to the goods and services which constitute the business' marketplace offerings" from exempt work "which 'contributes to running the business itself'") (quoting *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002)).

Employees can also qualify for this part of the administrative exemption if they advise an employer's customers on managing and operating their businesses. U.S. Dep't of Labor, Wage & Hour Div., Administrator's Interpretation 2010-1. Yet mortgage loan officers who sell mortgages to individual homeowners, helping them select from available options, do not meet this test either because "homeowners do not have management or general business operations." *Id.* While plaintiffs did advise MLD's customers on loan options, those customers were homeowners seeking mortgages to renovate their homes, fund their children's education and fill other personal financial needs. *See* Pls.' 56.1 ¶¶ 34–42. Plaintiffs did not perform management and operations work, then, for either MLD's business or customers' businesses. Consequently, defendants have not met their burden of showing plaintiffs had this type of administrative responsibility.

The second exempt administrative duty involves "the exercise of discretion and independent judgment with respect to matters of significance" to the employer's business. 29 C.F.R. § 541.200(a)(3). An employee exercises discretion and independent judgment by engaging in the "comparison and the evaluation of possible courses of conduct" and acting accordingly. *Id.* § 541.202(a). Administrative employees generally have the "authority to make an independent choice, free from immediate direction or supervision." *Id.* § 541.202(c). "The term 'matters of significance' refers to the level of importance or consequence of the work

performed." *Id.* § 541.202(a).

Seeing a more harmonious fit with their perception of their business operations, this is the exempt duty defendants rely on, arguing plaintiffs "were required to exercise independent discretion and judgment" in their interactions with borrowers, including by recommending particular loans based on customers' financial needs. Defs.' Mem. at 13. They are content in their understanding that satisfying only this prong of the administrative exemption would be sufficient under the short-form highly compensated employee test. Drilling deep, this exemption is controlled by statutory and regulatory provisions, which focus on whether employees exercise their independent discretion and judgment with respect to their employer's internal business operations. DOL offers ten factors to consider in making this determination, every one of which is management-focused. 29 C.F.R. § 541.202(b) (including whether the employee "has authority to formulate, affect, interpret, or implement management policies or operating practices," can "waive or deviate from established policies and procedures without prior approval," "provides consultation or expert advice to management," "investigates and resolves matters of significance on behalf of management," or "represents the company in handling complaints, arbitrating disputes or resolving grievances").

All in all, at any rate, there is little dispute as to what loan officers like plaintiffs were authorized to do at MLD. More specifically, there is no question that their work required the exercise of discretion, but, it is also clear, that plaintiffs applied their discretion and independent judgment to their own sales transactions and not to MLD's operations. For example, they exercised discretion in helping customers select loans, advertising to generate leads and occasionally transferring loans to other mortgage loan officers when they got too busy. *See* Pls.' 56.1 ¶ 28–29, 34–42. It is not disputed, furthermore, that they lacked the authority to determine

whether MLD would process loans, set clients' interest rates, or decide which clients were financially eligible for loans.  Brooks Tr. at 55:19–23, 67:14–20; Reilly Opp'n Aff. Ex. 4 ("John Veracka Tr."), at 43:24–44:9; *see also Wong v. HSBC Mortg. Corp.*, 749 F. Supp. 2d 1009, 1018 (N.D. Cal. 2010) (finding mortgage loan officers did not exercise the statutorily required discretion and independent judgment because they "'take mortgage applications and sell mortgages.  They don't process.  They don't underwrite.  They don't close loans.'").  Here, of equal, if not greater, importance, plaintiffs did not set company-wide policy or goals.  As such, plaintiffs were not involved in the sort of high-level management decisions this part of the administrative exemption envisions.  *See, e.g.*, *In re Novartis Wage & Hour Litig.*, 611 F.3d 141, 156 (2d Cir. 2010) (finding plaintiffs did not qualify for the administrative exemption despite discretion allowed in their daily work, given lack of involvement in management policies, practices and goals); *see also* 29 C.F.R. § 541.203(b) ("[A]n employee whose primary duty is selling financial products does not qualify for the administrative exemption.").

Because there is no genuine dispute that plaintiffs are not customarily and regularly engaged in either type of administrative duty, defendants' administrative employee affirmative defense fails.

iii.   Executive Capacity

Defendants argue, alternatively, that Rakeman and Schiele were employed in executive capacities, exempting them from FLSA's wage and overtime coverage pursuant to 29 U.S.C. § 213(a).  Defs.' Mem. at 13.  An "executive" employee is any employee whose primary duties consist of:

> management of the enterprise . . . or of a customarily recognized department or subdivision thereof; who customarily and regularly directs the work of two or more other employees; and who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion . . . of other employees are given particular weight.

29 C.F.R. § 541.100(a)(2)–(4).  For a highly compensated employee to qualify for this

exemption, he need only "customarily and regularly" engage in one executive duty, such as

directing the work of at least two other employees.  29 C.F.R. § 541.601(c).  Indicative of

executive duties are an employee's responsibility over a defined group of people, the

responsibility to evaluate their work and "making promotion recommendations" to higher-ups.

*Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 564 (2d Cir. 2012).

There remains a genuine dispute of material fact as to whether Rakeman and Schiele

customarily and regularly engaged in executive duties.  Defendants first argue that Rakeman and

Schiele directed the work of at least two other employees, but the record reflects evidence that

could lead a finder of fact to decide in either direction.  For example, defendants offer that

Rakeman and Schiele delegated excess loans to other loan officers.  Defs.' Mem. at 11, 14.

Further, Rakeman and Schiele used personal funds to hire MLD employees to assist with their

radio advertising campaigns.  *See* Schiele Tr. at 114:24–115:15.  They issued Form 1099s from

their individual corporations to Tollin, among other employees, in 2015—the period in

controversy.  Nardo Aff. Ex. L. at 4, 5, 10, 13, 14, 17, 18, 21; *see also* Tollin Tr. at 95:4–96:2;

Rakeman Tr. at 162:10–21; Schiele Tr. at 115:3–15.  Rakeman and Schiele commenced four or

five such advertising campaigns.  Rakeman Tr. at 88:15–17.

On the other hand, plaintiffs claim Rakeman and Schiele only passed along leads "on the

rare occasion" when they were overloaded.  Pls.' 56.1 ¶ 29.  Transferring work without further

managerial involvement is not an exempt executive task, and there is no evidence that Rakeman

and Schiele exercised oversight after delegating.  *See Baldor Specialty Foods, Inc.*, 687 F.3d at

564 ("The purpose of the FLSA's 'bona fide executive' exemption is to distinguish managerial

employees from non-managerial employees.").  Plaintiffs also contest the significance of

Rakeman's and Schiele's advertising campaigns.  *Id*. ¶ 28.  They contend that MLD would advance funding from its corporate account, which Rakeman and Schiele would repay.  *Id.* Given the genuine factual dispute as to whether Rakeman and Schiele customarily and regularly directed the work of at least two other employees, the Court reserves resolution of this issue for the jury.

Defendants push their argument further, suggesting that Rakeman and Schiele meet another part of the executive duty exemption: "management of the enterprise" or "a customarily recognized department or subdivision thereof."  *See* Defs.' Mem. at 13–14; 29 C.F.R. § 541.100(a).  Yet a genuine factual dispute persists as to this argument as well.  For example, while defendants make much of the fact that some employees wrote "Mike and Brian" or "M&B," referring to Rakeman and Schiele, on their timesheets, Rakeman and Schiele testified that they were unaware of this practice and exercised no control over those employees.  Pls.' 56.1 ¶ 26.  Plaintiffs further contend that Rakeman and Schiele did not engage in managerial duties, supervise employees or have authority to hire or fire employees.  Pls.' 56.1 ¶ 43.  Overall, then, without undisputed facts showing that Rakeman and Schiele customarily and regularly engaged in an exempt executive duty, the Court denies summary judgment for defendants on their executive employee affirmative defense.

II.     Unpaid Commissions

The parties also disagree as to whether defendants have paid plaintiffs all the commissions they are owed.  Plaintiffs claim MLD owes them hundreds of thousands of dollars in unpaid commissions, in violation of NYLL and plaintiffs' employment agreements, and seek liquidated damages.  Pls.' Opp'n Mem. at 27.  Defendants dismiss this claim as purely speculative and claim they fully paid plaintiffs' commissions.  Defs.' Mem. at 16.

NYLL § 191 provides that a "commission salesperson shall be paid the . . . commissions

and all other monies earned or payable in accordance with the agreed terms of employment, but not less frequently than once in each month and not later than the last day of the month following the month in which they are earned."  N.Y. Lab. Law §§ 191(1)(c).  Unlike FLSA, NYLL entitles a successful plaintiff to recover "the full amount of wages owed, not just the statutory minimum wage for the hours worked."  *Chun Jie Yin v. Kim*, 07-cv-1236 (DLI) (JO), 2008 WL 906736, at \*4 (E.D.N.Y. Apr. 1, 2008); *see also Arbeeny v. Kennedy Exec. Search, Inc.*, 71 A.D.3d 177, 182, 893 N.Y.S.2d 39, 43 (1st Dep't 2010) (New York's "long-standing policy against the forfeiture of earned wages . . . applies to earned, uncollected commissions as well.").

It goes without saying that there are many avenues to secure payment for work performed to another party's benefit.  That has been true from the earliest days of equity, when it recognized the ancient remedy of quantum meruit.  The question presented here is whether the record supports, as defendants claim, the closure of all avenues to recovery entitling them to summary judgment.  Plaintiffs supply detailed charts from Rakeman and Schiele that they allege show over $1.5 million in unpaid commissions, generated by comparing those plaintiffs' annual earnings to lists of loans they sold.  *See* Reilly Opp'n Aff. Exs. 25, 26.  Other plaintiffs lack similar documentation, but testified that they are owed commissions.  *See, e.g.*, Fenrich Tr. at 34:4–35:21; Tollin Tr. at 72:15–73:2.  Managers at the East Meadow branch also testified to plaintiffs' unpaid commissions.  *See* John Veracka Tr. at 20:16–21; Brooks Tr. at 40:21–41:15; Denise Veracka Tr. at 48:19–50:5.  Defendants supply plaintiffs' W-2s but provide no documentation as to loans closed, commissions earned on those loans and whether all those commissions were paid.  Nardo Aff. Ex. J.  Plainly, and contrary to defendants' contention, the avenues for the relief sought by plaintiffs remain wide open. There is a genuine dispute of material fact.  Summary judgment as sought by defendants is unwarranted on this point.

III.  Individual Employer Liability Under FLSA

Defendants next argue Dear is not plaintiffs' employer, so should be relieved of liability from their FLSA and NYLL claims.[9]  A corporate officer with "operational control" is an employer under FLSA, such that he may be held jointly and severally liable with the corporation itself for unpaid wages.  *Irizarry v. Catsimatidis*, 722 F.3d 99, 109 (2d Cir. 2013).  An officer's capacity as decisionmaker on behalf of the business generally will not suffice.  Instead, he must have operational control with respect to a plaintiff's employment, as determined by assessing the "economic reality" of that employer-employee relationship.  *Id.*  Factors to consider include whether the officer "(1) had the power to fire and hire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984).  No single factor is determinative, as "the economic reality test encompasses the totality of the circumstances."  *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).  The pivotal question is not one of formality, but of function.  *See Irizarry*, 722 F.3d at 109.

Quite simply, the record fails to support plaintiffs' claim that Dear was their employer. According to Dear's testimony, he neither supervised nor controlled plaintiffs' work schedules or conditions of employment, nor did he determine plaintiffs' rate and method of payment.  Defs.' Mem. at 18; *see also* Dear Tr. at 30:4–17, 41:18–42:11.  Tellingly, Dear stated he had only been

---

[9] Here too, the analysis under FLSA and NYLL is the same.  "Courts have interpreted the definition of 'employer' under [] NYLL coextensively with the definition used by the FLSA," *Fermin v. Las Delicias Peruanas Rest.*, 93 F. Supp. 3d 19, 37 (E.D.N.Y. 2015); *see also Apple v. Atlantic Yards Dev. Co., LLC*, 11-cv-5550 (JG), 2014 WL 5450030, at *6 n.4 (E.D.N.Y. 2014) (omitting a separate analysis under NYLL because its definitions are "nearly identical to the FLSA's" and courts apply the economic reality test equally to determine an employer's status under FLSA and NYLL).

to the East Meadow location once.  Dear Tr. at 30:12–14.  Dear also testified that he was not

personally involved with MLD employees' compensation plans.  *Id*. at 28:11–19.  And, although

his signature appeared on plaintiffs' paychecks, he testified it was preprinted and he never saw

any of plaintiffs' paychecks, *id.* at 32:23–33:6, 37:16–22, although he gave the company-wide

payroll his "stamp of approval" every two weeks, Zilberman Tr. at 149:2–15.  Defendants also

contend that Dear's signature appeared on many company documents, including employment

agreements, merely by virtue of his position as CEO, which does not support a finding of

operational control.  *See* Dear Tr. at 41:14–42:11.  Defendants add that nothing in the record

supports a finding that Dear maintained employment records.  Defs.' Mem. at 18.

Plaintiffs do scrap back with bits and pieces connecting Dear to MLD operations.  For

instance, they correctly note that Dear had the authority to hire and fire employees.  *See*

Zilberman Tr. at 161:11–15.  However, mere hiring and firing power is not dispositive of

operational control.  *See Irizarry*, 722 F.3d at 109 ("Evidence that an individual is an owner or

officer of a company, or otherwise makes corporate decisions that have nothing to do with an

employee's function, is insufficient to demonstrate 'employer' status.").  Rather, in order to stave

off summary judgment, plaintiffs must supply specific evidence in the record indicating that

Dear exercised actual control over MLD's East Meadow branch, which they have not done.  *See*

*Perez v. Sanford-Orlando Kennel Club, Inc.*, 515. F. 3d 1150, 1161 (11th Cir. 2008) (where an

employer "could have played a greater role in the day-to-day operations of the facility if he had

desired, . . . unexercised authority is insufficient to establish liability as an employer.").

Considering the totality of the circumstances established on this record, it is incontestable that

Dear did not exercise sufficient control over plaintiffs' employment to be considered an

"employer" under FLSA.  In sum, defendants having established their entitlement to summary

judgment on this issue, plaintiffs were obligated to put forward evidence sufficient to show that there is a genuine issue for trial.  They have not. Consequently, summary judgment is granted for defendants as to Dear's liability, and all claims against him personally are dismissed.

Conclusion

In line with the reasons set forth above, defendants' motion for summary judgment is denied with respect to the FLSA employee exemption defenses.  Searching the record, the Court finds that plaintiffs are not, as a matter of law, exempt administrative employees and, given the genuine dispute of material fact, denies summary judgment as to defendants' executive employee affirmative defense.  Summary judgment is denied as to plaintiffs' unpaid commissions claim, and is granted as to defendant Lawrence Dear's individual liability, and all claims against him are dismissed.  Additionally, while defendants moved for summary judgment on all claims, they failed to address plaintiffs' claims that defendants breached their employment contracts and did not provide accurate wage notices and statements as required under NYLL § 195.  Summary judgment is therefore denied on those claims as well.

So Ordered.

Dated:   Brooklyn, New York
            December 18, 2020

                                        /s/ Eric N. Vitaliano
                                        ERIC N. VITALIANO
                                        United States District Judge